**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
IN ADMIRALTY AND AT LAW**

|  |  |
|---|---|
| CARRI A. LOPEZ-MULVANEY, individually and as Personal Representative of the ESTATE OF RANDALL C. MULVANEY, and CONNOR MULVANEY, *et al.* | No. 23-cv-00789 |
| Plaintiffs, | Judge James D. Peterson |
| v. | Judge Anita M. Boor, Magistrate |
| FRASER SHIPYARDS, LLC, *et al.* |  |
| Defendants. |  |

**DEFENDANTS' OMNIBUS MOTIONS IN LIMINE AND BRIEF IN SUPPORT**

Defendants, Fraser Shipyards LLC and Travelers Property Casualty Company of America (together, "Fraser") respectfully moves *in limine* to exclude reference, argument, evidence, or any testimony at trial regarding the following issues. In support of its Motion, Fraser submits the following Brief in Support of its Motions *in Limine* Nos. 1 to 14.

## I.    MIL #1 – To Bar Mental Anguish and Grief Evidence and Damages.

Plaintiff Carri Lopez-Mulvaney pleads that she "suffered and continues to suffer a loss of consortium, support, love, care, affection, companionship, and other pleasures of their respective marital relationship." ECF 67, ¶26. Plaintiff Connor Mulvaney similarly pleads that he suffered "loss of society, companionship, support, love, affection, care, and other services relating to their respective parent-child relationship." *Id.*, ¶27. Notwithstanding their allegations, Plaintiffs are expected to call Lori Unger, NP ("Nurse Unger") as a non-specially retained expert witness in discovery to testify that Mrs. Lopez-Mulvaney, among other things, suffered from anxiety, depression, bereavement, and other psychological ailments as a result of Randy Mulvaney's death.

1

The U.S. Supreme Court has expressly excluded damages for mental anguish or grief, holding that they are "not compensable under the maritime wrongful-death remedy." *Sea-Land Servs. v. Gaudet,* 414 U.S. 573, 585 n.17, 94 S. Ct. 806, 815 (1974) ("Loss of society must not be confused with mental anguish or grief, which is not compensable under the maritime wrongful-death remedy. The former entails the loss of positive benefits, while the latter represents an emotional response to the wrongful death."). Plaintiffs thus must be barred from referencing, arguing, eliciting testimony, or introducing any type of evidence that either Mrs. Lopez-Mulvaney or Connor Mulvaney suffered mental anguish, grief, sorrow, or any type of medical condition as a result of Randall Mulvaney's death.

## II.    MIL #2 – To Exclude Evidence of OSHA Citations, Penalties, and the OSHA Director's Findings Letter.

### A.    Background.

Following the December 5, 2022 incident at issue in this case, OSHA conducted an investigation and ultimately issued two separate citations on May 16, 2023, both alleging violations of 29 C.F.R. § 1915.73(d). OSHA cited C&L Contracting, the decedent's direct employer, in Inspection No. 1637285, alleging that C&L "exposed employees to falls of approximately 41 feet, 8 inches from the starboard side deck to the floor of the drydock *while performing painting related tasks* near a gap in the guardrail approximately 48 inches wide." OSHA proposed a penalty of $5,625 against C&L. **Exhibit A** (MULVANEY 618 – 630) Separately, OSHA cited Fraser in Inspection No. 1638290, alleging that Fraser "exposed employees to falls of approximately 41 feet, 8 inches from the starboard side deck to the floor of the drydock *while performing rudder maintenance tasks* near a gap in the guardrail approximately 48 inches wide." **Exhibit B** (MULVANEY 631-638). OSHA proposed a penalty of $15,469 against Fraser.

On May 25, 2023, OSHA Area Director Mitzy Ruth Wright sent a letter to Plaintiff Carri Lopez-Mulvaney that combined a personal expression of sympathy ("I would like to express to you my deepest sympathy") with a summary of OSHA's conclusions ("OSHA's inspection determined that the deck of the vessel had an unguarded section of the edge") and enclosed the C&L Citation. **Ex. A**.

Neither citation was the subject of an evidentiary hearing before the Occupational Safety and Health Review Commission ("OSHRC"). Neither citation was the subject of any judicial review. The conclusions reflected in each citation are accordingly the unilateral, unreviewed product of one of OSHA's field office and its representative(s).

### B.      Argument.

#### 1.      OSHA Citations, Penalties, and the Findings Letter are Irrelevant.

Rules 401 and 402 of the Federal Rules of Evidence govern the admissibility of relevant evidence. Rule 401 provides that "[e]vidence is relevant if: (a) it has tendency to make a fact more or less probable than it would be without evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.  Rule 402 provides that irrelevant evidence is inadmissible unless the U.S. Constitution, federal statutes, or court rules make it admissible.

Here, the OSHA citations, penalties, and findings are irrelevant to any issue to be tried. The standard of care applicable to Fraser is one of ordinary care under the circumstances. *Parfait v. Swiftships, LLC*, 747 F.Supp.3d 931, 937 (E.D. La. 2024) (citing *Great Lakes Dredge & Dock Co. LLC v. La. State*, 624 F.3d 201, 211 (5th Cir. 2010).  OSHA's uncontested determination that Fraser and C&L violated certain OSHA regulations do not inform the jury of the proper standard of care and are irrelevant to the issues to be tried and should be excluded.

**2.    Even if relevant, the OSHA Citations, Penalties and Findings Letter are prejudicial and confusing and should be excluded.**

Under Federal Rule of Evidence 403, relevant evidence must be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. The OSHA citation against Fraser, the proposed $15,469 penalty, the C&L citation, and OSHA's findings each fail this test. This Court squarely addressed the admissibility of OSHA citations in a maritime negligence action involving Fraser Shipyards and concluded that they should be excluded in their entirety. In *Holder v. Interlake S.S. Co.*, No. 16-cv-343-wmc, 2018 U.S. Dist. LEXIS 60496 (W.D. Wis. Apr. 10, 2018), a shipyard worker brought negligence claims against the vessel owner (Interlake) and a project consultant (Capstan) for lead exposure during the repowering of the M/V *Herbert C. Jackson* at Fraser's Superior, Wisconsin facility. OSHA had cited Fraser—but not the other defendants—for violations including lead-related hazards. *Id.* at *26–31. The plaintiff moved to bar evidence of the Fraser citations, and co-defendant Capstan moved to exclude both the citations and their substance entirely. *Id.* Judge Conley granted both motions, holding:

> [T]he OSHA citations and the underlying statements in support are no more than an indictment, which Fraser was free to dispute, but chose instead to compromise. At no point did OSHA reach *any* final factual findings in its investigation . . . , and there is a substantial risk of misleading the jury, confusing issues, and potential prejudice if *any* party were allowed to introduce the OSHA citations or their underlying bases in this case.

*Id.* at *31–32 (emphasis in original). The court accordingly ordered that "no party shall be allowed to reference, or offer into evidence, evidence of any OSHA investigation, citations or underlying substance." *Id.* at *32. The same rationale here applies as to the citations, penalties, and findings letter which should be barred from evidence entirely.

**3.    The Citation, Penalties, and Findings Letter are inadmissible hearsay.**

4

If offered for the truth of OSHA's statements—that Fraser or C&L exposed employees to a fall hazard, that the regulation applied, and that the violation was "Serious"—the citations are inadmissible hearsay. Fed. R. Evid. 801(c). Plaintiffs may invoke the public records exception, Federal Rule of Evidence 803(8)(A)(iii), but the exception does not apply here, as the *Holder* court held in materially identical circumstances. To start, the OSHA documents do not contain any true "factual findings." The closest finding comes from the Area Director's letter to Mrs. Mulvaney in which she states "OSHA's inspection determined that the deck of the vessel had an unguard section of the edge and there were no other forms of fall protection provided to prevent a fall through the opening." **Ex. A.**  This statement is not contained in any actual OSHA "report" and does nothing to describe the investigation OSHA undertook or how the Area Director arrived at her conclusion. It accordingly does not meet the requirement under Rule 803(c) that a factual finding be laid out in a report that is based on a factual investigation.  *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988).  Moreover, the citations themselves contain legal conclusions that C&L and/or Fraser "violated" regulations or were the "employer" within the meaning of 29 U.S.C. §654(a). which are inadmissible under Rule 803(c).  *See Hines v. Brandon Steel Decks, Inc.*, 886 F.2d 299, 302 (11th Cir. 1989) ("Rule 803(8)(C) does not provide for the admissibility of legal conclusions contained within an otherwise admissible public report.").

Second, the OSHA documents—in particular, the Findings Letter—are untrustworthy and thus inadmissible. Fed. R. Evid. 803(c)(8)(B).  Factors for consideration of trustworthiness include the timeliness of investigation, the special skill or experience of the official, whether a hearing was held and the level at which it was conducted, and possible motivations problems suggested. Fed. R. Evid. 803, 1972 Advisory Committee Notes; *see also Beech Aircraft Corp.*, 488 U.S. at 167. The Area Director's expressions of sympathy to Mrs. Lopez-Mulvaney include going so far as to

5

state that OSHA recognizes "no amount of money or compensation can measure the loss you and your family have suffered, and your lives have been changed forever because of this tragedy." The expression of sympathy, alone, calls into question OSHA's motivations for issue citations and penalties, is highly prejudicial, and not a function of OSHA's granted regulatory authority. The OSHA citation, penalties, and findings letter are thus inherently untrustworthy and should be excluded.

OSHA's investigation was also clearly tainted and inadequate as it found that "there were no other forms of fall protection provided to prevent a fall through the opening." **Ex. B.** Every single C&L worker deposed in this matter unequivocally testified that C&L workers are provided with personal fall arrest systems upon hire and had them on site at Fraser's shipyard. C&L had its own "box" at Fraser's shipyard with additional PFAS and other personal protective equipment for its workers. The fact that OSHA nonetheless found that no fall protection was *provided* to C&L workers calls into doubt the seriousness and competency of their investigation and makes the OSHA documentation untrustworthy for purposes of Rule 803(c)(8). It should be excluded.

### III.    MIL #3 – To Bar Argument and Evidence that OSHA Standards Applied to Fraser or Set the Standard of Care.

As discussed above, OSHA cited C&L and Fraser after the December 5, 2022 incident. OSHA's citations as to C&L was due to alleged violations of 29 C.F.R. § 1915.73(d) because C&L "exposed employees to falls of approximately 41 feet, 8 inches from the starboard side deck to the floor of the drydock *while performing painting related tasks* near a gap in the guardrail approximately 48 inches wide." **Ex. A.** Fraser received a similar citation for allegedly exposing its own employees while they were performing "rudder maintenance" on the *Integrity*. **Ex B.**

Reference to OSHA standards should be barred from this trial entirely. "The responsibility for compliance with the regulations of the [OSHA regulations for Shipyard Employment] is placed

on 'employers.'" 29 C.F.R. § 1915.3.  An employer defined as "an employer, *any of whose employees are employed*, in whole or in part, in ship repairing, shipbuilding, shipbreaking or related employments as defined in this section on the navigable waters of the United States, including dry docks, graving docks and marine railways." 29 C.F.R. § 1915.4 (emphasis added). The Seventh Circuit recognized in *Elberg v. Mobil Corp.* that "OSHA regulations … impose a duty on the employer (Nicor)" but, "nevertheless, the imposition of that duty on the employer does not relieve" other entities from duties they otherwise have under law.  In *Elberg*, the other entities were vessel owners who were not the employer of the injured stevedore-plaintiff.  In this case, Fraser is simply the shipyard owner who did not employ Randall Mulvaney and thus was not his "employer" under OSHA standards.  The duty to affix guardrails on the purported unguarded edge rested with C&L, not Fraser.  Plaintiffs should not be able to argue or introduce evidence that OSHA standards applied to Fraser to protect or prevent injury to C&L's workers, as the responsibility for OSHA compliance fell to the respective employers of their different workforces. Allowing Plaintiff to argue that OSHA standards applied to Fraser as to C&L's workers is thus irrelevant, unduly prejudicial, and will only confuse the jury on C&L and Fraser's respective duties.  OSHA standards should thus be barred from evidence, including testimony from the parties' experts.

IV.    **MIL #5 – To Bar Reference and Testimony regarding OSHA's Multi-Employer Citation Policy.**

OSHA's Multi-Employer Citation Policy (the "MEP") is irrelevant, prejudicial, and confusing and should be barred from evidence at trial.  The MEP is a 1999 directive from OSHA clarifying its policy in enforcement actions involving multi-employer construction work sites. Occupational Safety and Health Administration, U.S. Department of Labor, *Multi-Employer*

7

*Citation Policy*, CPL 2-0.124 (1999)[1]; see also *Solis v. Summit Contrs., Inc.*, 558 F.3d 815, 819 (8th Cir. 2009) (OSHA published the MEP in conjunction with promulgating 29 CFR §1910.12(a), which apply to "every employment and place of employment of every employee engaged in construction work"). "In that directive, OSHA clarified the steps to determine whether an employer on a multi-employer work site incurred obligations as a 'creating,' 'exposing,' 'correcting,' or 'controlling' employer." *United States v. MYR Group, Inc.*, 2001 U.S. Dist. LEXIS 7401, \*14 (N.D. Ill. May 1, 2003). OSHA's directive defines a "controlling employer" as one "who has general supervisory authority over the worksite, including the power to correct safety and health violations itself or require others to correct them." *Multi-Employer Citation Policy*, CPL 2-0.124 at (X)(E)(1). A "creating employer" is the "employer that caused a hazardous condition that violates OSHA standards." *Id.* at (X)(B)(1). An "exposing employer" is one "whose own employees are exposed to the hazard." *Id.* at (X)(C)(1). A "correcting employer" is one "who is engaged in a common undertaking, on the same worksite, as the exposing employer and is responsible for correcting a hazard." *Id.* at (X)(D)(1).

Plaintiffs here intend to call Kenneth M. Smith, Jr., P.E., as an expert witness to offer opinions including that "Fraser was the correcting entity and failed to take proper actions to eliminate the hazard created by the gap, as required by the plain language of the contact with the owners." **Exhibit C** (Smith Report). Reference to the "correcting" entity and the other labels (controlling, exposing, creating) found in the MEP are irrelevant, prejudicial, confusing, and should be barred from trial. The Seventh Circuit has recognized this in *Aguirre v. Turner Constr. Co.*: "The only effect of putting the OSHA policy statement before the jury would have been to

---

[1] Available at https://www.osha.gov/enforcement/directives/cpl-02-00-124 (last accessed February 22, 2025).

confuse it about the significance of 'control' by pasting the label 'controlling employer' on the defendant. *Aguirre v. Turner Constr. Co.*, 582 F.3d 808, 815 (7th Cir. 2009).

Plaintiffs attempt to do the same here by calling Fraser the "correcting" employer in an effort to confuse the jury into believing Fraser had some duty to "correct" the opening in the guardrail.  The applicable standard, however, is one of ordinary care under the circumstances. OSHA's internal citation policy and drummed up labels as to what role each entity plays on a worksite is irrelevant, prejudicial, and confusing. The parties and their experts should be barred from referencing or eliciting any testimony regarding the OSHA MEP, including by referring to either C&L or Fraser as the "controlling," "creating," "exposing," or "correcting" employer.

## V.      MIL #5 – To Exclude Fraser's Contract with Vessel Defendants and Bar Testimony on Legal Conclusions and Interpretations of Contracts.

Plaintiffs are expected to offer testimony and evidence that Fraser's contract with the Vessel Defendants (Andrie and Holcim) imposed some duty upon Fraser beyond ordinary care under the circumstances.  In particular, the contract between Fraser, Andrie, and Holcim – to which C&L was not a party – states:

> [Fraser] is solely responsible for the safety of its workers, subcontractors, Owner's Representative, and outside contractors. All work shall be performed in accordance with the best standard safety precautions, including, but not limited to, federal and state laws and regulations, city ordinances and regulations and union safety rules. Safety measures shall include, but are not limited to, roping or covering openings in the deck, posting or warning signs, cleaning up oil spilled on the deck or walkers, erecting safety lines at the edge of the deck, etc.

**Exhibit D**.  Plaintiffs are likely to attempt to utilize this language to argue to the jury that Fraser had some type of duty to provide a safe work place or other heightened duty to protect C&L's workers, including Mulvaney.

9

First, the contract (Exhibit D) should be excluded from evidence entirely. Andrie and Holcim are no longer parties to the case and thus whatever agreement and terms governed Fraser's Andrie's and Holcim's relationship are irrelevant, prejudicial and confusing. Mulvaney's employer, C&L, was not a party to the Fraser-Andrie-Holcim contract or beneficiary thereof and thus its terms are irrelevant to the case. The jury should only hear evidence of Fraser and C&L's relationship and the work Mulvaney was performing pursuant to the companies' agreement.

Second, even if the contract is allowed into evidence, the parties' witnesses and experts should be barred from offering any type of legal conclusion or testimony interpreting its meaning. By way of example, Plaintiffs' engineering expert, Kenneth Smith, Jr. intends to offer opinions that:

6. Normally a contract exists between a shipyard and contractors hired by the shipyard makes clear the responsibilities of the parties with respect to indemnification, communications, mitigation, and correction of safety hazards and deficiencies. No such contract was produced in response to requests for appropriate documents.

7. According to the contract between the owners (Holcim and Andrie) and Fraser, Fraser assumed responsibility for correction of safety deficiencies, specifically including protecting gaps in guardrails. Fraser failed to properly perform that responsibility. Had Fraser properly identified and corrected the hazard caused by the gap in the guardrail on *Integrity*, the accident would have been prevented.

**Ex. D**, p. 24, 7. These are legal conclusions and improper expert testimony on what "standard" terms are normally found in contracts. *RLJCS Enterprises, Inc. v. Professional Benefit Trust Multiple Employer Welfare Benefit Plan & Trust*, 487 F.3d 494, 498 (7th Cir. 2007) ("Argument about the meaning of … contracts … belongs in briefs, not in 'experts' reports'"); *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 330 (N.D. Ill. 2008) ("expert testimony that contains a legal conclusion that determines the outcome of a case is inadmissible"); *Apotex Corp. v. Merck & Co., Inc.*, 2006 U.S. Dist. LEXIS 28855, 2006 WL 1155954, at *8 (N.D. Ill. Apr. 25, 2006) (excluding

10

expert testimony that consisted of "plainly inadmissible legal conclusions" that "would be completely unhelpful to the fact finder" *Burbach Aquatics, Inc. v. City of Elgin*, No. 08 CV 4061, 2011 U.S. Dist. LEXIS 4573, at \*17 (N.D. Ill. Jan. 18, 2011) ("should Nicholas attempt to offer opinions on the legal duties imposed on the parties under the terms of the contract (as he reads them), his testimony would stray into forbidden argument about the meaning of contracts — a question of law on which expert testimony is inappropriate").

The parties' fact witnesses and experts should be barred from offering this type of improper legal conclusion. Smith's Opinions #6 and 7, particularly, should be barred as providing improper legal conclusions couched as expert testimony.

### VI.    MIL #6 – To Bar Evidence of Subsequent Remedial Measures, including that Fraser placed a guardrail over the opening during the OSHA investigation.

Plaintiffs are likely to introduce evidence and testimony that Fraser welded a guardrail over the opening on December 6, 2022, after Mulvaney's death, and that Fraser did so on instruction from OSHA during its investigation of the incident. Plaintiffs may also introduce evidence that other workers wore a personal fall arrest system on the deck of the *Integrity* after Mulvaney's death. This type of evidence should be barred under Rule 407, which provides:

> When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Fed. R. Evid. 407. "The purpose of Rule 407 is to promote safety by removing the disincentive to take post-accident safety measures that would exist if the accident victim could introduce evidence

11

of these measures on the issue of the defendant's liability." *Probus v. K-Mart, Inc.,* 794 F.2d 1207, 1210 (7th Cir. 1986).

Plaintiff's attempt to introduce evidence of Fraser's post-incident conduct cannot establish negligence under Rule 407 and is thus inadmissible. Nor should evidence of Fraser placing the guardrail be introduced under a theory that it shows whether it was feasible to do so prior to the incident. Here, both C&L and Fraser employees testified that each company had the capability to weld a guardrail over the opening and thus the feasibility of doing so is uncontroverted. See *Edsall v. CSX Transp. Inc.,* No. 1:06-CV-389, 2008 U.S. Dist. LEXIS 6247, 2008 WL 244344, at *6 (N.D. Ind. Jan. 28, 2008) (where feasibility was not controverted, and where there was no evidence that the defendant planned to obtain a spike puller prior to the incident, evidence that the defendant ordered a spike puller after the incident was not admissible). Given that feasibility is uncontroverted, allowing evidence of the subsequent remedial measures would be unduly prejudicial and confusing to the jury in deciding whether Fraser or C&L had some type of obligation to place a guardrail over the opening.

## VII.   MIL #7 – To Exclude Evidence of Death Benefits Received by Plaintiffs and any argument or reference to an offset or reduction of damages.

Plaintiffs have each received death benefits under the Longshoreman Harbor Workers Compensation Act. C&L and its insurer, AmeriSafe, thus may hold a lien over the proceeds of any judgment or settlement and may be entitled to a credit against future liabilities if Plaintiff prevails obtains a judgment. See 33 U.S.C. §933. As Fraser understands it, AmeriSafe claims a lien of approximately $170,000 benefits paid to date and its future liability may total over $1.2M for which it may seek a credit from any judgment entered in this case.

Plaintiffs should be barred from offering any argument, testimony, or evidence regarding the death benefits received or that Plaintiffs' judgment in this case will be reduced or offset to pay

off the C&L/Amerisafe lien. Evidence of this nature is irrelevant to the issues of liability and damages and should be excluded under Rule 401. It should also be excluded as prejudicial and confusing under Rule 403, as allowing the evidence would provide the jury a "floor" of damages to start from in order to account for the money Plaintiffs might need to pay back to C&L/AmeriSafe. Reference to and evidence of the benefits received and C&L/AmeriSafe's potential lien should be excluded from trial.

## VIII.    MIL #8 – To Exclude Reference to Insurance and Travelers as a Defendant

Fraser moves under Federal Rules of Evidence 411 and 403 to preclude Plaintiff from referencing, eliciting testimony, or arguing that Fraser has liability insurance and that Travelers is a party to this action. See Fed. R. Evid. 411; *Lawson v. Trowbridge*, 153 F.3d 368, 379 (7th Cir. 1998) ("In the general case courts exclude evidence of indemnification out of a fear that it will encourage a jury to inflate its damages award because it knows the government—not the individual defendants—is footing the bill.").  In addition to referencing Fraser's insurance coverage, Plaintiffs should be precluded from mentioning that Travelers is a named party in this action. Referencing an insurance carrier a defendant who has only been added under Wisconsin procedural rules would only serve to flout Rule 411 and insinuate to the jury that Travelers may be "footing the bill" for any judgment entered. This has no probative value, unduly prejudicial, and would confuse the jury. Reference to liability insurance and Travelers should be barred at trial.

## IX.    MIL #9 – Exclude Testimony of Lori Unger, APRN/PMHNP

Plaintiffs have proffered Lori Unger, APRN/PMNHP as a non-specially retained expert witness to opine that Plaintiff Carri Lopez-Mulvaney suffers from exacerbated anxiety, depression, bereavement and other psychological conditions as a result of Randall Mulvaney's death.  As discussed in Motion *in Limine* #2, Plaintiffs cannot recover for mental anguish or grief.  Nurse

Unger's only opinions relate to her treatment of Mrs. Lopez-Mulvaney's medical conditions that, in another case, may support a recovery for mental anguish and grief.  Nurse Unger's testimony and opinions are therefore irrelevant to the issues and should be excluded under Rule 401 and 402. They should also be excluded under Rule 403, as any testimony about Mrs. Lopez-Mulvaney's medical conditions allegedly resulting from the incident would only serve to mislead and confuse the jury into thinking they can take these conditions into account when evaluating loss of society which would be prejudicial to Fraser.

## X.        MIL #10 – Exclude Testimony of Dr. Niendorf on Lost Services

Fraser moves to exclude and limit the testimony and opinions of economist Bruce Niendorf, Ph.D. as to Randall Mulvaney's lost household services pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Dr. Niendorf's household services opinion is unreliable and admittedly not tied to the facts and circumstances of this case or Mr. Mulvaney's life.

### A.  Dr. Niendorf's Report and Opinions

Dr. Niendorf is an economist who opines that the value of Randall Mulvaney's lost household services totals $493,993, premised on the assumption that Mr. Mulvaney had the capacity to provide 3.4 hours of domestic service per day for the remainder of his life expectancy. **Exhibit E** (Niendorf Report at Ex. 2).  His household services opinion rests on two components.

First, he calculated a "value of one hour of service per day" using wage data from the Wisconsin Workforce Development database for a set of occupational categories he selected — including cooks, dishwashers, housekeepers, and, notably, dietitians and nutritionists ($30.48/hr) and farm and home management advisors ($28.16/hr) — and weighted those rates using weights drawn from the U.S. Bureau of Labor's American Time Use Survey ("ATUS"). He arrived at an

14

hourly rate of $18.15 in 2022, growing at 3.77% annually. Dr. Niendorf then discounted the figures to present value of one hour of service per day from the date of death through Mr. Mulvaney's life expectancy, discounted to June 26, 2026, arriving at $145,292. (Niendorf Report, Ex. 2.)

Second, he applied a multiplier of 3.4 hours per day — the ATUS average for males aged 64.2 through 81.9 — to arrive at a total household services loss of $493,993 (revised figure). His report describes the basis for this figure as follows: "[T]he U.S. weighted average time men aged 64.2 years through age 81.9 spent doing unpaid domestic service can be calculated as 3.4 hours per day." (Ex. E, Report at 2.) Nowhere in the report does Dr. Niendorf reference anything specific to Randall Mulvaney's actual household contributions.

Dr. Niendorf's deposition testimony confirms that his domestic services methodology is entirely generic and not applied to the facts of this case. When asked whether his opinion was tied to what Mr. Mulvaney's domestic services actually were, he answered: "No, this is just the value of what the average man does during this time period from age 64.2 to age 81.9." (**Exhibit F,** Niendorf Dep. 66:23–67:2.) When presented with a hypothetical of two different 64-year-old males who died on the same date and asked whether his written tables would be numerically identical, he confirmed: "Yes." (*Id*. at 23:1–17.) When asked whether he had an opinion on whether Mulvaney provided more or fewer services than average, he answered: "I don't have an opinion on that." (*Id*. at 67:11–13.) When asked how his methodology is tied to the individual circumstances of Mulvaney, he answered:

> "The value that I provide for informational purposes in terms of the number of hours per day is a U.S. average, so it's not tied specifically to whatever tasks an individual person may or may not do."

(*Id.* at 19:1–8.)

Dr. Niendorf also entirely ignored key testimony from Carri Lopez-Mulvaney as to Randall Mulvaney's home life—that he spent 80% of the time traveling for work. When asked about Mrs. Lopez-Mulvaney's testimony that Randall Mulvaney was only at home 20% of the week, Dr. Niendorf acknowledged awareness of it — "I recall that he traveled for work a lot, he was away for work a lot" (Id. at 67:17–20) — yet he made no adjustment to his figures whatsoever. At bottom, Dr. Niendorf's household services opinion is nothing more than a recitation of ATUS survey results that have no real bearing to Randall Mulvaney's life or reliable connection to the facts of this case.

### B.  Legal Standard

Federal Rule of Evidence 702 provides that a qualified expert may testify if: (a) the testimony will help the trier of fact; (b) it is based on sufficient facts or data; (c) it is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The trial court serves as gatekeeper, and the proponent bears the burden of establishing admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592–93; *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

The Seventh Circuit requires that an expert actually analyze the facts of the case. *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("[t]he critical inquiry is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data 'only by the *ipse dixit* of the expert' that is properly excluded under Rule 702."). An opinion that presents "too great an analytical gap between the data and the opinion proffered" must be excluded. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The goal of the gatekeeping inquiry is "to make certain that the expert employs in the courtroom the same level of

16

intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

### C. Argument

Dr. Niendorf's household services opinion should be excluded as unreliable, speculative, unfounded, and not tied to the facts of this case.  Rule 702(d) demands that an expert "reliably appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702(d). Courts have applied this principle with particular force to household services opinions built exclusively on the ATUS, and they have excluded such opinions when the evidence establishes that the decedent's actual circumstances were materially different from the average the survey reflects.

*Cardenas v. Western Express*, 2021 U.S. Dist. LEXIS 253160 (W.D. Okla. Feb. 12, 2021), is on point. There, the plaintiff's economist offered a household services opinion premised entirely on the ATUS and U.S. wage data. The court excluded it, finding that "there is no basis in the evidence from which a jury could conclude that [the decedent] spent his time consistent with that of the hypothetical American male of the same age." *Id.* at *15. The court further explained that throughout his analysis the expert "ignored the reality of [the decedent's] existence" in favor of generic data "that is simply inapplicable." *Id.* The court held the opinion "not reliable and therefore inadmissible." *Id.*

The same result followed in *Prisbrey v. Progressive Classic Ins. Co.*, No. 4:18-cv-00088-DN, 2021 U.S. Dist. LEXIS 78410, at *3 n.11 (D. Utah Jan. 8, 2021) (D. Utah Jan. 8, 2021), where the court excluded a household services economist who relied exclusively on the ATUS and Bureau of Labor Statistics wage data, citing the rule that "general statistics cannot be used in isolation and without regard to information specific to the relevant individual." *Id.* at *3 n.11. And in *Davis v. ROCOR Int'l*, cited with approval in *Prisbrey*, the court excluded household services

17

testimony that was "not supported by any evidence in the record" and "based on conjecture and/or speculation. 226 F. Supp. 2d 839, 842 (S.D. Miss. 2002).

The commonality of these cases is that an economist cannot present the ATUS average as a damages figure for a specific decedent without some evidentiary foundation establishing that the average is applicable to that individual. Dr. Niendorf not only lacks that foundation — the record affirmatively establishes the opposite. He confirmed that his household services figures are "not tied specifically to whatever tasks an individual person may or may not do." (Ex. F, Tr. 19:1–8.) He confirmed that the same tables would apply to any 64-year-old male who died on the same date. (*Id*. at 23:1–17.) He confirmed that he has no opinion on whether Mr. Mulvaney's services were above or below average. (*Id*. at 67:11–13.) He also entirely ignored clear testimony as to Mr. Mulvaney's actual work-life balance. (*Id.* 67:17–20). Under such circumstances Dr. Niendorf's methodology and opinions are unreliable, speculative, and not actually tied to the facts of this case and should be excluded.

## XI.    MIL #11 – Bar Punitive Damages or Alternatively Until Plaintiffs Prove Prima Facie case

As the Court recognized in its Order on summary judgment, this case involves an "accident" that led to the death of Mr. Mulvaney. Fraser anticipates making a directed verdict at the end of Plaintiffs' close to preclude any argument or jury instruction on recovery of punitive damages, among other damages. Simply put, there is no malice or recklessness warranting punitive damages in this case.

Fraser moves to preclude any reference to punitive damages prior to Plaintiffs establishing a *prima facie* case for punitive damages. It would unfairly prejudice Fraser and mislead and confuse the jury in *voir dire* and opening statements if this Court later concludes that such damages are unwarranted.

Courts have precluded reference to punitive damages to prevent references which may ultimately be irrelevant and unfairly prejudicial to Fraser. See *Adams Laboratories, Inc. v. Jacobs Eng'g Co., Inc.,* 761 F.2d 1218 (7th Cir. 1985) (the District Court ordered that punitive damages not be mentioned until Plaintiff had established a *prima facie* case). *See also Isbell v. John Crane, Inc.,* 74 F. Supp. 3d 893 (N.D. Ill. 2014) (Precluding reference to punitive damages "avoids the danger that a mention of punitive damages during the trial's first stage could unfairly prejudice the jury's assessment of compensatory damages."); *Kincaid v. Sangamon* County, 2015 WL 13548179, slip op. (C.D. Ill. Sept. 11, 2015) ("No reference to punitive damages is permitted during opening statements. Punitive damages may be argued in closing, if the Court determines that punitive damages may be awarded after the close of all the evidence.").

For this reason, this Court should exercise its gatekeeper function and preclude any testimony or evidence concerning punitive damages prior to a Plaintiff establishing a *prima facie* case showing entitlement to such relief.

### XII.    MIL #12 – To Exclude Expert Testimony of Brad K. Grunert, Ph.D.

Fraser moves to exclude the testimony and opinions of psychologist Brad K. Grunert, Ph.D pursuant to Federal Rule of Evidence 702 and *Daubert*. In 2023, the Eastern District of Wisconsin excluded Dr. Grunert as an expert in a wrongful death action, holding after a full *Daubert* analysis that "[e]very *Daubert* factor weighs against the admission of Grunert's opinions." *Leibfried v. Caterpillar, Inc.*, No. 20-CV-1874, 2023 U.S. Dist. LEXIS 106006, at \*29 (E.D. Wis. June 20, 2023). The same expert now offers materially the same opinion, applying materially the same methodology, in this case. Plaintiffs retained Dr. Grunert to opine that decedent Randall Mulvaney experienced "panic, terror, and horror" during a fall of approximately 1.5 to 2 seconds that ended in immediate death on impact. Dr. Grunert's report and his deposition confirm that nothing has

changed since *Leibfried*. The methodology, the qualifications, the absence of testing, the absence of peer review, the absence of error rate, the absence of standards, the absence of general acceptance — every reliability deficit identified in *Liebfried* reappears here.

### A. Dr. Grunert's Report and Opinions.

Dr. Grunert issued a four-page report dated September 13, 2023. The operative opinion paragraph states:

> [Mulvaney] clearly already recognized that he was in danger and would have experienced feelings of panic, terror and horror as he recognized that he was going to strike the ground 40 to 60 feet below him.... His last conscious moments, therefore, would have been of fear, panic, terror, and horror as he was falling through the air to his ultimate death.

**Exhibit G** (Grunert Report at 3). The report states that Dr. Grunert's opinions are "based on [his] clinical work with more than 50 individuals who have fallen anywhere from 30 to 110 feet and survived their accidents." *Id.* The report identifies no peer-reviewed literature, no standardized methodology, no error rate, no controls, and no generally accepted framework supporting the opinion.

### B. Argument.

Dr. Grunert's methodology is unreliable and fails to satisfy the *Daubert* mandates. His opinions here are materially similar to those offered in *Liebfried*, where the Court walked through each of the reliability factorss and found that Dr. Grunert's methodology failed all of them.

**Testing.** In *Leibfried*, the court found that "it is difficult to characterize anything Grunert did as a 'test,'" and that he "forewent the formalities and rigors of anything akin to a survey and instead relied on his recollection to identify commonalities, trends, and frequencies." 2023 U.S. Dist. LEXIS 106006, at \*19–21. In this case, Dr. Grunert testified that his methodology has not been empirically tested; that he cannot identify any way to validate the methodology against

20

results; and that the methodology rests on "extrapolation" and "several assumptions." **Exhibit H** (Grunert Dep. at 59:16–60:22).

**Peer Review.**  The *Leibfried* court found that "Grunert's theory has not been subject to peer review or publication by him or anyone else," and that "Grunert has not pointed to any published or peer reviewed study, article, or paper supporting his theory." 2023 U.S. Dist. LEXIS 106006, at *22. In this case, Dr. Grunert similarly conceded that he has not published peer-reviewed work on pre-impact awareness or pre-impact terror in falls; that he is not aware of any peer-reviewed literature defining "terror" or "horror" as he uses those terms; and that he is not aware of any peer-reviewed literature on the temporal sequencing of cognitive processing of those states. **Ex. G,** Tr. at 22:25–24:9; 41:13–22; 41:23–25.

**Error Rate.** The *Leibfried* court found that "Grunert's opinion has no known error rate." 2023 U.S. Dist. LEXIS 106006, at *23. In this case, Dr. Grunert testified that "I don't know that anyone has calculated" any error rate for his methodology. **Ex. H,** Tr. at 60:23–61:2.

**Standards and Controls**. The *Leibfried* court found that "Grunert did not articulate any standards that he created or employed in the application of his novel and unique theory," and that "he made little to no effort to control for variables." 2023 U.S. Dist. LEXIS 106006, at *24–25. In this case, Dr. Grunert testified that there are no standards or controls governing the application of his methodology to this type of case, and that he did not consult any guideline or written protocol. **Ex. H,** Tr. at 61:3–11.

**General Acceptance.** The *Leibfried* court found that "Grunert has not explained or demonstrated how his opinion as to the emotions experienced by persons when they believe they are about to die has achieved general acceptance in the psychological community," and "there is no indication that Grunert has even expressed his opinion to the psychological community; he

appears to have expressed it exclusively in the context of litigation." 2023 U.S. Dist. LEXIS 106006, at \*25–26. Dr. Grunert's testimony in this case is no different — he could not identify any professional organization, peer-reviewed publication, or recognized framework accepting his methodology as applied to decedent pre-impact experience. **Ex. H**, Tr. at 58:21–59:1; 61:24–62:3.

Dr. Grunert called his methodology "qualitative case studies"— recollection-based clinical interviewing of survivors he treats in his clinical practice, then "correlating" those recollections to the circumstances of decedents. **Ex. H**, Tr. at 55:16–57:10; 57:18–22.  As discussed above, he concedes there is no testing, controls, authoritative guidance in the psychology field, or validation method for determining whether the recollections of his surviving patient based are like decedents who suffered falls.  Dr. Grunert's methodology is further flawed in that he concedes that survivors have different overall experiences than decedents but he "presumes" that while they are falling the two groups experience the same emotions.  This is the primary "assumption of the methodology" Dr. Grunert employed in this case. *Id.* at 65:25–66:10.

Moreover, Dr. Grunert's opinions lack foundation and are not based on sufficient facts or data.  As to the opinion that Mulvaney experienced "terror and horror," particularly, Dr. Grunert explained in deposition that it takes "at least 1.5 seconds" for a human to begin processing these emotions. Grunert Dep. at 38:23–39:1. He also assumed (without actually precisely calculating) that the fall was "40-60 feet" to arrive at his conclusion that Mulvaney fell for 1.5 to seconds.  *Id.* at 32:24–33:1 ("40 feet I think is the one-and-a-half and 60 feet is the about two seconds"). In actuality, the height of the vessel was 41'8" from the ground, leaving Dr. Grunert's opinions as to the upper threshold (anything beyond 41'8") entirely baseless and not tied to any facts or data of the case.  Dr. Grunert then conceded that confirmed that for a 1.5-second fall *i.e.* about 40" Mulvaney "would not have been able to experience terror and horror." *Id.* at 35:20–25.  His terror

and horror opinions are based on no foundation and should be excluded even if the Court disagrees with the *Liebfried* Court's rationale as to his overall methodology.

Dr. Grunert's methodology in this case is unreliable and his opinions lack foundations. Dr. Grunert, his opinions, and testimony should be excluded from trial accordingly.

## XIII.   MIL #13 – To Exclude Responding Officers' Body Worn Camera Video Footage

Through discovery, the parties obtained Axon Body Worn Camera video footage from Superior Police Department police officers and other first responders who arrived on scene after Mr. Mulvaney's fall. The videos include the following files, which are attached to this motion as compendium **Exhibit I:**

Axon Body 3 Video 2022-12-051153 X60A5820H

Axon Body 3 Video 2022-12-05 1154 X60A5938F

Axon Body 3 Video 2022-12-05 1211 X60A5939H

Axon Body 3 Video 2022-12-05 1219 X60A5820H

Axon Body 3 Video 2022-12-05 1224 X60A5782F

Axon Body 3 Video 2022-12-05 1247 X60A5939H

Axon Body 3 Video 2022-12-05 1248 X60A5782F

The videos show responding officers and paramedics performing CPR and other first aid on Mr. Mulvaney, which include gruesome images of Mr. Mulvaney's bloodied head, mouth, and face. (See, *e.g.*, Axon Body 3 Video 2022-12-051153 X60A5820H at around the 2:00 minute mark).

These videos should be excluded as irrelevant, prejudicial, misleading, and confusing under Rule 401, 402 and 403 of the Federal Rules of Evidence. There is no dispute that Mr. Mulvaney died immediately upon impact and that he did not suffer any conscious pain or suffering after he landed on the floor of the dry dock. The jury will only be tasked with determining what,

23

if any, damages the Estate is entitled to under the survival claim for Mr. Mulvaney's pre-impact pain and suffering *i.e.* the roughly 1.5 seconds between the time of fall and impact on the dry dock.

The post-impact video footage is entirely irrelevant to determining Mr. Mulvaney's pre-impact pain and suffering should be excluded under Rules 401 and 402. If the Court finds some relevancy, they should nonetheless be excluded as prejudicial, misleading and confusing under Rule 403. They lack any probative value to determining the pre-impact damages issue and allowing the jury to see gruesome images of Mr. Mulvaney after impact—when he was not suffering— would only serve to inflame the passions of the jury and mislead or confuse them into factoring unconscious "pain and suffering" for their pre-impact damages evaluation. The videos should be excluded from evidence.

### XIV.   MIL #14 – To Exclude Witness Testimony Regarding Their Observations and Impressions of Mulvaney After Impact.

In the same vein as the BWC video footage, Fraser moves to exclude witness testimony regarding their observations of Mr. Mulvaney after impact as irrelevant, prejudicial and confusing under Rules 401, 402 and 403. By way of example as to anticipated testimony, Fraser's Safety Manager, Amanda Sayles, testified in deposition:

> Q. Okay. You indicated in the statement, He had blood spurting out of his head and mouth as chest compressions were being performed.
>
> Q. That part's still — is in your memory?
>
> A. Yes.

**Exhibit J**, Sayles Tr. 31:22-32:1. This type of lay witness observation is irrelevant to determining whether and to the extent that the Estate is entitled to damages for pre-impact pain and suffering. Similar to the Axon BWC video footage, testimony regarding observations of Mr. Mulvaney as he was unconscious after the fall should be excluded as irrelevant, prejudicial, misleading, and confusing.

**XV.    MIL #15 – To Exclude Video of the Incident**

Fraser's surveillance footage captured part of the incident that occurred on December 5, 2022.  The grainy video shows Mr. Mulvaney handling a tarp then walking through the opening in the railing. Fraser moves to exclude the video as prejudicial under Rule 403.  The probative value of the video is slight in light of the witness testimony as to how the incident occurred and thus showing the video to the jury would be unduly prejudicial.

Respectfully submitted,

**CLYDE & CO US LLP**


By: /s/ Michael J. Roman

Siobhán Murphy
Michael J. Roman
Dawn L. Johnson
Vincent P. Tomkiewicz
WI State Bar No. 1012778
30 South Wacker Drive, Suite 2600
Chicago, IL 60606
Phone: (312) 635-7000
Email:  Siobhan.murphy@clydeco.us
        Michael.roman@clydeco.us
        Dawn.johnson@clydeco.us
        Vincent.tomkieqicz@clydeco.us

James H. Rodgers
Clyde & Co US LLP
The Chrysler Building
45 Lexington Avenue, 16th Floor
New York, NY 10174
Phone: (212) 702-6771
Email:  James.Rodgers@clydeco.us

*Attorneys for Defendants*

Dated: May 15, 2026

## CERTIFICTE OF SERVICE

The undersigned attorney certify that, on May 15, 2026, a copy of the foregoing **DEFENDANTS' OMNIBUS MOTIONS IN LIMINE AND BRIEF IN SUPPORT** was served to all counsel of record on the service list below via electronic mail.

## SERVICE LIST

**COUNSEL FOR PLAINTIFFS**
**Thomas J. Lonzo**
WI State Bar No.  1000826
**Douglas W. Rose**
WI State Bar No. 1017205
**Kaitlynn E. Ebben**
WI State Bar No. 1112777
**THE ROSE GROUP, S.C.**
1134 N. 9th Street, Suite 220
Milwaukee, WI 53233
Phone: (414) 274-1400
Fax: (814) 273-1311
Email: tjl@rosegrouplaw.com
        kee@rosegrouplaw.com
        dwr@rosegrouplaw.com

Christopher J. Koppes
WI State Bar No. 1072178
**BENDER, LARSON, CHIDLEY, KOPPES, et al.**
138 Hospital Drive, Suite 100
Watertown, WI 53098
Phone: (920) 261-7626
Fax: (920) 261-1249
Email: ckoppes@blcklaw.com

Delafield, WI 53018
Phone: (262) 646-4850
Email: kanderson@zslegal.com

**COUNSEL  FOR INVOLUNTARY PLAINTIFFS C&L CONTRACTING, INC. and AMERICAN INTERSTATE INSURANCE COMPANY**
Todd Anthony Delcambre
LEBAS LAW OFFICES A PLC
2 Flagg Place, Suite 1
Lafayette, LA 70508
337-236-5500
Fax: 337-236-5590
Email: todddelcambre@lebaslaw.com

**CLYDE & CO US LLP**

By: /s/ Michael J. Roman
Michael J. Roman
*Attorney for Defendants*