# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

_____

CARRI A. LOPEZ-MULVANEY,
individually and as Personal
Representative of the ESTATE
OF RANDALL C. MULVANEY
and CONNOR MULVANEY,

        Plaintiffs,

    -and-

C&L CONTRACTING, INC.,
AMERICAN INTERSTATE INSURANCE
COMPANY and BLUE CROSS
BLUE SHIELD OF WISCONSIN,

       Involuntary Plaintiffs,

    -vs-                    Case No. 23-cv-00789

FRASER SHIPYARDS, LLC, ANDRIE, LLC,
a/k/a Andrie Transportation, LLC
a/k/a Andrie Tranportation Group, LLC
ANCHOR CONSULTING, LLC, TRAVELERS
PROPERTY CASUALTY COMPANY OF AMERICA,
NORTHSTANDARD (AMERICAS), INC.,
a/k/a NORTHSTANDARD LIMITED
a/k/a THE NORTH OF ENGLAND PROTECTING
AND INDEMNITY ASSOCIATION, f/k/a NORTH,

       Defendants.

_____

VIDEOCONFERENCE DEPOSITION OF BRUCE NIENDORF, Ph.D.

Monday, May 11, 2026

2:01 p.m.

Reported by:  SANDRA L. McDONALD

Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 2

VIDEOCONFERENCE DEPOSITION of BRUCE NIENDORF, Ph.D., a witness of lawful age, taken on behalf of the defendants in the above-entitled cause, under all applicable federal, state and local rules, pursuant to notice, before SANDRA L. McDONALD, a Notary Public in and for the State of Wisconsin, from various remote locations, on the 11th day of May, 2026, commencing at 2:01 p.m.

*A P P E A R A N C E S*

THOMAS J. LONZO and DOUGLAS W. ROSE,
    THE ROSE GROUP, S.C.
    1134 North 9th Street, Suite 220
    Milwaukee, Wisconsin 53233
    tjl@rosegrouplaw.com
    dwr@rosegrouplaw.com?
    appearing by videoconference on behalf of
    the plaintiffs;
CHRISTOPHER J. KOPPES,
    BENDER, LARSON, CHIDLEY, KOPPES &
    ASSOCIATES, S.C.
    138 Hospital Drive, Suite 100
    Watertown, Wisconsin 53098
    ckoppes@blcklaw.com
    appearing by videoconference on behalf of
    the plaintiffs;

MICHAEL H. ROMAN,
    CLYDE & CO US, LLP
    30 South Wacker Drive, Suite 2600
    Chicago, Illinois 60606
    michael.roman@clydco.us
    appearing by videoconference on
    behalf of the defendants.

Also Present: JASON DUGMORE, Videographer

* * * * *

Page 3

*I N D E X*

Examination By:                          Page:
Attorney Roman                              5
Attorney Lonzo                             --
Attorney Koppes                            --

*E X H I B I T S*
Exhibit Nos.:                        Identified:
Exhibit 1 - Curriculum Vitae              5
Exhibit 2 - 03/26/25 Niendorf Report      26
Exhibit 3 - Revised Earning Capacity Loss    61
Exhibit 4 - Revised Domestic Service Loss    61

*R E Q U E S T S*
Request Nos.:                       Page, Line:
Request 1 - Current Curriculum Vitae      6, 24
Request 2 - Current Rule 26 Testimony List    11, 20

* * * * *

(Original transcript filed with Attorney Roman)

Page 4

THE VIDEOGRAPHER: This begins File No. 1. We are now on the record for the deposition of Bruce D. Niendorf, Ph.D. in the matter of Carri A. Lopez-Mulvaney, et al. versus Fraser Shipyards, LLC.

Today's date is May 11, 2026. The time is 2:01 p.m. Will counsel please introduce themselves?

MR. LONZO: Thomas Lonzo appearing on behalf of the plaintiffs.

MR. ROSE: Douglas Rose on behalf of the plaintiffs.

MR. KOPPES: Christopher Koppes appearing on behalf of the plaintiffs.

MR. ROMAN: Michael Roman for Fraser Shipyards and Traveler's.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness?

BRUCE NIENDORF, Ph.D., having been first duly sworn on oath, was examined and testified as follows:

EXAMINATION

BY MR. ROMAN:

Q   Good afternoon again. My name is Michael Roman, one of the attorneys representing Fraser Shipyards and

Page 5

Travelers in a lawsuit that we're here to talk about today. Can you please state your name and spell your last for the record?

A   Bruce Niendorf. That's spelled N-i-e-n-d-o-r-f.

Q   And you've been retained as an expert witness on behalf of the plaintiffs through Mr. Lonzo's office. Do I have that correct?

A   Yes.

Q   Great. And I take it you've given depositions before?

A   Yes.

Q   All right. Can I -- can you spare me going over the ground rules, we're on the same page as to how this will go today?

A   I think so.

Q   Okay, great. Do you have a copy of your report and CV in front of you?

A   Yeah, I have a copy of my report. I could pull up my CV.

Q   Okay. Let's do the CV first, which we'll mark as Exhibit 1. I can pull it up, but I just want to make sure that we're talking about the same one. The copy that I have is four pages. I don't see a revision date or anything on it, but it starts with Areas of Interest and ends with a Presentations and



MAGNA
LEGAL SERVICES

Page 6

Professional Meetings section that goes on to about halfway onto a fourth page. Does that appear to be the one that you are looking at?

A Yes.

Q All right. Is this version that you provided over to counsel and produced in this case that we're looking at your accurate and up-to-date CV?

A I'm looking at my up-to-date one. If we have the same one, then yes.

Q All right. Let me just pull it up real quick.

(Exhibit 1 is shared on the video screen)

Q Okay. Can you see my screen there?

A Yes.

Q All right. I'll scroll through it, but --

A No, that's not the most current one.

Q Okay. This one that we're looking at, do you know when, about, it was prepared?

A I think probably at the time of my report.

Q So mid-2025, does that sound about correct?

A Yes.

Q I think your report is dated March 26, 2025, so somewhere in that time frame?

A Yes, so early, early 2025 that one would be.

Q I'm just going to ask when we get done today if you could provide counsel, Mr. Lonzo, with a copy of

Page 7

your most updated version. For now, what is it that needs to be updated or added, modified, et cetera to the CV that you had produced originally in this case?

A Well, I retired from UW-Oshkosh in May of 2025, so I'm professor emeritus. And I also got a research award, a Dean's Award for exemplary research in 2025.

Q Congratulations on retirement.

A Thank you.

Q Okay. Other than those two changes, anything else that you can think of?

A No, that would be it.

Q Okay. Let's go through your experience a little bit. It looks like you have been a professor in some capacity since the early nineties, around 1994?

A Yes.

Q And your work as a professor has been in the finance statistics arena; is that fair to say?

A Yes.

Q All right. What was the last professorship that you held with University of Wisconsin-Oshkosh before moving to emeritus status?

Q That would be the one shown on your version of the CV, of my CV. It was a full professor of finance -- or a distinguished professor of finance was my last

Page 8

position.

Q And do you do litigation consulting work outside of this case that you're here on today?

A Yes.

Q How long have you been doing legal consulting work?

A Hmm, I think since 2002 or 2003.

Q So simultaneous to doing work as a professor at either Wisconsin-Oshkosh or University of Montana -- or I take that back. Were you working as a professor at any other universities or institutions than Wisconsin-Oshkosh while you were also doing legal work, consulting work?

A If I follow your question, I only worked for UW-Oshkosh.

Q Okay. So over that last 23 or so years, what would the split between your legal consulting work and your professor work be?

A Probably 70 percent of my time as a professor and the rest doing consulting, maybe 80 percent professor.

Q And when you were -- well, let's just use the spring 2008 through present time frame, which I understand should be now marked as about May of 2025, but for that distinguished professor of finance at Wisconsin-Oshkosh, what classes were you teaching over that time period?

Page 9

A I was teaching Advanced Financial Management, which is an undergraduate course, and I was teaching Financial Management in our MBA program.

Q And that was all teaching work?

A Yes.

Q Did you do any research at all?

A Yes, I was doing research as well.

Q What were your topics of research that you were working on during that time period, that 2008 through the time you retired?

A Well, as listed in my CV, I was doing some work on the financial value of postsecondary educations and doing some research work on investment returns.

Q And I think I saw two of the presentations that you do is The Financial Value of a California Postsecondary Education, and one is for Wisconsin as well that was in that time frame?

A Yes, and both of those were publications.

Q Is that something that you published after doing research on the topic?

A Yes. Both of those should be listed in your version as publications, Refereed Publications.

Q That 70 to 80 percent of the time that you worked as a professor as compared to litigation work, did that change at all over time from '03 to '25?

MAGNA
LEGAL SERVICES

Page 10

MR. LONZO: Object to the form. Go ahead, you can answer.

A   It tended -- it varied a little bit by year and I would say also was slowly increasing over time.

Q   What was your split of professor versus litigation work that you would say when you started in around 2002, 2003 for that first five-year time period?

A   90/10 maybe.

Q   And then what was it in the last five years before your retirement?

A   That would be the 70 or 80 percent teaching and 30 or 20 percent research -- or litigation work.

Q   And then we've also been provided a copy of your Rule 26 list. The one that I have is dated 2021 to 2024. Have you -- and I'm showing it looks like the most recent case on that list that I have is Year 2024. The case name is Estate of Charles McMurray, et al. versus Columbia St. Mary's, Inc., et al. in Milwaukee County. Do you know whether you've testified or provided deposition testimony in any cases since that Estate of Charles McMurray matter in 2024?

A   Yes, I have.

Q   Can you list any of the case names or docket numbers on any of those cases, by chance?

Page 11

A   Yes. In 2025 I testified in Brauner versus Artisan Truckers and Casualty. That was in Door County, and the case number is 2023-CV-0187. And I also had a deposition on that case in 2025.
    In 2024 -- so the rest of these are depositions. In 2024, Claude Leon versus Ryan Twohig. That's Fond du Lac County, No. 23-CV-66. In 2025, the Estate of Maria Bravo-Ramirez versus Acuity. That's Brown County, 24-CV-720. In 2025, Timothy Owens versus Seth Michael Baunik, Menomonie County, Michigan. That's 24-17677-NI.
    In 2025, Rick Jannsen versus Caine Transfer, Western District of Wisconsin, and that is 3:24-CV-00217-JDP. And in 2025, Michael Joseph, Jr. versus Solaris on Main, and that's Winnebago County, 2024-CV-000474.

Q   And do you maintain an updated Rule 26 testimony list?

A   Yes.

Q   I'm also going to ask if you have an updated version, which it sounds like you do, from the one that I've received, if you could get that over to counsel when we're done here today; is that okay?

A   Yes.

Q   All right. What are -- over the time that you've

Page 12

testified as an expert, what would the split between testifying for the plaintiff versus the defendants be for your work?

A   I don't know specifically testifying, but in terms of being retained, probably 80 percent plaintiff, 20 percent defense.

Q   What's the estimate of how many cases you've worked on for legal consulting over your career?

A   I don't think I've got a -- I don't think I've got one. I'm not sure.

Q   The list that I have shows about 20 from 2021 to 2024 where you provided a deposition. Would you say that's a rough accurate estimate of your frequency of cases you've worked on?

A   No. I would -- I would have worked on a fair number more than that. I'd say, you know, the minority of them wind up in deposition or testimony.

Q   What are -- what's the sort of standard nature of the cases that you work on? Are they normally personal injury cases, or are you doing commercial work, things like anti-trust cases, opining on finance issues in that? Generally, if you could describe the cases that you've worked on as a legal consultant at any time.

A   Generally, personal injury and wrongful death. I do

Page 13

do some business valuation cases, but not -- not a lot of them.

Q   Would it be fair to say that the majority of the work, your legal consulting work, is on cases involving personal injury or death?

A   Yes.

Q   Do you also do -- do you do any consulting for like workers' comp cases?

A   No, I don't think I've done any of those.

Q   How many times have you offered an opinion on a decedent's wage loss claim in a wrongful death action?

A   I don't know. 50, 75 maybe.

Q   If we use 50 to 75 as a general estimate, is that okay?

A   Yes.

Q   Would most of those 50 to 75 cases be in Wisconsin where you were on the case?

A   Yes.

Q   Do you typically employ the same methodology in calculating a decedent's expected future lost earnings in every case?

MR. LONZO: Object to the form. Go ahead and answer.

A   Yeah, I'm not sure what you mean by typically and

MAGNA
LEGAL SERVICES

Page 14

then in every case.

Q   Sure.  Do you use the same method to calculate a decedent's anticipated or expected wage loss in every case?

A   Roughly speaking, yes.

Q   And then how about for calculating lost services, in how many cases do you think you've provided an opinion on that issue?

MR. LONZO:  In a wrongful death case?

MR. ROMAN:  Sure, in a wrongful death case, yeah.

A   Probably almost all of the wrongful death cases I've done, so 50 to 75.

Q   And I think you were alluding to something I was going to ask.  Is it fair to say that generally if you're opining on a decedent's lost wages in a wrongful death action that you're also being asked to opine on lost domestic services in the same case?

A   Yes.

Q   Do you use the same methodology in calculating potential lost domestic services in every case that you work on as a legal consultant?

MR. LONZO:  I'm going to object again, but go ahead.

A   Yeah, at a high level, yes.  The details, of course,

Page 15

differ, but in terms of the general methodology or method of doing the calculation, yes.

Q   And for the lost earnings component, what -- how would you describe the methodology that you typically use in calculating a decedent's lost earnings?

A   Well, for earning capacity, I would identify an estimate of what the person's earning capacity was at the time of their death, and then I would apply a growth rate to forecast what their earning capacity would have been going forward.  And then once I have the future values of their earning capacities, I'd discount them, bring them back to present value.

Q   And how do you typically calculate what their estimated earnings in the past have been?

A   Again, I -- I -- I guess to answer your question exactly, I don't.  I calculate earning capacity, and that would be based upon, you know, if there's a vocational expert, on a vocational expert's opinion, or the person's earnings at the time of their death and for some years before that.

Q   Do you ever take into account a decedent's actual past earning -- earnings in your calculations for determining their future earnings capacity?

A   Yes.

Q   And then sometimes you also rely on a voc rehab

Page 16

expert?

A   Yes.

Q   In what circumstances do you use the actual figures that someone earned as compared to an opinion of a voc rehab expert?

A   If there's a vocational expert, I use their opinion.  Otherwise, I'll -- I'll look at what their actual earnings were.

Q   Which one do you prefer to use?

A   No preference.

Q   Do you have an opinion as to which is typically more accurate as to reflecting a person's actual future earning capacity?

A   No.

Q   In a situation where you're going to use past earnings capacity as an indicator for or as part of your methodology for calculating future earning capacity, what types of data do you use for the past earnings part?

A   Usually W-2s.

Q   Anything else?

A   I could get it off the tax return if -- you know, if the -- if the person was filing single, I could get what I need off of their tax return.

Q   And then what is it that you need?  What actual data

Page 17

are you looking for to input into your methodology?

A   What their earnings were.

Q   And what do you mean by earnings?

A   Well, the amount of money that they were paid for compensation for the period covered by the W-2.

Q   Do you also look at things like benefits, whether an employer matches 401(k), provides disability compensation, anything of that nature?

A   I do look at that sometimes, yes.

Q   In what circumstances would you review that information versus not review that information?

A   If I had to -- if I had reason to believe that a person's benefits were likely greater than average, then I would review it.  Otherwise, I would tend to assume that the person had the capacity to earn -- in terms of benefits, to earn what the average person in the U.S. earns.

Q   What if the subject of your opinion earned less than the national average, what would you do in that situation?

A   I would -- I would apply the average, because earning less than the average would be using their actual earnings and not -- in my opinion, not a measure of capacity, unless there was a reason to believe that the person didn't have the capacity to earn average.

Page 18

Q  And would you disagree that a person's past earnings are not a reliable indication of what their future earnings capacity is?
       MR. LONZO:  Object to the form.
A  Could you restate that question, please?
Q  Sure.  Do you disagree that a person's actual past earnings are a reliable indicator of their future earnings capacity?
A  Do I disagree that they're not a reliable indicator?
       MR. LONZO:  Yeah, I'm going to object to the form.
Q  Yeah.
       MR. LONZO:  Same objection.
A  Yes, I -- sorry, Tom, go ahead.
       MR. LONZO:  Yeah, I just objected to the form, but go ahead, if you follow.
A  If we're talking in general, yes, I would disagree that a person's past earnings are not a reliable indicator of their future earning capacity.
Q  And in your opinion, for someone who earns less than the national average, using the national average for or as a basis to calculate future earnings capacity is a more -- is more reliable than relying on their past actual earnings?
A  No.

Page 19

Q  Okay.  Could you explain the difference?  Because what I heard is that you use their actual earnings capacity, past earnings capacity, to flesh out what their future earnings capacity may be if they earned more than the national average.  Did I hear that correctly?
A  No.
Q  Okay.  Could you re-explain it then for me?
A  In the absence of a vocational expert, I would look at what the person's previous earnings were as an indicator of what their future earning capacity would have been.
Q  And that's for someone who earns more than the national average?
A  No, that's for anyone.
Q  Well, have you ever offered an opinion in a legal case as to -- for someone who earns less than the national average wages using a methodology where your future expected loss of earnings for that individual are based on their actual past earnings, or would you always use the national average in that situation?
A  I don't look to see what a person's earnings are relative to national average, so I -- I don't know what the answer to that question would be.
Q  Now, how would you describe what the methodology is

Page 20

that you typically use for calculating a decedent's lost domestic services?
A  I'd calculate using the American Time Use Survey.  I'd calculate what their average daily number of hours would be, for their lifetime average what that number of hours would be.  And I provide that for informational purposes, and I also calculate the value of the loss of one hour of domestic service per day for life from their date of injury or date of death through their life expectancy.
       And so I provide both of those numbers with the idea that if the jury decides, okay, the person provided or had the capacity to provide the U.S. average amount of domestic service, then they can multiply that average number of hours per day times the value of the loss of one hour per day and identify the value of the total domestic service loss.
Q  And what is the American Time Use Survey?
A  That's a survey that's published by the U.S. Bureau of -- or no, the U.S. Census Bureau.  It's done as part of the census, calculated using census data.
Q  And what types of data are tracked in that survey?
A  What different tasks people do and how much time they spend doing them based on -- based on gender and

Page 21

based on age, and maybe based on other factors.  I'm not sure.
Q  You said that's collected at the time of the census?
A  I don't know if it's collected at the same time as the census, but it's collected by the same bureau.
Q  Is that a survey that's published annually?
A  No.
Q  How often is it published?
A  That I don't know, but the most recent one was 2023.
Q  The most recent one as we sit today or at the time that you authored your report?
A  Both.
Q  Do you know when the last one was before 2023 that was published?
A  I don't recall, no.
Q  And so if I understand your methodology for the domestic service, you use the figures for the national average based on this American Time Use Survey as to whether, for example, a 64 year-old male on average would provide this level of domestic service?
A  No, I wouldn't put it quite that way.
Q  Well, how is the methodology that you used for calculating domestic service tied to the individual circumstances of the particular decedent in a case

MAGNA
LEGAL SERVICES

Page 22

that you're opining on?

A   The value that I provide for informational purposes in terms of the number of hours per day is a U.S. average, so it's not tied specifically to whatever tasks an individual person may or may not do. It's -- it's just with the idea that the person had the ability to be average and to, within that average, presumably choose whatever domestic service tasks needed to be done or they wanted to do.

Q   Okay.  So you pull the average hours per day from the -- of domestic service from the ATU Survey, right?

A   No.

Q   Okay.  Well, what data points do you pull from the ATU Survey?

A   I -- I identify the -- on the American Time Use Survey, I identify the different tasks and different items that people spend time on.  I identify those that tend to be unpaid that are domestic service, and then by -- by decade, I pull the data on how much time men/women each spend on those different activities.

    And then using that data from the survey, then I calculate what the average person of the -- well, the time range that we're interested in, again generally

Page 23

from date of injury or date of death through life expectancy, and I calculate the person's lifetime weighted average.

Q   And so when you identify those tasks or items from the American Time Use Survey, that is based off of what the decedent in the case actually provided during his or her lifetime; is that fair?

A   No.

Q   Okay.  How do you determine what tasks or items to include in your opinion?

A   I don't, because I don't -- I don't have an opinion on how much time the person had the capacity to spend doing domestic service.  As I said, I just provide that value for informational purposes to give people, the jury, an idea of what the -- what the average person spends, the average person in the age range of the person that I'm doing the report on, what the average person would spend doing domestic service.

Q   So it's like you're providing a benchmark to the jury for them to reference what the average American would provide as far as domestic services?

A   Yeah, the average American of that gender and within that age range.  And then the jury can decide maybe they did twice as -- maybe they had the capacity to do twice as much, maybe they had the capacity to do

Page 24

half as much, but that one is not my call.

Q   And is there a way to filter out for the average that the ATU is -- like for the average person, is there a way to filter out for like gender, male or female?

A   Yes, and that's what I've done.

Q   Okay.  And then you can filter out by age?

A   Yes.

Q   Any other characteristics like type of labor or domestic situation, single, married?  What other inputs can you filter through?

A   I don't know what other of those might be available.

Q   In your methodology that you typically employ for calculating lost domestic services do you filter by anything other than age and gender?

A   No, those are the only two that I would consider in identifying a person's capacity.

Q   So if you have two ongoing litigation matters at one time, the first is John Smith versus Company X and the second is Daniel Moore versus Company Y and both of the decedents are 65 year-old White males who died on the same date and you provided two opinions in two separate cases for two different decedents, are you with me so far?

A   Yes.

Q   Okay, and you provided an opinion as to what each of

Page 25

those decedents, what their lost domestic services were using that methodology that we just discussed, would your opinion be that each of those same decedents had the same lost domestic services because -- well, that's the question.  Would each of those decedents under that scenario have the same opinion from you for lost domestic services?

A   No, not necessarily.

Q   Okay.  So what -- what would change or how would the opinion differ between those two?  What types of things would impact it?

A   Well, first, in your hypothetical you're assuming they have the same date of birth as well then, all right, so they're roughly the same, we're talking about the same time period?  That's a question.  Are you assuming that in your hypothetical?

Q   Yeah, they're the same age, they're both White males and they're both 64 years old and they were both born on January 1st of whatever date that is to get you to 64.

A   So, yes, they would have -- sorry, go ahead.

Q   My apologies.  I just want to make sure we're on the same page, and I'll get your answer now.

A   Okay.  In your hypothetical it sounds like they would have the same average number.  You know, they would



Page 26

fit in the same category, so they would have the same average number of hours of domestic service that, you know, they had the capacity to provide as average, but they wouldn't necessarily have the same loss because the jury or whoever might decide the first person had a lot more capacity than the second person, and so maybe they would -- you know, in the first case they would -- they might apply more than an average number of hours, and in the second case maybe they'd provide an average number of hours, and so that would lead to different total values of domestic service capacity.

Q   But excluding what the jury may determine, your written opinion in those two cases, again, for a decedent who is the same date of birth and age and gender, your table and your opinion and report would be the same figures for those two different decedents, fair?

A   Yes.

Q   All right.  Dr. Niendorf, I do understand per Mr. Lonzo that you have provided some revised exhibits to your report in this case, fair?

A   Yes.

Q   Okay.  I want to go through your initial version in your report, so we'll mark it as Exhibit 2.  I have

Page 27

it's a four page -- well, a two-page report with Exhibit 1 and Exhibit 2, dated March 26, 2025.  Is that your report as initially stated in this case?

A   Yes.

Q   Okay.  I will get to your revised opinions, but I want to go through your report as it was produced on March 26, 2025.  And I'm saying that to hopefully avoid the back and forth on every question that I understand the numbers that we're talking about have since then been amended in some capacity and we'll get to it, fair?

A   Yes.

Q   All right.  Is it fair to say you're making two primary opinions in this case for Mr. Mulvaney, one with regard to his lost earnings capacity, correct?

A   Yes.

Q   And then the second being his lost domestic services capacity, fair?

A   Yes.

Q   Let's do the lost earnings capacity first.  If you could, take me through your methodology that you used here and how you came up with your opinion on Mr. Mulvaney's lost earnings capacity.

A   Okay.  So I identified what his -- what his earnings were in 2021 and 2022, and 2022 got cut short by

Page 28

three weeks or a little more than that because of his death, so I extrapolated 2022 to make it a full year.  And then I took the average of those two values to identify what his earning capacity would have been.

And then from there, I applied a growth rate going forward, and that average, by the way, was $58,624.  And so then from -- well, that was the average, though starting in 2022 he'd just had a fractional year's loss, but then moving forward, from 2023 forward, I -- I also incorporated the growth rate of 1.037 percent, again a U.S. average.

And so I used that growth rate to identify what his future earning capacity amounts would have been, and then I discounted those values to bring them back to June 26th of 2026.  And those values are the ones that you see in Column 3 of my Exhibit 1.

I also included the benefits, so U.S. Social Security contributions of his employer, 6.2 percent, and I included average health insurance and pension benefits as well.  And I also reduced his loss by -- or the value of his earning capacity, I reduced it by consumption, the portion of what he earned that he himself would have consumed, again, had he been an U.S. average person.

And so his earnings plus his benefits, less the

Page 29

amount that he would have consumed himself is the value of what he could have contributed as support to his household, and those are the values that you see.  The Total Loss in Years is the values you see in Column 6, and the Cumulative Loss is what you see in Column 7.

Q   And did you -- you reviewed Mr. Mulvaney's W-2s for 2021 and 2022?  I think I saw that in your report, fair?

A   Yes.

Q   Okay.  Did you receive or did you review any of Mr. Mulvaney's compensation information, whether that be W-2 or a tax return for any years prior to 2021?

A   Yes, I had his earnings data.  Let's see.  No, I think I just had 2021 and 2022.

Q   Did you ask whether any of the wage information for years before 2021 was available?

A   I don't think I did, no.

Q   If Mr. Mulvaney earned less than $58,624 in each of the three years before 2021 and you utilized that data as well, would that impact your final figures under your methodology?

A   Not necessarily.

Q   In what circumstances would it not impact your final conclusions?

MAGNA
LEGAL SERVICES

Page 30

A   If there had been some change in his job in those different time periods, some change in the level of responsibility or pay grade, also if there was reason to believe that his earnings during the time period that you're asking about may have been affected by COVID.  So, yeah, there are circumstance where it would not have an impact.

Q   And is there any reason you excluded prior years than '21 and '22 from your methodology?

A   No, I don't think so.

Q   And when you were running through it, you said one of the first things you calculated was what his earning capacity was.  What do you mean by you calculated that that's what his earning capacity was?

A   Well, I assumed at that point that he had the capacity to earn at least what his earnings were, what his average earnings were in those two years, that he had the capacity to continue earning that amount going forward.

Q   Well, when you say he had the capacity to continue earning that, what in particular do you mean by the phrase capacity?

A   Well, he may have -- you know, in the years following his death, he may have decided to work less, he may have decided to work more.  But again, I assume that

Page 31

he had at least the capacity to continue to earn what he -- what he was earning.

Q   Did you -- did you read any of the deposition transcripts in this case?

A   I did, following the date that I issued my report.

Q   But not prior to issuing your report?

A   Correct.

Q   Which depositions did you review after, after your report was issued?

A   His wife, Carri Lopez-Mulvaney, I looked through portions of that, and I looked through portions of his son's, Connor Mulvaney's deposition.  Those are the only two I received.

Q   And can we agree that Mrs. Lopez-Mulvaney testified that Randall Mulvaney planned to retire at age 67 or 68?

        MR. LONZO:  Object to the form.

A   No.

Q   You disagree that that's what she testified to?

A   Yes.  She said, "I think he was planning."  She didn't say he was planning --

Q   Gotcha.

A   -- to work until 67 or 68.

Q   That was Mrs. Lopez-Mulvaney's belief at the time of her deposition?

Page 32

A   That's what she stated on Page 22, Lines 18 and 19, yes.

Q   Did you consider that testimony at all since you received it as to modifying your report?

A   No.

Q   And why not?

A   Because that doesn't necessarily -- if she thought he was planning to retire at 67 or 68, that -- that doesn't necessarily affect his capacity.  He might have gotten to age 68 and changed his mind and said, "I love this," and worked until he was 80.  Or he might have retired at age 68.  We don't know.  That's all speculation.

Q   Well, what we do know is Mr. Mulvaney's wife said that she thought that he was going to retire at 68 or 67, fair?

A   She thought he was planning to.  That's, again, just from those two lines in her deposition.

Q   Did you review any record, document, testimony in this case that provided that Mr. Mulvaney was going to work up and through the time that he was 70 years old?

A   No, that wouldn't have been relevant, because what you're talking about is earnings, not earning capacity.

Page 33

Q   And there's that distinction again of earnings versus earning capacity.  If I'm understanding your distinction and how it ties in to your report, is it fair to say that you're not actually making any opinion as to what Mr. Mulvaney's actual lost earnings would have been?

        MR. LONZO:  Object to the form.

A   His actual, no, that's not fair to say.

Q   And how would you modify what I asked to make it fair?

A   His actual lost earnings are a part of earning capacity, but earning capacity contains more than what an individual's speculation on what a person's actual earnings may have been.

Q   And how did you arrive at the determination to use age 70 as a marker for your opinions in this case?

A   Age 70 is a -- is a typical age to use.  It's a common cutoff point.  He -- actually, you know, if he was an average person and he had the capacity to work beyond age 70 or, well, beyond age 80, he could have.  He had the capacity to work to some extent for the rest of his life.  But at some point, in my opinion, that's not a reasonable assumption, and so I just provide the information by year, I cut it off and say, okay, maybe he would have retired before 70,

**MAGNA**
LEGAL SERVICES

Page 34

maybe he would have retired after, but I'm going to cut it off at 70.

Q   And how did you decide that 70 is a common cutoff point?

A   By studying work life, by seeing work life expectancy tables and just by years of experience.

Q   Are there any work life expectancy tables that you relied on in formulating your opinions in this case?

A   No.

Q   Are there any articles, peer-reviewed journals, anything of that nature that states that it is common to use age 70 years as a retirement age for a decedent in a wrongful death case?

A   I don't know.

Q   Are there any peer-reviewed journals, articles, any government publications, any publications at all that you're aware of that says, for example, the average maritime construction worker works up and through age 70, at which point he retires?

        MR. LONZO:  Object to the form.

A   That wouldn't be relevant because, again, we're talking about capacity, not actual earnings.

Q   Do you know of any such publication as I just rattled through them?

A   I do not.

Page 35

Q   Is it fair to say you didn't rely on any such publication in formulating your opinion in this case and, in particular, arriving at the conclusion to use age 70 as the retirement figure for Mr. Mulvaney, fair?

A   I did not use age 70 as a retirement figure for Mr. Mulvaney, so no, not fair.

Q   I don't mean to be flippant, but if you didn't utilize age 70 for Mr. Mulvaney's retirement figure, then why is it in your report?

A   His actual retirement date, whenever that -- again, whenever we might speculate as to when his actual retirement date is could be used to estimate what his actual earnings, his actual earnings loss may have been, but it's not useful in identifying what a person's earning capacity is.  A person can retire at whatever age, and the next week they still have earning capacity.  They're just choosing not to use it.  They -- they're enjoying the value of their ability to choose, which is what Mr. Mulvaney has lost.

Q   Let's say that a decedent in a case that you are opining on had a set retirement date, he works at a firm that requires that for him to retire at age 65.  Are you with me?

Page 36

A   I'm with you.

Q   Under your standard methodology, would you provide a lost earnings capacity up and through age 70 if that were the fact circumstances of the case you're opining on?

A   Assuming there's no reason not to, yes, because the person could be retired -- in your hypothetical, the person could retire and the next week they launch a new career in some other activity or go to work for another company.  They still may have capacity.

Q   And as I understand it, under your methodology the capacity would in some sense be founded upon what the person's earnings were in the years before his death at the firm doing the work in that industry at a firm that makes him retire at 65, yet you would still provide the earnings capacity up and through age 70?

A   Potentially, if, you know, unless -- it depends on the -- it depends on details.  If the person is an airline pilot, maybe not.  They have to retire from commercial flying, but they can -- they could still fly freight, so they still may have earning capacity.  You know, it's the -- yeah, the answer to your question depends on the details.

Q   All right.  And so your opinion is that Mr. Mulvaney's past earnings capacity was $58,624.

Page 37

Do I have that correct?

A   That was his capacity in 2022, yes.

Q   Okay.

A   So I'm assuming that that's the case, since the company that -- that's what they would have paid him for that year.

Q   And you arrive -- well, is the $58,624 your figure for 2022?

A   No.  I'm sorry, that's the average of 2021 and 2022.

Q   '21 and '22?

A   Yeah, I'm sorry.  2022 is $57,180.

Q   And part of that $57,180, I think you said, was you extrapolate it out from his earnings through death, right?

A   Yes, that would be the last -- just the last 25, 26 days.

Q   Okay.  And so how do you arrive at that part of your -- at that particular component?

A   Well, his -- his total earnings in 2022 up to his date of death were $52,950.  And then assuming -- and that's off of his W-2s.  And then adding another 26 days worth of earnings at that year's rate would put him to $57,180.

Q   And what wage rate did you use for that?

A   His total earnings of $52,950 up to December 5th.

**MAGNA**
LEGAL SERVICES

Page 38

Q   Did you use an hourly rate or did you reverse engineer it from the total earned in the days through the year?

A   Neither.

Q   Okay. So how -- I'm just trying to figure out what your base rate is that you used to extrapolate out those I think you said 26 working days. Are you with me?

A   Yes. It would be the $52,000. I based it on the fact that he had earned the $52,950 in about, what, 344 days. And so whatever, whatever that average daily earnings rate is, I assumed that for the rest of the year to get the $57,180.

Q   Yeah, and as you said, you don't know what that daily rate is that you ultimately ended up using, fair?

A   It -- that's part of the $52,950. Whether you want to count it by the hour, by the minute, by the second or by that portion of a year, we're talking about the same coin, which is how much did he earn that year up to his date of death.

Q   In the 26 days that you used, did you assume he was working every day, or how did that factor in?

A   I assumed that he worked the same, the average number of days, you know, that he had the same hours, average hours per day as he did for the -- the first

Page 39

part of the year.

Q   And in running your calculations for the future earnings capacity, did you run or factor in any scenarios in which Mr. Mulvaney earned less than he did in '21 in '22?

A   No.

Q   All right. Then it says, "In addition to wages, Mr. Mulvaney also earned his employer's contribution to Social Security and health insurance, and I assume he had the capacity to also earn U.S. average retirement benefits." Do you see that part there?

A   Yes.

Q   And did you review any of Mr. Mulvaney's actual retirement benefits information?

A   I don't recall if I did or not. I think -- I think I knew that he -- that his current employer offered 4.3 percent. I may have -- I may have known that. I don't recall. Or at least that was a part of what they offered. I don't know if they offered additional retirement benefits or not.

Q   And meaning his employer matched 4.3 percent into a 401(k) plan?

A   Yeah, that sounds right.

Q   Did you use or review any schedules or payment history logs of what Mr. Mulvaney actually

Page 40

contributed to a retirement plan, a benefits plan?

A   No. That would be part of trying to project his actual earnings, because we don't -- in the hypothetical where he contributed an amount that would have gotten him less than the 4.3 percent match, he still had the capacity going forward. We don't know. It might have been December 6th he was planning on -- you know, again, in this hypothetical that he was planning on upping his contributions to get the 4.3 or -- or maybe more.

Q   Okay.

A   So there's a difference. That's, again, the difference between capacity and someone's speculation on what actually may have been going forward.

Q   And the 4.3 figure that you're using, where did you come up with that?

A   I don't remember where that was in the documents. I know it showed up in Dr. Hunter's report. I remember seeing it there.

Q   Okay. Did you --

A   I don't know in my documents where that was.

Q   And did you use a U.S. average for retirement benefits as part of your calculations?

A   Yes.

Q   And what are those figures?

Page 41

A   7.22 percent for average, U.S. average pension for retirement benefits.

Q   And walk me through that. What does that mean?

A   That the average --

Q   Sorry, go ahead.

A   That the average -- according to the Bureau of Labor statistics data, the average -- the average person in the -- employee in the U.S. earns -- a civilian employee in the U.S. earns 7.22 percent of their hourly wages as retirement benefits.

Q   So that would be -- if we looked at Mr. Mulvaney's 2021, he earned about $60,000, more or less, between C&L and Gillett, right?

A   Yes.

Q   And so if I understand what that 7.2 percent is, is it that Mr. Mulvaney if on average was getting that 7.2 percent that he would receive above that $60,000 in some type of retirement benefits?

A   No. It's -- it's saying that his employer in some way, in some form would have contributed value if he were -- if he were working at the capacity of the average civilian employee in the U.S., that his employer would have contributed value equal to about 7.22 percent of his earnings.

Q   And what goes into that value figure?

MAGNA
LEGAL SERVICES

Page 42

A   The average, the average civilian employee earns $2.30 in retirement benefits, and the average civilian employee earns $31.87 per hour, so that comes out to 7.22 percent.

Q   And is that things like a 401(k) match?

A   Yes, anything that could be considered retirement benefits.

Q   Yeah, that's what I'm trying to get.  What other -- are there other things in that value, that 7.2 percent value that are not strictly a cash benefit?

A   No.  I don't -- I don't know that I would classify 401(k) as a -- as a cash benefit.  I guess that depends on what time period you're talking about and making some assumptions, but it could take, you know, whatever form an employer might offer it in.  Whatever that form, the average civilian employee gets 7.22 percent in retirement benefits.

Q   I was referring to if you work at an employer that says, "If you contribute 3 percent of your salary to a 401(k) I'll match that, so if you're making $100,000, you kick in three, and I'll kick in 3."  That's what I meant by a cash benefit, fair?

A   Well, I understand what you meant, yep, okay.  So could you restate the question, please?

Q   Yeah, I'm just trying to figure out -- this 7.2

Page 43

figure that you used, I'm not familiar with that government calculation, and I heard that you said that there's 7.2 percent of value, which is, in my view, a little bit of a specious word in economics.  So I'm just trying to figure out what types of things could be all included in that 7.2 percent value.

    To me, cash benefit makes sense, okay?  Somebody gets or has an employer that matches up to 6 percent.  Well, there's 6 percent, I can see that.  But like what other things could comprise of that 1.2 percent in the -- in the figure that you're using?  Are we on the same page of what I'm trying to ask?

A   Yeah, okay, I think I see your distinction.

Q   Yeah.

A   It could be what you are describing as a cash benefit.  It could also be something like companies making contributions to a pension fund but there are -- and they may be cash contributions, but there's a vesting period, you know, in which case we're talking about value and not necessarily cash.  There's a wide, wide range of forms out there, I think.

Q   Could it be like an ESOP plan where the company will give you shares in the company instead of -- instead of money?

Page 44

A   I think it could be, yes.

Q   And could it be training?

A   I don't think so.  I don't think that would be included.

Q   How about like if an employee pays his cell phone bill after you retire for 10 years, could that be considered in what the government uses as value?

A   That I don't know.

Q   Did you review anything in this case to determine whether the benefits that C&L Contracting gave Mr. Mulvaney were above or below the average of 7.2 percent?

A   No.

Q   Okay.  And then I think I've got to come back.  Where does this 4.3 figure come in that we talked about a little bit ago?

A   Again, I don't recall if I saw that in information that I got from Attorney Lonzo.  It seems like I maybe saw it somewhere, but I know that I saw it in Dr. Hunter's report.

Q   Did you use the 4.3 figure at all in your methodology?

A   No.

Q   Okay.  And so you just used the 7.2 percent, which as I understand it, you took Mr. Mulvaney's past

Page 45

earnings capacity, which were based on his '21 and '22, and then you applied a 7.2 percent addition, which is based on that U.S. average of benefits that the average employee gets from their employer?

A   Yes.

Q   Okay.  So we can -- at least for your opinions in your report, wherever that 4.3, whatever that 4.3 means, we can disregard it for your opinions, fair?

A   I would characterize it as a part of the capacity, that he was earning at least a part of the capacity or the amount that he had the capacity to earn.

Q   Meaning it's part of the 7.2?

A   I don't mean that it's literally part of the 7.22 percent in terms of a calculation, but if we're assuming that he has the capacity to earn what the average civilian employee has, then we know in terms of what he was actually earning that if that 4.3 percent is accurate what he was actually earning was at least that much of the 7.22 percent.

Q   Right, yeah, I think I understood what you were saying, but we're on the same page now.  If your numbers take into account the 7.2, then they certainly take into account the 4.3 because it's lower, right?

A   Yeah, I think that's fair.

MAGNA
LEGAL SERVICES

Page 46

Q   All right.  Could you take us through and explain what the consumption is?

A   Yeah, so the consumption is based on his -- the fact that he was a husband and the fact that he had not yet retired, and it was based on their family income, or should have been based on their family income. And that was an error that I changed between the Exhibit 1 that you see and the new Exhibit 1 that you just got.

And so as I stated, my report states it accurately that consumption is based on family income, which would also include then Mrs. Mulvaney's or Lopez-Mulvaney's income, and it's the idea that he would have consumed a part of his income and he would have consumed a part of her income.  And so I reduced his earning capacity, the value of his earning capacity loss, to reflect the idea that not all of the family -- not all of his income would have been available as family support and now that he's deceased all of Mrs. Lopez-Mulvaney's income is available to the family for family support.

Q   And I think I heard it, but just how -- what's the definition of consumption or economic -- or how would you explain that to a jury, someone who's never heard it before?

Page 47

A   Consumption is the -- is the amount that a person spends or that it costs just to maintain an additional person in the household, and so that now that he's deceased, they don't have to spend that money anymore, and so it's recognizing that, you know, those costs go down a little bit because he's deceased.  They don't have to maintain him anymore.

Q   And what was wrong with the consumption figure that you used initially in Exhibit 1 to our Exhibit 1?

A   Originally in the report that you're looking at, in the text of the report I stated correctly that consumption should be a percentage of family income. In my calculations in the report that you're looking at, I only based consumption on his income, not Mrs. Lopez-Mulvaney's income, and so in that version I had understated the amount of -- the number of family dollars he would have consumed.

Q   Okay.  And what was Mrs. Lopez-Mulvaney's income figures that you used to modify your consumption figures?

A   Well, let's see.  I don't have her income in front of me, but she -- or their family income in 2021 was $119,318, so that -- so her income would be $119,318 minus $60,068, so she was about $60,000 a year.

Q   Is that $119,000 Mrs. Mulvaney's income personally or

Page 48

is that combined with Mr. Mulvaney?

A   That's combined.

Q   Okay.  So then in your opinion or from what you've reviewed, the Mulvaney's had a household income of about $119,000 per year?

A   Yes.

Q   And that's based on '21 and '22 earnings?

A   Just 2021.

Q   And then you used a consumption rate of 16.14 percent, right?

A   Yes.

Q   And where did you source that rate from?

A   That is from the Krueger article that I cite in Exhibit 1 --

Q   And that's --

A   -- on consumption.  Yeah, in that article he provides consumption rates based on different income brackets and different ages, different number of children, married versus single, man versus woman, or husband versus wife he identifies in there.

Q   Did you use the same 16.14 percent rate for your revised figures that we received earlier today?

A   Yes.

Q   Okay.  So the rate stayed the same; the only thing that changed was the household earnings?

Page 49

A   Correct.

Q   And I think if -- I mean, we'll get into it, but that's why the less consumption there doubles there?

A   Yes.

MR. ROMAN:  Okay, all right.  We've been going about an hour.  Why don't we take a break and we'll pick up there, if that works.

THE WITNESS:  Yes.

MR. ROMAN:  Okay.  How long, seven minutes, 10 minutes, something like that?

MR. ROSE:  Sure.

THE VIDEOGRAPHER:  Okay.  We're going off the record at 3:25.

(A recess is taken)

(3:25 p.m. to 3:36 p.m.)

THE VIDEOGRAPHER:  We're back on the record at 3:36.

EXAMINATION (RESUMED)

BY MR. ROMAN:

Q   Dr. Niendorf, we were starting to talk about the consumption figure.  How is that 16.14 percent calculated?

A   That's a value taken from the table of the Krueger article.

Q   Okay.  And is that article something that you

13 (Pages 46 to 49)

MAGNA
LEGAL SERVICES

Page 50

consider authoritative in your field?

A   Yes.

Q   Is that typically the article that you use to base consumption rates and offer opinions on lost earnings capacity?

A   Yes.  That's one pretty much everybody uses.

Q   And generally, can you describe how that figure, 16.14 percent, is arrived at?

A   Well, given the -- given the information in the article, the descriptions in the article, it's -- they're -- basically what they're doing is tracking individual spending on a range of different types of costs, based again on income levels and marital status, number of kids.  And then they provide that data in the tables, what does the average person of whatever parameter, what does the average person consume?

Q   So 16.14 percent is being used as the percentage of the Mulvaney household income that Mr. Mulvaney consumed while he was living; is that a fair way to put it?

A   Yes.

Q   Did you review any of Mr. Mulvaney's actual spending habits in arriving at your opinions in this case?

A   No.

Page 51

Q   How about Mrs. Mulvaney's spending?

A   No.

Q   And is the 16.14 percent tied to a certain income level?

A   Yes.

Q   What is -- is that like a range that Mr. Krueger uses?

A   Yes.

Q   And what range did you utilize for your opinions in this case?

A   It would have been the 80 to 89.9 thousand dollars level.

Q   And did you use the same 16.14 percent in the revised Exhibit 1 tables that we received?

A   Yes.

Q   What are the other available income ranges from which you can base a consumption rate for?

A   Well, the lowest one is 20 thousand to 29.9 thousand, and the highest one is 200,000 and over.

Q   What are the ones between the 89,000 range that you used and the 200,000 one?

A   90 thousand to 99.9, 100 thousand to 114.9 thousand, 115 thousand to 149.9 thousand, 150 thousand to 199.9 thousand.

Q   And what is the consumption rate that Mr. Krueger

Page 52

comes up with for the income bracket of 115 to 149, I think you said?

A   It would be 11.95 percent.

Q   And so using that figure as someone who's in that income bracket, a male generally, based on Mr. Krueger's research, would consume 11.9 percent of the family household income?

A   Yes.

Q   So are there any reasons that someone who earns more or someone in a higher earning -- a higher income earning household spends less?

A   I'm sure there are specifically, but the findings in the Krueger report are that, generally speaking, as your income goes up, your consumption percentage goes down.

MR. ROMAN:  I don't know about you guys, but I lost Dr. Niendorf.  I can see you talking, Doctor.  Did you hit Mute, by chance?

THE WITNESS:  I didn't lose you.

THE REPORTER:  I can still hear him.

(Discussion off the record)

THE REPORTER:  Should we go off the record for a second?

THE VIDEOGRAPHER:  Sure, I was just about to say that, yeah.  We're going off at

Page 53

3:42.

(Discussion off the record)

THE VIDEOGRAPHER:  Back on the record at 3:44.

EXAMINATION (RESUMED)

BY MR. ROMAN:

Q   Okay.  I'm sorry, Dr. Niendorf.  I don't think I was hearing your answer, and my question was what are the reasons, if you know, as to why someone's consumption rate would decrease as their household income increases?

A   I don't think I know the reasons why, but the results of the Krueger consumption studies shows that they do as a percentage.  The total dollars consumed increase, but the consumption percentage decreases.

Q   And the only one that you utilized in your opinions for Mr. Mulvaney are the 16.14 percent figure, fair?

A   That's the one that's appropriate for him, yes.

Q   And how did you determine to use that one?

A   I identified what his household income group would be, identified him as a husband, and that puts him in Table 1.  Because he was employed, that puts him in Table 1 of the Krueger report, the 16.14 percent, and that's the same -- the same study and the same table as Dr. Hunter utilized.

MAGNA
LEGAL SERVICES

Page 54

Q   All right.  Does a husband's consumption rate, based on the Krueger study, change as to whether they have dependent minor kids as opposed to adult children?

A   Well, they don't track for adult children, but it does -- it does change based on, you know, having minor children and how many minor children you have.

Q   Okay.  And which -- did you factor in any children into the figures you used for Mr. Mulvaney?

A   No.

Q   Okay, all right.  And why didn't you use the figure that was for that 115 to 150 income bracket range?

A   Because that was not their income bracket --

Q   Okay.

A   -- based on the report.  The report uses 2011 to 2013 dollars, and the $119,318 income level in 2022, you know, is stated in 2022 dollars.

Q   And so you discounted down from 2022 dollars to, you said, 2012 dollars?

A   Yes.

Q   Has that -- well, what year was that study done by Mr. Krueger?  It looks like it was published in 2015 but utilized data from beforehand?

A   Yes, it utilized data that was available, which it appears to be 2011 through 2013 data.

Q   Okay, all right.  And then in arriving at your

Page 55

future lost earnings capacity, you applied, I think, a 3.7 percent growth rate to what in your opinion was Mr. Mulvaney's earnings capacity, fair?

A   Yes.

Q   All right.  And that 3.7 was based on the CPI index?

A   No, that's not part of CPI, but it's related to CPI.  It's the --

Q   Okay.  Could you --

A   Sorry, go ahead.

Q   I was going to ask what the 3.7 figure reference, what that is.  How did you -- how did you determine to use it?

A   That's the -- that's the change in U.S. average hourly business compensation, so that's the 30-year average that I identify in my -- in my report.  I calculate that 3.7 percent using Bureau of Labor Statistics data.

Q   Okay.  And I saw in your report you said using Bureau of Labor Statistics Consumer Price Index data, so that is not a reference to the actual CPI?

A   Yeah, my mistake.  It's actually this is a subset of this, of the CPI, so, yes, it is.

Q   Okay, all right.  And so the 3.7 is the average wage growth rate; am I understanding that correctly?

A   Yes.

Page 56

Q   And what -- well, what industry did you use to get those figures?

A   It's industrywide.

Q   Okay.  And why did you use the 30-year average?

A   30 years is long enough to contain a range of different economic conditions, so that's the rationale for using 30.  Longer than 30, I think the economy starts to differ structurally enough that it's not appropriate to include longer than 30.

Q   Okay.  And I see in the figures that you used a discount rate of 3.0 percent, fair?

A   Yes.

Q   And is that only for reducing the figures to net present value that you use that rate?

A   To present value, yes.

Q   Okay.  Does the 3.0 discount rate have anything to do with the 3.7 growth rate that you used?

A   They're calculated independently.  Economists would probably argue about how they're related.  I'm sure they are somehow, but they are calculated independently from different data sets.

Q   And can you recall the figures that you used to come up with the average growth rate of 3.7, like where you pulled the pinpoints from?

A   Yes, that's the using the index that's available for

Page 57

the hourly business, U.S. hourly business compensation.

Q   And that's -- do you have like the particular source that you used?

A   Yes, that's the source that I just identified.

Q   And that's available on the Bureau of Labor website?

A   Yes.

Q   And in calculating the discount rate, I see that you omitted the 2011 to 2015 time frame.

A   Yes.

Q   And why did you do that?

A   Because those were years, some of the years, that the Federal Reserve was exerting extreme control over interest rates.  Treasury bill rates were effectively zero or very close to it.  And I don't -- I don't think it's realistic to think that going forward that they could do the same thing.  There are a couple of years remaining outside of that on either side of that window where rates are very low or very close to zero, but again, I don't think it's realistic that they'd do that in the future.

Q   And what do you base that prediction on?

A   My understanding of the -- of how interest rates are set and how the economy works.

Q   Well, President Trump has been calling for zero



MAGNA
LEGAL SERVICES

Page 58

percent interest rates, right?

A   Not that I've heard.  He wants them lower.

Q   We must read different financial news.

A   He definitely wants them lower, but I haven't heard zero.

Q   I think he'd go negative if you'd let him, right?  Is it fair to say that removing that low rate period increased the figures that you used?

A   It increased the discount rate and it decreased the losses, the value of earning capacity and domestic service, so removing that period makes my values more conservative or closer to zero.

Q   And could you explain how you used the 30-year average of the 90-day T-bills?

A   Yes, that's the -- that 30-year average of 3 percent is the rate that I applied to reduce future earning capacity losses to reduce them or to bring them back to the present as of June 26, 2026.

Q   And how did you figure to use June 26, 2026?

A   That was the date Mr. Lonzo asked me to use.

Q   Did Mr. Lonzo tell you that's our trial date, probably the date you might be testifying?

A   I don't know if he did at the time, but that's my understanding now, yes.

Q   All right.  If we go go to Exhibit 1 of the report

Page 59

that we're looking at, the totals in bold at the bottom, those are your top-line opinions as to what you opine as to Mr. Mulvaney's lost earning capacity, fair?

A   Yes, as of the date of -- of this report.

Q   Yes, and that's net present value as of June 26, 2026 for depending on what year you look at, right?

A   Yes.

Q   And so if I read correctly your opinion, if we use 67 for Mr. Mulvaney, then, in your opinion, based on the methodology you used, that Mr. Mulvaney's cumulative lost earning capacity would have been 206,305, right?

A   Yes.

        MR. LONZO:  We're talking about as of the date --

Q   And then --

        MR. LONZO:  Excuse me, Mike.  We're talking about as of the date of his report, not considering the revisions that were referenced earlier?

        MR. ROMAN:  Yeah, I'm going to get to the revisions.

        MR. LONZO:  Okay.

        MR. ROMAN:  I just want to make

Page 60

sure.

        MR. LONZO:  Okay.

Q   And I think, is it fair to classify -- and we'll just use the total figure, the 405,357 -- that that would be a maximum earning capacity loss in your opinion?

A   No.

Q   Okay.  How is it not, I guess, a maximum?

A   Well, it -- it doesn't include any earning capacity that he has after age 70, so if he had the capacity in fact to work until age 75 or work until age 80 doing whatever, doing his original job or working as a checker at Kwik Trip or whatever he might have done or wanted to do.  So that would be the maximum would be to take it out to -- well, work life expectancy tables will take it out to age 100.

Q   And I understand that's the maximum, but taking -- assuming that we're only talking about up until the age of 70, the dollar figure, the 405,357 would be the maximum, and that's where the difference between the earning capacity versus actual earnings comes into play a little bit, right?

A   No, I don't agree with the characterization, your characterization of it as a maximum.  It's this is the value of his earning capacity by year.  There's no maximum to it, unless you're talking about,

Page 61

you know, a lifetime maximum.

A   All right.  Let's look at the -- I guess we'll do Exhibit 3 for the revised Exhibit 1 Earning Capacity. Do you have that in front of you, Mr. Niendorf?

A   Yes.

Q   We'll mark this as Exhibit 3.  And then Exhibit 4, for everyone else, it will be the Exhibit 2. Dr. Niendorf, can you run us through what the -- what we've marked as Exhibit 3 is, please?

A   Yes.  Exhibit 3 is the same in principle to Exhibit 1 with three changes.  First is it has the correct and higher consumption amounts.  And second, I updated the growth rate, and the -- and third, I updated the discount rate.

Q   Okay.  So for the consumption, is the only difference the revised household income that we discussed earlier?

A   Yes.

Q   Because that was taking the household income from -- well, what was the household income in pure 2022 dollars that you used for the revised calculations on Exhibit 3?

A   I didn't use it in 2022 dollars.  I used it in 2021 dollars, which was 119,318.  Do you mean for purposes --

MAGNA
LEGAL SERVICES

Page 62

Q   And then you --

A   Do you mean for purposes, I should ask as a clarification, looking it up in the table or for going forward for the -- for calculating the consumption dollars themselves?

A   Yeah, yeah, that's what I'm getting at. So the 119 that you used was the real 2021 dollars of the Mulvaney family household income, right?

A   I used the, yes, 119,318, and then -- for family, family income. And then going forward, I applied the 3.77 percent growth rate to that 119,318 to calculate the estimated family income in the years forward.

Q   But first I want to -- that 119,318, you still used the Krueger tables for the consumption rate, fair?

A   Yes.

Q   Okay. And so did you reduce the 119,318 from 2021 dollars to I think it's 2012 dollars?

A   I just did it once to identify -- in terms of the 2021 dollars, I reduced 119,318 just to get the 16.14 percent from Krueger's Table 1. And from there, I applied the 16.14 percent in all subsequent years.

Q   Okay, because I think I was misunderstanding earlier. So that -- the reason you used that 80 to 89 thousand dollar range on the table from Krueger was because

Page 63

that's what the figure of 119,318 was when you reduced it, discounted it down to those, whatever year the figures are that are used in Krueger, right?

A   Yes.

Q   Okay. And then that 3.7 percent is the same average of the wage growth rates that we discussed earlier?

A   Yes. It increased a little bit, it went to 3.77 percent, but, yes, representing the same thing as what we talked about earlier.

Q   And why did it increase to 3.77 percent?

A   Wages have been going up at a higher rate than average since I authored my first report, well, my only report.

Q   Okay. So you pulled from that Bureau of Labor Statistics CPI page again in revising and used the updated figures?

A   Yes.

Q   And what -- because I've been on the Bureau of Labor Statistics website, it is vast and there's a lot to it. Like where can I find that, the figures you used for that 3.7 percent?

A   It's under the CP -- under the, you know, overall umbrella of the CPI calculations, and it's under the producer. There's a Producer Cost Index, and within the Producer Cost Index there's an index for

Page 64

Average Hourly Business Compensation, and it's in there.

Q   Did you review any of the BLS data on wage growth within the construction industry in particular?

A   No.

Q   Do you know if the BLS tracks such data?

A   I don't think they track it just for construction, but they track it, as I recall, for a wider range. It's like construction and transportation and mining or something.

Q   Right. I figure it tracks, you know, blue-collar labor, fair?

A   Yeah, I don't think they would identify it as such, but maybe.

Q   I know they wouldn't, but you and I are speaking to, you know, normal people, so that's how we or at least I would characterize it. But we're on the same page, that there is a figure out there from BLS that tracks wage growth within that construction/laborer/mining industry, right?

A   Yes.

Q   Okay. And why did you --

A   Give or take -- give or take a couple of categories in that description, yes.

Q   Okay. And so why did you use the producer cost

Page 65

hourly rate as compared to that construction industry growth rate?

A   The -- the average one, the hourly business compensation that I used, comes from a bigger sample set, and I make the assumption that long-term wage growth has to -- that wage growth in all industries has to -- has to keep up. All industries have to keep up or they start getting short of labor or having excess labor, and so long-term, you know, industries have to -- have to come to -- to the economywide average.

Q   Now, you say keep up with. What's the benchmark you're referring to as keeping up with?

A   The U.S., the average, the economywide hourly business compensation average across all different industries.

Q   And do you know whether or not over the last 30 years that the wage rates for construction and labor have kept up with that benchmark?

A   I've not looked that up specifically, no.

Q   And does the 3.7 -- I know I asked this a little bit earlier. The 3.7 is not just a straight Consumer Price Index metric, right?

A   It is from that database, but it is specifically calculated from the data on wages that employers pay

17 (Pages 62 to 65)

Page 66

employees. So I think if what you're asking, no, it doesn't include, you know, how has the price of socks changed over the last 20 years.

Q   Yeah.

A   And so it's all just based on what employers are paying their employees to be able to maintain the workforce.

Q   All right. So that's where the revised consumption figures come in in your new Exhibit 1, right?

A   Well, what is where they come in? I don't understand the question.

Q   The difference in the numbers, 128,429 compared to 69,611, is due to you using slightly revised 3.77 percent growth rate and the updated household income of about 119,000 as compared to the 60-some, right, those are the two, the two inputs that changed in order to come to your new figures?

A   Yes.

Q   Okay. Any other changes either to your methodology or the inputs that you used that caused your new consumption figures on your revised Exhibit 1?

A   Not in calculating the values themselves, but as they stand or as they're presented in Exhibit 1, the discount rate also changed just a little bit, and that would have affected -- you know, affected the

Page 67

actual numbers that you see in the new Exhibit 1 or what you're calling Exhibit 3. That would have affected those values just a little bit.

Q   Okay. And how did the discount range change?

A   It went from 3.0 percent in my original Exhibit 1 to 2.9 percent in the new table in the Exhibit 3.

Q   And what caused that change, if you know?

A   Changes in U.S. Treasury Bill rates, 90-day rates.

Q   And you used the same 30-year average of the 90-day T-bills?

A   I moved it. It is a 30-year average. I moved it forward, or that window moved forward a little bit, but other than that, it's calculated the same.

Q   Yeah, so what was the updated window that you used?

A   February 1st of '91, 1991, through March of 2026. That would actually probably be easier to think of as March 1st of 1991 through March 1st of 2026.

Q   And did you also exclude the 2011 through 2015 in that second set of calculations you did?

A   Yes.

Q   Do you always typically remove those years from when you're offering opinions on lost earning capacity?

A   Well, not preceding 2010, but -- and I don't remember at what point I switched that over, but in recent years in a case like this, yes.

Page 68

Q   Are there any circumstances where you leave in that five-year period?

A   Not that I can think of.

Q   All right. So I think I heard you say consumption and the growth rate changed a little bit, which we've talked about both of those, right?

A   Yes.

Q   And then there was a third category. There was one other change from your original report and this one. What was that third category again?

A   The discount rate.

Q   Discount. And that was from 3 to 2.9, right?

A   Yes.

Q   Okay. There are slight variations between your revised Exhibit 1 and the original on the earnings and the benefits. What is that attributable to?

A   Can you be more specific?

Q   Yeah. Well, it looks like your earnings -- the earning capacity on what we've marked as Exhibit 3 is 381,419. On your original report it was 380,276. So it's only about 1,200 bucks, so a minor modification, but I'm wondering why, why that figure in particular changed on your revised report.

A   That's as a result of the updated growth rate, the 3.77 versus 3.70, and the updated discount rate

Page 69

of 2.90 versus 3 percent discount rate.

Q   Okay. And then that would be the same for the benefits, right?

A   Yes.

Q   And then the consumption, the main differences were the updated household income, right?

A   Yes.

Q   All right. Let's talk about the domestic service loss. You had not reviewed Mrs. Mulvaney's -- Mrs. Lopez-Mulvaney's testimony at the time you authored your report, right?

A   Right.

Q   And we've talked about it, but as I understand it, the figures that we see on Exhibit 2 are what the average married White male, the average value of those services for that particular individual in America would be through Year 2040?

A   Yes, for that age range. And it doesn't specify. I -- I don't specify White, but an average male in that age range, yes.

Q   Okay. Is any figure on Exhibit 2, which is your report that we marked as Exhibit 1, or the revised table that we marked on Exhibit 4 specifically tied to what Mr. Mulvaney's domestic services were?

A   No, this is just the value of what the average man

MAGNA
LEGAL SERVICES

Page 70

does during this -- this time period from December 5, 2022 to -- well, let me restate that -- from age 64.2 to age 81.9.

Q   Okay. And that's for one hour of service per day per year, right?

A   Yes.

Q   And as I understand, your ultimate conclusion for the domestic service loss for Mr. Mulvaney is that it would have been about 488,168, which is the 145,292 figure times 3.4, which is the average hours a male works domestically in the house, and that's how you arrived at your final figure?

A   If his ability to provide household domestic service was averaged, yes.

Q   Do you think that Mr. Mulvaney while he was alive provided more or fewer services around the house than the average male?

A   I don't have an opinion on that.

Q   And you've now read Mrs. Lopez-Mulvaney's deposition testimony, including where she said that he was outside of the home about 80 percent of the time?

A   Yeah, I don't recall the amount.

           MR. LONZO: Objection to form.

A   I -- I recall that he -- that he traveled for work a lot, he was away for work a lot.

Page 71

Q   Did you use the same discount to present value methodology as you did for the lost earnings capacity?

A   Yes.

Q   And what are the differences between the revised Exhibit 2 and the initial one in your report?

A   Only the growth rate and the discount rate.

Q   So you used the same revised 3.77 percent growth rate and that 2.9 percent discount rate?

A   Yes.

Q   And is that -- well, I guess how did you use that growth rate in your methodology for the domestic service loss?

A   I computed the -- the value of one hour, and then for each of the -- each of the subsequent years, the first year being 2022, just the tail end of the last 25 days there, I computed the value of one hour for 2022. And I also at that point had the data to compute the value of one hour in 2023 and following, in the following years, so beginning in 2024, you know, through 2040, I applied that growth rate of 3.77 percent.

Q   And how is that value of one hour of service calculated?

A   I calculate that using data from Wisconsin Workforce

Page 72

Development.

Q   So if I'm looking at Exhibit 2, the value of one hour of service per day per year is $454?

A   Yes, for -- for the 25 days that remained in 2022.

Q   And so were you using like a particular daily rate for the domestic service?

A   Yes, that was -- that's -- that $454 is based on an hourly rate of $18.15 in 2022.

Q   And how did you come up with the $18.15?

A   That's calculated using data from Wisconsin Workforce Development where they identify the costs of a wide range of services, so that's picking out the different domestic service components, identifying them and identifying their cost and then using those to calculate the weighted average of $18.15.

Q   And what is that Wisconsin workplace services? Is that a database?

A   Wisconsin Workforce Development, yes.

Q   And what's in the database, what type of information?

A   Well, wages, cost of -- the cost of hiring someone, effectively, for all kinds of different occupations.

Q   Okay. And so if I look at your report, it says, "According to his wife, Carri Lopez-Mulvaney, Mr. Mulvaney did their lawn work, snow removal, home maintenance, home improvement, and shared in

Page 73

doing household laundry, cleaning, grocery shopping, cooking, and picking up and dropping off their son from school," fair, that's in your report?

A   Yes.

Q   Okay. So did you look in that -- I apologize, Dr. Niendorf. I'm going to forget the name of it, the Wisconsin workplace database?

A   Workforce Development, yep.

Q   I apologize. So if I look in that database, did you review labor rates for folks in the lawn care industry?

A   Yes.

Q   And then people who work in the snow removal business?

A   I think it was, yeah, so yard -- there's a category for yard maintenance. I don't know if snow removal is specifically a part of that one, but one of the categories they provide is yard maintenance.

Q   So if I'm understanding correctly, that database said on average in Wisconsin people who do lawn work charge 15 bucks an hour, let's just say hypothetically. Is that the type of data that you're pulling from that database?

A   Along those lines, yes.

Q   Okay. And so my understanding is your $18.15 figure

MAGNA
LEGAL SERVICES

Page 74

is you pulled various wage rates from categories that you believed applied, things like lawn work, snow removal, home improvement, et cetera, pulled them, averaged them together and came up with a rate to apply for Mr. Mulvaney at $18.15 per hour?

A   Yes.

Q   Okay.  And do you know particularly what rates you pulled to come up with that average?

A   Yes.

Q   Which ones did you use?

A   Let's see, cooks and so forth for cooking, $16.80 an hour; dishwashing, $11 and -- well, I can tell you the categories or I can read them all off, I guess, whichever you --

Q   Yeah, if you can read them off, that would be great.

A   Okay.  Dishwasher is $11.99 an hour; housekeeping, $14.42 an hour; animal care, $13.37 an hour; food prep workers, $14.03 an hour.  Home health aides, this is under the category of caring for and helping household members.  Home health aides is $14.09 an hour.  Orderlies is $16.79 an hour.  Personal care service workers is $16.02 an hour.  Yard maintenance is $17.53 an hour.  Home repairs is $20.25 an hour.  Auto maintenance is $23.73 an hour.  Farm and home management and home

Page 75

management advisors is $28.16 an hour.  And dietitians and nutritionists is $30.48 an hour.  Procurement, so purchasing goods and services, is $21.24 an hour.

Q   Did you weight any of those at all in coming up with your $18.15 average?

A   Yes, they're all weighted based on weights provided in the American Time Use Survey.

Q   Okay.  And what -- so those, you weighted them tied to the U.S. average from the ATU survey?

A   That's it, yes.

Q   Okay.  I'm just curious.  What's the average male weight for household services?  What does the average male do more of?

A   For household services, so just cooking, washing dishes, housekeeping, animal care and food prep is .5256 hours per day.

Q   So then back to Exhibit 2, and I'm going to look at the one we've marked, excuse me, as Exhibit 4, we use those figures.  So in 2022, your opinion is that Mr. Mulvaney would have provided $454 worth of household services in the remaining part of 2022 had he been alive?

A   No.

Q   Okay.  Could you just explain how we interpret what

Page 76

that 454 means?

A   That 454 is the value of the loss of one hour per day in 2022.  And so if you're asking for the total value of his domestic service in 2022, in the remainder of 2022, if we assume that he provides an average amount of domestic service, the 3.4 hours a day, it would be 3.4 hours times the $454.

Q   So all of the -- all of the rates that we just went through, the dishwasher, the animal care, did you add all those together to come up with the figure we see in value of one hour of service?

A   They're a weighted average, so not straight added, but added in the process of computing a weighted average, yes.

Q   So if --

A   So all those values, all those values that -- all those values that we talked about are contained in that $454.

Q   Okay.  So if Mr. Mulvaney worked one hour to maintain things around the house, you would -- you're applying a $454 value on that one hour?

A   One hour per day for the remainder of 2022, yes.

Q   So if Mr. Mulvaney spent four days from December 5, 2022 -- and obviously this is a hypothetical had he lived -- but he was home for the weekends from

Page 77

December 5, 2022, so six weekend days, and he put in six hours of work, if I'm doing the numbers right, that would be six times $454 for those six days as the total value?

A   No.  It would be -- you'd have to calculate in your hypothetical however many hours of domestic service you want to assign him, like total hours for the remainder of 2022, and then you'd have to divide by the 25 days that he was not alive in 2022.  That would give you your hypothetical average daily rate or daily amount, and then you would multiply that by the 454.

A   I see, okay.  And then explain how we can interpret 2023, so the first full year that Mr. Mulvaney was not living.

Q   So that's the same in principle as 2022, except it's for the full year of 2023, and it's had that, oh, you know, one year of -- well, actually, 2023 is not a year of growth.  That's an actual number as well.  The weighted average went up to $19.66 an hour.

Q   Oh, so the $18.15 changes by year?

A   Yes.  The cost of replacing all those services changes every year.

Q   Okay.  Is that true for each year that you have listed here on Exhibit 2?

MAGNA
LEGAL SERVICES

Page 78

A   Yes, it's true for 2022 and 2023, which are actual. I had the data at that point to calculate actual values. But then in 2024, that data wasn't available yet, and so 2024, that is just based on the 3.77 percent. If we're talking about Exhibit 4 versus Exhibit 2, 2024 is 3.77 percent greater than 2023.

Q   All right. Let's go for 2027. And if you could just take us through, what does the 7,972 figure mean, how do we interpret that?

A   You would interpret it as the value as of June 26, 2026. The value of the domestic service of one hour per day of domestic service that he is no longer able to provide is $7,972.

Q   In that year, 2026?

A   As of June 26, 2026, that's the value on that day of the domestic service that he would have -- the value of one hour per day of domestic service for the year 2027.

Q   And then what -- for that year 2026, what was the rate that you used?

A   2027 or '26?

Q   2027, I'm sorry.

A   And which, which rate?

Q   The daily rate equivalent to the $18.15 that you

Page 79

would have used for 2022.

A   Ah, gotcha, okay. So for 2027, it would be $22.80.

Q   And then how many hours did you use for that?

A   How many hours did I use for what?

Q   Well, I'm just trying to -- what's your actual calculation for arriving at 7,972?

A   It's $22.80 per hour times 365 days in the year identifies a 2027 value of $8,321, and that amount is discounted back to June 26th of 2026, and that is $7,972.

Q   And then from '27 onward, 2027 onward, if we apply that 3.77 percent rate to the hourly rate, is that the input, is that how we arrive at one of the inputs for the remaining figures?

A   Yes, if you apply onwards, if you're talking about Column 3 there, so if you take the 7,972 that you were talking about and if you multiply that by 1.0377, you should get the 8,039.

Q   Gotcha, okay, all right. So let's stick with 2027. Would one way to explain this be every day of the year Mr. Mulvaney would have provided one hour of domestic service and that the value for each one of those hours worked is $22.80 and that's how you arrived at $7,792 discounted for 2026 dollars?

A   It's not assuming that he provides it every day.

Page 80

It's assuming that he provides an average of one hour per day.

Q   Sure.

A   But other than that, yes.

Q   All right. And then the only difference between that -- well, what's your total figure, your opinion for the total value of Mr. Mulvaney's lost domestic services based on the revised numbers that you used in arriving in what we've now marked as Exhibit 4?

A   Assuming he provides an average amount of domestic service --

Q   Yes.

A   -- it's $493,993.

Q   And that's up from 488,168?

A   Yes, one second.

Q   That's not a trick question. I'm looking at your report, the bottom of the second paragraph on Page 2.

A   Yes, that's up from the 488,168. So there is that multiplier. It's not the 143,579. Now it is 145,292. But other than that, it's the same.

MR. ROMAN:  Okay, all right. Dr. Niendorf, I think that's all I have for now. I appreciate you bearing with me, and it's good to meet you.

THE WITNESS:  Okay, thank you.

Page 81

MR. LONZO:  I have no questions.

Mr. ROSE:  All right. Thanks, Mike. Thanks, Doctor.

THE WITNESS:  Yep.

MR. ROMAN:  Dr. Niendorf, do you like to read and sign or waive signature?

THE WITNESS:  Waive, but whatever Mr. Lonzo would prefer.

MR. LONZO:  That is fine.

THE VIDEOGRAPHER:  Are you ready to go off the record now?

MR. LONZO:  Yes.

THE VIDEOGRAPHER:  Okay. We're going off the record at 4:41 p.m.

(Off the video-recorded record)

THE REPORTER:  And then just on the stenographic record, I just need everyone's orders. I just need everyone's orders on the record. Mr. Roman?

MR. ROMAN:  Yeah, I know. I'm trying to decide. Can I let you know this afternoon? We're not going to order it at this time, I guess.

THE REPORTER:  Okay.

MR. LONZO:  We'll let you know also.

MAGNA
LEGAL SERVICES

Page 82

MR. KOPPES:  Yep, I'm with them, same.

THE REPORTER:  Okay.

MR. LONZO:  Same with Mr. Rose.

MR. ROSE:  Yep, same for me, yep.

THE REPORTER:  Okay.  Thank you all.

(Adjourned at 4:42 p.m.)

Page 83

STATE OF WISCONSIN   )
                     )
COUNTY OF DANE     )

        I, SANDRA L. McDONALD, Shorthand Reporter and
Notary Public in and for the State of Wisconsin, do hereby
certify that the foregoing is a true record of the
videoconference deposition of BRUCE NIENDORF, Ph.D., who
was first duly sworn by me, having been taken on the 11th
day of May, 2026, from various remote locations, in my
presence, and reduced to writing in accordance with my
stenographic notes made at said time and place.

        I further certify that I am not a relative or
employee or attorney or counsel for any of the parties, or
a relative or employee of such attorney or counsel, or
financially interested in said action.

        In witness whereof, I have hereunto set my hand
and affixed my seal of office this 14th day of May, 2026.


        _____
        Notary Public, State of Wisconsin
        My Commission Expires 10/18/26

MAGNA
LEGAL SERVICES

## A

**ability**
22:7 35:20 70:13
**able**
66:6 78:13
**about**
5:1,22 6:1,17,19 8:22
12:11 14:6 25:15
27:9 30:5 32:24
34:22 38:10,18
41:12,23 42:13
43:20 44:5,15 47:24
48:5 49:6,20 51:1
52:16,25 56:19
59:15,19 60:17,25
63:9 66:15 68:6,21
69:8,13 70:9,21
76:17 78:5 79:15,17
**above**
41:17 44:11
**above-entitled**
2:3
**absence**
19:9
**accordance**
83:10
**according**
41:6 72:23
**account**
15:21 45:22,23
**accurate**
6:7 12:13 16:12
45:18
**accurately**
46:11
**across**
65:15
**action**
13:12 14:17 83:15
**activities**
22:22
**activity**
36:9
**actual**
15:21 16:3,7,12,25

17:22 18:6,24 19:2
19:20 33:5,8,11,14
34:22 35:11,12,14
35:14 39:13 40:3
50:23 55:20 60:20
67:1 77:19 78:1,2
79:5
**actually**
23:6 33:4,18 39:25
40:14 45:17,18
55:21 67:16 77:18
**Acuity**
11:8
**add**
76:9
**added**
7:2 76:12,13
**adding**
37:21
**addition**
39:7 45:2
**additional**
39:20 47:3
**Adjourned**
82:6
**adult**
54:3,4
**Advanced**
9:1
**advisors**
75:1
**affect**
32:9
**affected**
30:5 66:25,25 67:3
**affixed**
83:17
**after**
9:19 31:8,8 34:1 44:6
60:9
**afternoon**
4:24 81:21
**again**
4:24 14:23 15:15
22:25 26:14 28:11
28:23 30:25 32:17

33:1 34:21 35:11
40:8,12 44:17 50:13
57:20 63:15 68:10
**age**
2:2 21:1 23:16,23
24:6,14 25:17 26:15
31:15 32:10,12
33:16,17,17,20,20
34:12,12,19 35:4,6
35:9,17,24 36:3,16
60:9,10,10,15,18
69:18,20 70:3,3
**ages**
48:18
**ago**
44:16
**agree**
31:14 60:22
**Ah**
79:2
**ahead**
10:2 13:24 14:24
18:14,16 25:21 41:5
55:9
**aides**
74:19,20
**airline**
36:19
**al**
4:4 10:18,18
**alive**
70:15 75:23 77:9
**all**
2:3 5:12 6:5,10,14
7:20 9:4,6,25 11:25
14:12 25:13 26:20
27:13 32:3,13 34:16
36:24 39:7 43:6
44:21 46:1,17,18,20
49:5 54:1,10,25
55:5,23 58:25 61:2
62:21 65:6,7,15
66:5,8 68:4 69:8
72:21 74:13 75:5,7
76:8,8,10,16,16,16
77:22 78:8 79:19

80:5,21,22 81:2
82:5
**alluding**
14:14
**almost**
14:12
**Along**
73:24
**also**
2:22 7:6 8:11 10:4,13
11:3,20 13:7 14:17
15:25 17:6 20:7
28:10,17,20 30:3
39:8,10 43:16 46:12
66:24 67:18 71:18
81:25
**always**
19:21 67:21
**am**
55:24 83:12
**amended**
27:10
**America**
1:14 69:17
**American**
1:8 20:3,19 21:18
22:16 23:5,20,22
75:8
**AMERICAS**
1:15
**amount**
17:4 20:14 29:1
30:19 40:4 45:11
47:1,16 70:22 76:5
77:11 79:8 80:10
**amounts**
28:13 61:12
**an**
5:5 9:2 11:17,20 12:1
13:10 14:7 15:6
16:4,11,16 17:6
19:10,16 22:5 23:11
23:15 24:25 26:9,10
28:23 30:7 33:13,19
36:18 38:1 40:4
42:15,18 43:8,23


MAGNA
LEGAL SERVICES

44:5 46:7 47:2 49:6
63:25 69:19 70:18
72:7 73:21 74:12,16
74:17,17,18,21,21
74:22,23,24,25 75:1
75:2,4 76:5 77:19
77:20 80:1,10
**ANCHOR**
1:14
**Andrie**
1:12,13,13
**animal**
74:17 75:16 76:9
**annually**
21:6
**another**
36:10 37:21
**answer**
10:2 13:24 15:15
19:24 25:23 36:22
53:8
**anticipated**
14:3
**anti-trust**
12:21
**any**
8:10 9:6 10:20,24,25
12:24 13:7,9 24:8
29:11,13,16 30:8
31:3 32:19 33:4
34:7,10,15,15,16,23
35:1 39:3,13,24
50:23 52:9 54:7
60:8 64:3 66:19
68:1 69:21 75:5
83:13
**anymore**
47:5,7
**anyone**
19:15
**anything**
5:24 7:10 16:21 17:8
24:14 34:11 42:6
44:9 56:16
**apologies**
25:22

**apologize**
73:5,9
**appear**
6:2
**appearing**
2:12,17,21 4:9,14
**appears**
54:24
**applicable**
2:4
**applied**
28:5 45:2 55:1 58:16
62:10,21 71:21 74:2
**apply**
15:8 17:21 26:8 74:5
79:11,15
**applying**
76:20
**appreciate**
80:23
**appropriate**
53:18 56:9
**are**
4:2 6:3 11:5,25 12:18
12:19,20 17:1 18:2
18:7,18 19:20,22
20:23 22:19 24:15
24:20,22 25:15
28:15 29:3 30:6
31:12 33:11 34:7,10
34:15 35:22,25 38:7
40:25 42:9,10 43:11
43:15,18 51:16,20
52:9,12,13 53:8,17
56:20,20 57:17,19
57:23 59:2 63:3,3
64:15 66:5,16 68:1
68:14 69:14 71:5
76:17 78:1 81:10
**Areas**
5:24
**arena**
7:18
**argue**
56:19
**around**

7:15 10:6 70:16
76:20
**arrive**
33:15 37:7,17 79:13
**arrived**
50:8 70:12 79:24
**arriving**
35:3 50:24 54:25
79:6 80:9
**article**
48:13,16 49:24,25
50:3,10,10
**articles**
34:10,15
**Artisan**
11:1
**ask**
6:24 11:20 14:15
29:16 43:12 55:10
62:2
**asked**
14:17 33:9 58:20
65:21
**asking**
30:5 66:1 76:3
**assign**
77:7
**ASSOCIATES**
2:15
**ASSOCIATION**
1:16
**assume**
17:15 30:25 38:21
39:9 76:5
**assumed**
30:15 38:12,23
**assuming**
25:12,16 36:6 37:4
37:20 45:15 60:17
79:25 80:1,10
**assumption**
33:23 65:5
**assumptions**
42:14
**at**
2:7 6:3,7,8,16,18 8:7

8:10,23 9:6,25
12:23 14:25 15:7,19
16:7 17:6,9 19:10
21:3,4,10 24:17
30:15,16 31:1,15,24
32:3,8,12,15 33:15
33:22 34:2,16,19
35:3,16,23,24 36:14
36:14,15 37:17,18
37:22 39:18 41:11
41:21 42:18 44:21
45:6,10,19 47:10,14
49:13,17 50:8,24
52:25 53:4 54:25
58:23 59:1,1,7
60:12 61:2 62:6
63:11 64:16 67:24
69:10 70:12 71:18
72:2,22 74:5 75:5
75:18 78:2 79:6,13
79:24 80:16 81:14
81:22 82:6 83:11
**attorney**
3:3,4,5,23 44:18
83:13,14
**attorneys**
4:25
**attributable**
68:16
**ATU**
22:11,15 24:3 75:10
**authored**
21:11 63:12 69:11
**authoritative**
50:1
**Auto**
74:24
**available**
24:11 29:17 46:19,21
51:16 54:23 56:25
57:6 78:4
**averaged**
70:14 74:4
**avoid**
27:8
**award**


MAGNA
LEGAL SERVICES

7:7,7
**aware**
34:17
**away**
70:25
**a/k/a**
1:13,13,15,16

**B**

**B**
3:7
**back**
8:9 15:12 27:8 28:14
44:14 49:16 53:3
58:17 75:18 79:9
**base**
38:6 50:3 51:17
57:22
**based**
15:17 19:20 20:25,25
21:1,1,18 23:5 38:9
45:1,3 46:3,5,6,11
47:14 48:7,17 50:13
52:5 54:1,5,14 55:5
59:10 66:5 72:7
75:7 78:4 80:8
**basically**
50:11
**basis**
18:22
**Baunik**
11:10
**be**
6:2,23 7:2,12,23 8:17
8:22 9:21 10:11
12:2 13:3,17 15:17
17:22 19:4,24 20:5
20:6 22:7,9,19
24:11 25:3 26:17
29:13 34:21 35:8,13
36:7,12 37:15 38:9
40:2 41:11 42:6
43:6,15,16,18,23
44:1,2,3,6 47:12,23
52:3 53:21 54:24
58:22 60:5,13,14,18

61:7 66:6 67:16
68:17 69:2,17 74:15
76:6 77:3,5 79:2,20
**bearing**
80:23
**because**
17:21 19:1 23:11
25:5 26:5 28:1 32:7
32:23 34:21 36:6
40:3 45:23 47:6
53:22 54:12 57:12
61:19 62:23,25
63:18
**been**
4:20 5:5 7:14,17 8:5
10:13 15:10,14
19:12 27:10 28:4,13
28:23 30:1,5 32:23
33:6,14 35:15 40:7
40:14 46:6,18 49:6
51:11 57:25 59:12
63:11,18 70:9 75:23
83:8
**before**
2:5 5:10 7:21 10:9
15:20 21:13 29:17
29:20 33:25 36:13
46:25
**beforehand**
54:22
**beginning**
71:20
**begins**
4:1
**behalf**
2:2,12,17,21 4:10,11
4:14 5:6
**being**
12:5 14:17 27:17
50:18 71:16
**belief**
31:24
**believe**
17:12,24 30:4
**believed**
74:2

**below**
44:11
**benchmark**
23:19 65:12,19
**BENDER**
2:14
**benefit**
42:10,12,22 43:7,16
**benefits**
17:6,13,16 28:17,20
28:25 39:11,14,20
40:1,23 41:2,10,18
42:2,7,17 44:10
45:3 68:16 69:3
**between**
8:16 12:1 25:10
40:13 41:12 46:7
51:20 60:19 68:14
71:5 80:5
**beyond**
33:20,20
**bigger**
65:4
**bill**
44:6 57:14 67:8
**birth**
25:13 26:15
**bit**
7:13 10:3 43:4 44:16
47:6 60:21 63:7
65:21 66:24 67:3,12
68:5
**BLS**
64:3,6,18
**BLUE**
1:9,9
**blue-collar**
64:11
**bold**
59:1
**born**
25:18
**both**
9:18,21 20:11 21:12
24:19 25:17,18,18
68:6

**bottom**
59:2 80:17
**bracket**
52:1,5 54:11,12
**brackets**
48:17
**Brauner**
11:1
**Bravo-Ramirez**
11:8
**break**
49:7
**bring**
15:12 28:14 58:17
**Brown**
11:9
**Bruce**
1:19 2:1 4:3,19 5:4
83:7
**bucks**
68:21 73:21
**bureau**
20:20,21 21:5 41:6
55:16,18 57:6 63:14
63:18
**business**
13:1 55:14 57:1,1
64:1 65:3,15 73:14
**but**
5:21,24 6:14 8:22
12:4 13:1 14:24
15:1 18:16 21:5,9
24:1 26:4,13 27:5
28:9 30:25 31:6
33:12,22 34:1 35:8
35:15 36:20 42:14
43:9,17,18 44:19
45:14,21 46:22
47:22 49:2 52:12,17
53:12,15 54:4,22
55:6 56:20 57:20
58:4,23 60:16 62:13
63:8 64:8,14,15,17
65:24 66:22 67:13
67:23,24 68:22
69:13,19 73:17



76:13,25 78:3 80:4 80:20 81:7

**by**
1:22 2:12,17,21 3:2 4:23 10:3,25 13:25 17:3,5 20:20 21:5 22:20,20 24:6,13 27:25 28:6,20,21 30:5,13,21 33:24 34:5,5,6 38:17,17 38:17,18 42:22 49:19 52:18 53:6 54:20 60:24 77:8,11 77:21 79:17 83:8

**C**

**C**
1:4 2:8

**Caine**
11:12

**calculate**
14:2 15:13,16 18:22 20:3,4,7 22:24 23:2 55:16 62:11 71:25 72:15 77:5 78:2

**calculated**
20:22 30:12,13 49:22 56:18,20 65:25 67:13 71:24 72:10

**calculating**
13:21 14:6,20 15:5 16:17 20:1 21:24 24:13 57:8 62:4 66:22

**calculation**
15:2 43:2 45:14 79:6

**calculations**
15:22 39:2 40:23 47:13 61:22 63:23 67:19

**California**
9:15

**call**
24:1

**calling**
57:25 67:2

**came**
27:22 74:4

**can**
5:2,12,12,21 6:12 7:11 10:2,24 20:14 23:23 24:6,10 31:14 35:16 36:20 43:9 45:6,8 50:7 51:17 52:17,20 56:22 61:8 63:20 68:3,17 74:12 74:13,15 77:13 81:21

**capacities**
15:11

**capacity**
3:11 7:15 15:6,7,9,16 15:23 16:13,16,18 17:15,24,25 18:3,8 18:19,22 19:3,3,4 19:11 20:13 23:12 23:24,25 24:16 26:3 26:6,12 27:10,15,18 27:20,23 28:4,13,21 30:13,14,16,18,20 30:22 31:1 32:9,25 33:2,12,12,19,21 34:22 35:16,18 36:3 36:10,12,16,21,25 37:2 39:3,10 40:6 40:13 41:21 45:1,9 45:10,11,15 46:16 46:17 50:5 55:1,3 58:10,17 59:3,12 60:5,8,9,20,24 61:3 67:22 68:19 71:3

**care**
73:10 74:17,22 75:16 76:9

**career**
12:8 36:9

**caring**
74:19

**Carri**
1:3 4:4 31:10 72:23

**case**
1:11 6:6 7:4 8:3

10:16,17,24 11:3,4 13:18,22 14:1,4,9 14:11,18,21 19:17 21:25 23:6 26:8,9 26:22 27:3,14 31:4 32:20 33:16 34:8,13 35:2,22 36:4 37:4 43:19 44:9 50:24 51:10 67:25

**cases**
10:21,25 12:7,14,19 12:20,21,23 13:1,4 13:8,17 14:7,12 24:22 26:14

**cash**
42:10,12,22 43:7,15 43:18,20

**Casualty**
1:14 11:2

**categories**
64:23 73:18 74:1,13

**category**
26:1 68:8,10 73:15 74:19

**cause**
2:3

**caused**
66:20 67:7

**cell**
44:5

**census**
20:21,22,22 21:3,5

**certain**
51:3

**certainly**
45:23

**certify**
83:6,12

**cetera**
7:2 74:3

**chance**
10:25 52:18

**change**
9:25 25:9 30:1,2 54:2 54:5 55:13 67:4,7 68:9

**changed**
32:10 46:7 48:25 66:3,16,24 68:5,23

**changes**
7:10 61:11 66:19 67:8 77:21,23

**characteristics**
24:8

**characterization**
60:22,23

**characterize**
45:9 64:17

**charge**
73:21

**Charles**
10:17,21

**checker**
60:12

**Chicago**
2:20

**CHIDLEY**
2:14

**children**
48:18 54:3,4,6,6,7

**choose**
22:8 35:20

**choosing**
35:18

**Christopher**
2:14 4:13

**circumstance**
30:6

**circumstances**
16:3 17:10 21:25 29:24 36:4 68:1

**cite**
48:13

**civilian**
41:8,22 42:1,3,16 45:16

**ckoppes@blcklaw....**
2:16

**claim**
13:11

**clarification**
62:3



**classes**
8:24
**classify**
42:11 60:3
**Claude**
11:6
**cleaning**
73:1
**close**
57:15,19
**closer**
58:12
**CLYDE**
2:19
**CO**
2:19
**coin**
38:19
**collected**
21:3,4,5
**Columbia**
10:18
**Column**
28:16 29:5,6 79:16
**combined**
48:1,2
**come**
40:16 44:14,15 56:22
   65:10 66:9,10,17
   72:9 74:8 76:10
**comes**
42:4 52:1 60:20 65:4
**coming**
75:5
**commencing**
2:7
**commercial**
12:20 36:20
**Commission**
83:20
**common**
33:18 34:3,11
**comp**
13:8
**companies**
43:16

**company**
1:9,14 24:18,19
   36:10 37:5 43:23,24
**compared**
9:24 16:4 65:1 66:12
   66:15
**compensation**
17:5,8 29:12 55:14
   57:2 64:1 65:4,15
**component**
15:3 37:18
**components**
72:13
**comprise**
43:10
**compute**
71:19
**computed**
71:14,17
**computing**
76:13
**conclusion**
35:3 70:7
**conclusions**
29:25
**conditions**
56:6
**Congratulations**
7:8
**Connor**
1:5 31:12
**conservative**
58:12
**consider**
24:15 32:3 50:1
**considered**
42:6 44:7
**considering**
59:20
**construction**
34:18 64:4,7,9 65:1
   65:18
**construction/labor...**
64:19
**consultant**
12:23 14:22

**consulting**
1:14 8:2,5,12,16,19
   12:8 13:4,7
**consume**
50:17 52:6
**consumed**
28:23 29:1 46:14,15
   47:17 50:20 53:14
**Consumer**
55:19 65:22
**consumption**
28:22 46:2,3,11,23
   47:1,8,12,14,19
   48:9,16,17 49:3,21
   50:4 51:17,25 52:14
   53:9,13,15 54:1
   61:12,15 62:5,14
   66:8,21 68:4 69:5
**contain**
56:5
**contained**
76:17
**contains**
33:12
**continue**
30:18,20 31:1
**Contracting**
1:8 44:10
**contribute**
42:19
**contributed**
29:2 40:1,4 41:20,23
**contribution**
39:8
**contributions**
28:18 40:9 43:17,18
**control**
57:13
**cooking**
73:2 74:11 75:15
**cooks**
74:11
**copy**
5:16,18,22 6:25
   10:13
**correct**

5:7 6:19 27:15 31:7
   37:1 49:1 61:11
**correctly**
19:6 47:11 55:24
   59:9 73:19
**cost**
63:24,25 64:25 72:14
   72:20,20 77:22
**costs**
47:2,6 50:13 72:11
**could**
5:18 6:25 11:22
   12:22 16:22,23 18:5
   19:1,8 27:21 29:2
   33:20 35:13 36:7,8
   36:20 42:6,14,24
   43:6,10,15,16,23
   44:1,2,6 46:1 55:8
   57:17 58:13 75:25
   78:8
**counsel**
4:7 6:6,25 11:22
   83:13,14
**count**
38:17
**County**
10:19 11:2,7,9,10,15
   83:2
**couple**
57:17 64:23
**course**
9:2 14:25
**court**
1:1 4:17
**covered**
17:5
**COVID**
30:6
**CP**
63:22
**CPI**
55:5,6,6,20,22 63:15
   63:23
**CROSS**
1:9
**cumulative**


MAGNA
LEGAL SERVICES

29:5 59:12
**curious**
75:12
**current**
3:16,17 6:15 39:16
**Curriculum**
3:9,16
**cut**
27:25 33:24 34:2
**cutoff**
33:18 34:3
**CV**
5:17,19,20 6:7 7:3,24
7:24 9:11
**C&L**
1:8 41:13 44:10

**D**

**D**
3:1 4:3
**daily**
20:4 38:12,14 72:5
77:10,11 78:25
**DANE**
83:2
**Daniel**
24:19
**data**
16:18,25 20:22,23
22:14,20,23 29:14
29:21 41:7 50:15
54:22,23,24 55:17
55:19 56:21 64:3,6
65:25 71:18,25
72:10 73:22 78:2,3
**database**
65:24 72:17,19 73:7
73:9,19,23
**date**
4:6 5:24 20:9,9 23:1
23:1 24:21 25:13,19
26:15 31:5 35:11,13
35:23 37:20 38:20
58:20,21,22 59:5,16
59:19
**dated**

6:21 10:14 27:2
**day**
2:7 20:9,15,16 22:3
22:10 38:22,25 70:4
72:3 75:17 76:2,6
76:22 78:13,16,18
79:20,25 80:2 83:9
83:17
**days**
37:16,22 38:2,7,11
38:21,24 71:17 72:4
76:23 77:1,3,9 79:7
**Dean's**
7:7
**death**
12:25 13:5,11 14:9
14:10,12,17 15:8,19
20:10 23:1 28:2
30:24 34:13 36:13
37:13,20 38:20
**decade**
22:20
**deceased**
46:20 47:4,7
**decedent**
21:25 23:6 26:15
34:13 35:22
**decedents**
24:20,22 25:1,4,6
26:18
**decedent's**
13:11,21 14:3,16
15:5,21 20:1
**December**
37:25 40:7 70:2
76:23 77:1
**decide**
23:23 26:5 34:3
81:21
**decided**
30:24,25
**decides**
20:12
**decrease**
53:10
**decreased**

58:9
**decreases**
53:15
**defendants**
1:17 2:3,21 12:2
**defense**
12:6
**definitely**
58:4
**definition**
46:23
**dependent**
54:3
**depending**
59:7
**depends**
36:17,18,23 42:13
**deposition**
1:19 2:1 4:3 10:20
11:4 12:12,17 31:3
31:12,25 32:18
70:19 83:7
**depositions**
5:9 11:5 31:8
**describe**
12:22 15:4 19:25
50:7
**describing**
43:15
**description**
64:24
**descriptions**
50:10
**details**
14:25 36:18,23
**determination**
33:15
**determine**
23:9 26:13 44:9
53:19 55:11
**determining**
15:23
**Development**
72:1,11,18 73:8
**did**
9:6,24 19:5 23:24

29:7,11,11,16,18
31:3,3,5,8 32:3,19
33:15 34:3 35:6
37:24 38:1,1,19,21
38:22,25 39:3,5,13
39:15,24 40:15,20
40:22 44:9,21 48:12
48:21 50:23 51:9,13
52:18 53:19 54:7
55:11,11 56:1,4
57:11 58:19,21,23
62:16,18 63:10 64:3
64:22,25 67:4,18,19
71:1,2,11 72:9,24
73:5,9 74:10 75:5
76:9 79:3,4
**didn't**
17:25 31:21 35:1,8
52:19 54:10 61:23
**died**
24:20
**dietitians**
75:2
**differ**
15:1 25:10 56:8
**difference**
19:1 40:12,13 60:19
61:15 66:12 80:5
**differences**
69:5 71:5
**different**
20:24 22:17,17,21
24:22 26:11,17 30:2
48:17,18,18 50:12
56:6,21 58:3 65:15
72:13,21
**disability**
17:7
**disagree**
18:1,6,9,17 31:19
**discount**
15:12 56:11,16 57:8
58:9 61:14 66:24
67:4 68:11,12,25
69:1 71:1,7,9
**discounted**


MAGNA
LEGAL SERVICES

28:14 54:17 63:2
79:9,24
**discussed**
25:2 61:16 63:6
**Discussion**
52:21 53:2
**dishes**
75:16
**dishwasher**
74:16 76:9
**dishwashing**
74:12
**disregard**
45:8
**distinction**
33:1,3 43:13
**distinguished**
7:25 8:23
**District**
1:1,1 11:13
**divide**
77:8
**do**
5:7,16,20 6:16 8:2,2
9:6,15 10:19 11:17
11:21 12:25 13:1,7
13:7,7,7,20 14:2,7
14:20 15:13,21 16:3
16:9,11,18 17:3,6,9
17:19 18:6,9 20:24
21:13 22:5,9,14
23:9,25,25 24:13
26:20 27:20 30:13
30:21 32:14 34:23
34:25 37:1,17 39:11
53:13 56:16 57:3,11
57:17,21,22 60:13
61:2,4,24 62:2 64:6
65:17 67:21 70:15
73:20 74:7 75:14
78:10 81:5 83:5
**docket**
10:24
**Doctor**
52:18 81:3
**document**

32:19
**documents**
40:17,21
**does**
6:2,19 41:3 44:15
50:15,16 54:1,5,5
56:16 65:21 70:1
75:13 78:9
**doesn't**
32:7,9 60:8 66:2
69:18
**doing**
8:5,7,11,19 9:7,11,13
9:19 12:20 15:2
20:25 23:13,17,18
36:14 50:11 60:11
60:11 73:1 77:2
**dollar**
60:18 62:25
**dollars**
47:17 51:11 53:14
54:15,16,17,18
61:21,23,24 62:5,7
62:17,17,19 79:24
**domestic**
3:12 14:18,21 20:2,8
20:14,17 21:17,20
21:24 22:8,11,19
23:13,18,21 24:9,13
25:1,4,7 26:2,12
27:17 58:10 69:8,24
70:8,13 71:12 72:6
72:13 76:4,6 77:6
78:12,13,17,18
79:22 80:7,10
**domestically**
70:11
**done**
6:24 11:23 13:9
14:13 20:21 22:9
24:5 54:20 60:12
**don't**
5:23 12:4,9,9 13:9,13
15:16 19:22,23 21:4
21:9,15 23:11,11,11
24:11 29:18 30:10

32:12 34:14 35:8
38:14 39:15,18,19
40:3,7,17,21 42:11
42:11 44:3,3,8,17
45:13 47:4,7,21
49:6 52:16 53:7,12
54:4 57:15,15,20
58:23 60:22 64:7,13
66:10 67:23 69:19
70:18,22 73:16
**Door**
11:2
**doubles**
49:3
**Douglas**
2:9 4:11
**down**
47:6 52:15 54:17
63:2
**Dr**
26:20 40:18 44:20
49:20 52:17 53:7,25
61:8 73:6 80:22
81:5
**Drive**
2:15,19
**dropping**
73:2
**du**
11:7
**due**
66:13
**DUGMORE**
2:22
**duly**
4:20 83:8
**during**
9:9 23:7 30:4 70:1
**dwr@rosegroupla...**
2:12

_____
E
_____
**E**
2:8,8 3:1,7,14,14
**each**
22:21 24:25 25:3,5

29:19 71:15,15
77:24 79:22
**earlier**
48:22 59:21 61:17
62:23 63:6,9 65:22
**early**
6:23,23 7:15
**earn**
17:15,16,25 30:16
31:1 38:19 39:10
45:11,15
**earned**
16:4 17:18 19:4
28:22 29:19 38:2,10
39:4,8 41:12
**earning**
3:11 15:6,7,9,11,16
15:22 16:13,17
17:21 18:19 19:11
28:4,13,21 30:12,14
30:18,21 31:2 32:24
33:2,11,12 35:16,18
36:21 45:10,17,18
46:16,16 52:10,11
58:10,16 59:3,12
60:5,8,20,24 61:3
67:22 68:19
**earnings**
13:22 15:3,5,14,19
15:22,23 16:8,16,19
17:2,3,23 18:1,3,7,8
18:18,22,24 19:2,3
19:4,10,19,20,22
27:15,20,23,24
28:25 29:14 30:4,16
30:17 32:24 33:1,6
33:11,14 34:22
35:14,14 36:3,13,16
36:25 37:13,19,22
37:25 38:12 39:3
40:3 41:24 45:1
48:7,25 50:4 55:1,3
60:20 68:15,18 71:2
**earns**
17:17 18:20 19:13,17
41:8,9 42:1,3 52:9



easier
67:16
economic
46:23 56:6
economics
43:4
Economists
56:18
economy
56:8 57:24
economywide
65:11,14
Education
9:16
educations
9:12
effectively
57:14 72:21
either
8:8 57:18 66:19
else
7:10 16:21 61:7
emeritus
7:6,22
employ
13:20 24:12
employed
53:22
employee
41:8,9,22 42:1,3,16
  44:5 45:4,16 83:13
  83:14
employees
66:1,6
employer
17:7 28:18 39:16,21
  41:19,23 42:15,18
  43:8 45:4
employers
65:25 66:5
employer's
39:8
end
71:16
ended
38:15

ends
5:25
engineer
38:2
ENGLAND
1:16
enjoying
35:19
enough
56:5,8
equal
41:23
equivalent
78:25
error
46:7
ESOP
43:23
Estate
1:4 10:17,21 11:8
estimate
12:7,13 13:14 15:7
  35:13
estimated
15:14 62:12
et
4:4 7:2 10:18,18 74:3
ever
15:21 19:16
every
13:22 14:1,3,21 27:8
  38:22 77:23 79:20
  79:25
everybody
50:6
everyone
61:7
everyone's
81:17,18
exactly
15:16
Examination
3:2 4:22 49:18 53:5
examined
4:21
example

21:19 34:17
except
77:16
excess
65:9
exclude
67:18
excluded
30:8
excluding
26:13
excuse
59:18 75:19
exemplary
7:7
exerting
57:13
Exhibit
3:8,9,10,11,12 5:21
  6:11 26:25 27:2,2
  28:16 46:8,8 47:9,9
  48:14 51:14 58:25
  61:3,3,6,6,7,9,10,10
  61:22 66:9,21,23
  67:1,2,5,6 68:15,19
  69:14,21,22,23 71:6
  72:2 75:18,19 77:25
  78:5,6 80:9
exhibits
26:22
expectancy
20:10 23:2 34:5,7
  60:14
expected
13:21 14:3 19:19
experience
7:13 34:6
expert
5:5 12:1 15:18 16:1,5
  16:6 19:9
expert's
15:18
Expires
83:20
explain
19:1 46:1,24 58:13

75:25 77:13 79:20
extent
33:21
extrapolate
37:13 38:6
extrapolated
28:2
extreme
57:13

---
**F**

fact
36:4 38:10 46:3,4
  60:10
factor
38:22 39:3 54:7
factors
21:1
fair
7:18 12:15 13:3
  14:15 23:7 26:18,22
  27:11,13,18 29:9
  32:16 33:4,8,10
  35:1,5,7 38:15
  42:22 45:8,25 50:20
  53:17 55:3 56:11
  58:7 59:4 60:3
  62:14 64:12 73:3
familiar
43:1
family
46:5,6,11,18,19,21
  46:21 47:12,17,22
  52:7 62:8,9,10,12
far
23:21 24:23
Farm
74:25
February
67:15
federal
2:4 57:13
female
24:4
fewer
70:16



MAGNA
LEGAL SERVICES

**field**
50:1
**figure**
35:4,6,9 37:7 38:5
40:15 41:25 42:25
43:1,5,11 44:15,21
47:8 49:21 50:7
52:4 53:17 54:10
55:10 58:19 60:4,18
63:1 64:11,18 68:22
69:21 70:10,12
73:25 76:10 78:9
80:6
**figures**
16:3 21:17 26:17
29:21 40:25 47:19
47:20 48:22 54:8
56:2,10,13,22 58:8
63:3,16,20 66:9,17
66:21 69:14 75:20
79:14
**File**
4:2
**filed**
3:23
**filing**
16:23
**filter**
24:2,4,6,10,13
**final**
29:21,24 70:12
**finance**
7:17,24,25 8:23
12:21
**financial**
9:1,3,12,15 58:3
**financially**
83:15
**find**
63:20
**findings**
52:12
**fine**
81:9
**firm**
35:24 36:14,14

**first**
4:20 5:20 10:7 24:18
25:12 26:6,8 27:20
30:12 38:25 61:11
62:13 63:12 71:16
77:14 83:8
**fit**
26:1
**five**
10:9
**five-year**
10:7 68:2
**flesh**
19:3
**flippant**
35:8
**fly**
36:21
**flying**
36:20
**folks**
73:10
**follow**
8:13 18:16
**following**
30:23 31:5 71:20,20
**follows**
4:21
**Fond**
11:7
**food**
74:18 75:16
**forecast**
15:9
**foregoing**
83:6
**forget**
73:6
**form**
10:1 13:23 18:4,11
18:16 31:17 33:7
34:20 41:20 42:15
42:16 70:23
**forms**
43:21
**formulating**

34:8 35:2
**forth**
27:8 74:11
**forward**
15:10 28:6,9,10
30:19 40:6,14 57:16
62:4,10,12 67:12,12
**founded**
36:12
**four**
5:23 27:1 76:23
**fourth**
6:2
**fractional**
28:9
**frame**
6:22 8:21 9:17 57:9
**Fraser**
1:12 4:5,15,25
**freight**
36:21
**frequency**
12:13
**from**
2:6 7:5 9:25 11:21
12:11 20:9 22:10,11
22:14,23 23:1,4
25:7 28:5,7,9 30:9
32:18 36:19 37:13
38:2 44:18 45:4
48:3,12,13 49:23
51:16 54:17,22
56:21,24 61:20
62:16,20,20,25
63:14 64:18 65:4,24
65:25 67:5,21 68:9
68:12 70:1,3 71:25
72:10 73:3,23 74:1
75:10 76:23,25
79:11 80:14,18 83:9
**front**
5:17 47:21 61:4
**full**
7:24 28:2 77:14,17
**fund**
43:17

**further**
83:12
**future**
13:21 15:11,23 16:12
16:17 18:2,7,19,22
19:4,11,19 28:13
39:2 55:1 57:21
58:16
**f/k/a**
1:16

G

**gave**
44:10
**gender**
20:25 23:22 24:4,14
26:16
**general**
13:14 15:1 18:17
**generally**
12:22,25 14:15 22:25
50:7 52:5,13
**get**
6:24 11:22 16:22,23
25:19,23 27:5,11
38:13 40:10 42:8
49:2 56:1 59:22
62:19 79:18
**gets**
42:17 43:8 45:4
**getting**
41:16 62:6 65:8
**Gillett**
41:13
**give**
23:14 43:24 64:23,23
77:10
**given**
5:9 50:9,9
**go**
5:14 7:13 10:1 13:23
14:24 18:14,16
25:21 26:24 27:6
36:9 41:5 47:6
52:22 55:9 58:6,25
58:25 78:8 81:10


MAGNA
LEGAL SERVICES

**goes**
6:1 41:25 52:14,14
**going**
5:12 6:24 11:20
14:15,23 15:10
16:15 18:10 28:6
30:19 32:15,21 34:1
40:6,14 49:6,12
52:25 55:10 57:16
59:22 62:4,10 63:11
73:6 75:18 81:13,22
**good**
4:24 80:23
**goods**
75:3
**got**
7:6 12:9,9 27:25
44:14,18 46:9
**gotcha**
31:22 79:2,19
**gotten**
32:10 40:5
**government**
34:16 43:2 44:7
**grade**
30:3
**great**
5:9,16 74:15
**greater**
17:13 78:6
**grocery**
73:1
**ground**
5:13
**group**
1:13 2:10 53:20
**growth**
15:9 28:5,10,12 55:2
55:24 56:17,23
61:13 62:11 63:6
64:3,19 65:2,6,6
66:14 68:5,24 71:7
71:8,12,21 77:19
**guess**
15:15 42:12 60:7
61:2 71:11 74:13

81:23
**guys**
52:17

————————————

**H**

**H**
2:18 3:7
**habits**
50:24
**had**
7:3 11:3 17:12,12,15
20:13 22:6 23:12,24
23:25 25:4 26:3,6
28:8,23 29:14,15
30:1,15,18,20 31:1
33:19,21 35:23
38:10,24 39:10 40:6
45:11 46:4 47:16
48:4 60:9 69:9
71:18 75:22 76:24
77:17 78:2
**half**
24:1
**halfway**
6:2
**hand**
83:16
**has**
7:17 35:20 43:8
45:15,16 54:20
57:25 60:9 61:11
65:6,7,7 66:2
**have**
5:7,16,18,23 6:8 7:14
8:5 10:14,15,16,23
11:20 12:11,15
13:10 15:10,10,14
16:11 17:25 19:12
19:16 23:11 24:17
25:6,13,21,25 26:1
26:4,21,25 27:9
28:4,13,23 29:1,2
30:5,7,23,24,25
32:10,12,23 33:6,14
33:20,25 34:1 35:14
35:17 36:10,19,21

37:1,5 39:17,17
40:5,7,14 41:20,23
46:6,14,15,18 47:4
47:7,17,21 51:11
54:2,6 56:16 57:3
59:12 60:12 61:4
63:11 65:7,10,10,18
66:25 67:2 70:9,18
75:21 77:5,8,24
78:17 79:1,21 80:22
81:1 83:16
**haven't**
58:4
**having**
4:20 54:5 65:9 83:8
**he**
28:22,22,23 29:1,2
30:15,18,20,23,24
30:24 31:1,2,2,20
31:21 32:7,9,11,11
32:15,17,21 33:18
33:18,19,20,21,25
34:1,19 35:23 38:10
38:19,21,23,24,25
39:4,10,16 40:4,6,7
40:9 41:12,17,20,21
45:10,11,15,17,18
46:4,4,13,14 47:17
48:16,20 50:20
53:22 58:2,4,23
60:9,9,12 70:15,20
70:24,24,25 75:23
76:5,24,25 77:1,9
78:13,17 79:25 80:1
80:10
**health**
28:19 39:9 74:18,20
**hear**
19:5 52:20
**heard**
19:2 43:2 46:22,24
58:2,5 68:4
**hearing**
53:8
**held**
7:21

**helping**
74:20
**her**
23:7 31:25 32:18
46:15 47:21,23
**here**
5:1 8:3 11:23 27:22
77:25
**hereby**
83:5
**hereunto**
83:16
**he'd**
28:8 58:6
**he's**
46:19 47:4,6
**high**
14:25
**higher**
52:10,10 61:12 63:11
**highest**
51:19
**him**
35:24 36:15 37:5,23
40:5 47:7 52:20
53:18,21,21,22 58:6
77:7
**himself**
28:23 29:1
**hiring**
72:20
**his**
23:7 27:15,17,24,24
28:1,4,13,18,20,21
28:25,25 29:3,14
30:1,4,12,14,16,17
30:24 31:10,12 32:9
32:10 33:8,11,22
35:11,12,13,14
36:13 37:2,13,19,19
37:19,21,25 38:20
39:8,16,21 40:2,9
41:19,22,24 44:5
45:1 46:3,14,16,16
46:18 47:14 53:20
59:19 60:11,24


MAGNA
LEGAL SERVICES

70:13 72:23 76:4
**history**
39:25
**hit**
52:18
**Hmm**
8:6
**home**
70:21 72:25,25 74:3
74:18,20,23,25,25
76:25
**hopefully**
27:7
**Hospital**
2:15
**hour**
20:8,16 38:17 42:3
49:6 70:4 71:14,17
71:19,23 72:2 73:21
74:5,12,16,17,17,18
74:21,21,22,23,24
74:25 75:1,2,4 76:2
76:11,19,21,22
77:20 78:12,18 79:7
79:21 80:2
**hourly**
38:1 41:10 55:14
57:1,1 64:1 65:1,3
65:14 72:8 79:12
**hours**
20:5,6,15 22:3,10
26:2,9,10 38:24,25
70:10 75:17 76:6,7
77:2,6,7 79:3,4,23
**house**
70:11,16 76:20
**household**
29:3 47:3 48:4,25
50:19 52:7,11 53:10
53:20 61:16,19,20
62:8 66:14 69:6
70:13 73:1 74:20
75:13,15,22
**housekeeping**
74:16 75:16
**how**

5:13 8:5 12:7 13:10
14:6,7 15:3,13
19:25 20:24 21:8,23
22:20 23:9,12 25:9
27:22 33:3,9,15
34:3 37:17 38:5,19
38:22 44:5 46:22,23
49:9,21 50:7 51:1
53:19 54:6 55:11,11
56:19 57:23,24
58:13,19 60:7 64:16
66:2 67:4 70:11
71:11,23 72:9 75:25
77:13 78:9 79:3,4
79:13,23
**however**
77:6
**Hunter**
53:25
**Hunter's**
40:18 44:20
**husband**
46:4 48:19 53:21
**husband's**
54:1
**hypothetical**
25:12,16,24 36:7
40:4,8 76:24 77:6
77:10
**hypothetically**
73:22

---

**I**

**idea**
20:12 22:6 23:15
46:13,17
**identified**
3:8 27:24 53:20,21
57:5
**identifies**
48:20 79:8
**identify**
15:6 20:17 22:16,17
22:18 23:4 28:4,12
55:15 62:18 64:13
72:11

**identifying**
24:16 35:15 72:13,14
**if**
6:8,24 8:13 11:20,22
12:22 13:14 14:15
15:17 16:6,22,22,23
17:12,12,18 18:16
18:17 19:4 20:12
21:4,16 24:17 27:20
29:19 30:1,3 32:7
33:2,18 35:8 36:3
36:17,18 39:15,19
41:11,15,16,20,21
42:18,19,20 44:5,17
45:14,17,21 49:2,7
53:9 58:6,23,25
59:9,9 60:9 64:6
66:1 67:7 70:13
72:2,22 73:9,16,19
74:15 76:3,5,15,19
76:23 77:2 78:5,8
79:11,15,15,16,17
**Illinois**
2:20
**impact**
25:11 29:21,24 30:7
**improvement**
72:25 74:3
**Inc**
1:8,15 10:18
**include**
23:10 46:12 56:9
60:8 66:2
**included**
28:17,19 43:6 44:4
**including**
70:20
**income**
46:5,6,12,13,14,15
46:18,20 47:12,14
47:15,18,21,22,23
47:25 48:4,17 50:13
50:19 51:3,16 52:1
52:5,7,10,14 53:10
53:20 54:11,12,15
61:16,19,20 62:8,10

62:12 66:15 69:6
**incorporated**
28:10
**increase**
53:15 63:10
**increased**
58:8,9 63:7
**increases**
53:11
**increasing**
10:4
**INDEMNITY**
1:16
**independently**
56:18,21
**index**
55:5,19 56:25 63:24
63:25,25 65:23
**indication**
18:2
**indicator**
16:16 18:7,9,19
19:11
**individual**
19:19 21:24 22:5
50:12 69:16
**individually**
1:3
**individual's**
33:13
**industries**
65:6,7,10,16
**industry**
36:14 56:1 64:4,20
65:1 73:11
**industrywide**
56:3
**information**
17:11,11 29:12,16
33:24 39:14 44:17
50:9 72:19
**informational**
20:7 22:2 23:14
**initial**
26:24 71:6
**initially**


MAGNA
LEGAL SERVICES

27:3 47:9
**injury**
 12:20,25 13:5 20:9
  23:1
**input**
 17:1 79:13
**inputs**
 24:10 66:16,20 79:13
**instead**
 43:24,24
**institutions**
 8:10
**insurance**
 1:8 28:19 39:9
**interest**
 5:25 57:14,23 58:1
**interested**
 22:25 83:15
**interpret**
 75:25 77:13 78:10,11
**INTERSTATE**
 1:8
**into**
 15:21 17:1 39:21
  41:25 45:22,23 49:2
  54:8 60:21
**introduce**
 4:7
**investment**
 9:13
**Involuntary**
 1:10
**involving**
 13:5
**issue**
 14:8
**issued**
 31:5,9
**issues**
 12:22
**issuing**
 31:6
**items**
 22:18 23:4,9
**it's**
 20:21 21:4,5 22:4,6,6

23:19 27:1 33:17
35:15 36:22 41:19
41:19 45:12,13,23
46:13 47:5 50:10
55:6,7,21 56:3,9
57:16,20 60:23
62:17 63:22,23 64:1
64:9 66:5 67:13
68:21 77:16,17 78:1
79:7,25 80:1,13,19
80:20,23
**I'd**
 12:16 15:11 20:3,4
**I'll**
 6:14 16:7,7 25:23
  42:20,21
**I'm**
 6:8,24 7:6 10:15
  11:20 12:10 13:25
  14:23 18:10 21:1
  23:17 27:7 33:2
  34:1 36:1 37:4,9,11
  38:5 42:8,25 43:1,5
  43:12 52:12 53:7
  56:19 59:22 62:6
  68:22 72:2 73:6,19
  75:12,18 77:2 78:23
  79:5 80:16 81:20
  82:1
**I've**
 11:21 12:9,9 13:9
  14:12 24:5 44:14
  58:2 63:18 65:20

**J**

**J**
 2:9,14
**Jannsen**
 11:12
**January**
 25:19
**JASON**
 2:22
**job**
 30:1 60:11
**John**

24:18
**Joseph**
 11:14
**journals**
 34:10,15
**Jr**
 11:14
**June**
 28:15 58:18,19 59:6
  78:11,16 79:9
**jury**
 20:12 23:15,19,23
  26:5,13 46:24
**just**
 5:21 6:10,24 8:20
  18:15 22:6 23:13
  25:2,22 28:8 29:15
  32:17 33:23 34:6,23
  35:18 37:15 38:5
  42:25 43:5 44:24
  46:9,22 47:2 48:8
  52:24 57:5 59:25
  60:3 62:18,19 64:7
  65:22 66:5,24 67:3
  69:25 71:16 73:21
  75:12,15,25 76:8
  78:4,8 79:5 81:16
  81:17,18

**K**

**keep**
 65:7,8,12
**keeping**
 65:13
**kept**
 65:19
**kick**
 42:21,21
**kids**
 50:14 54:3
**kinds**
 72:21
**knew**
 39:16
**know**
 6:16 10:19 12:4,16

13:13 15:17 16:22
19:23 21:4,9,13
24:11 25:25 26:3,7
30:23 32:12,14
33:18 34:14,23
36:17,22 38:14,24
39:19 40:7,8,18,21
42:11,14 43:19 44:8
44:19 45:16 47:6
52:16 53:9,12 54:5
54:16 58:23 61:1
63:22 64:6,11,15,16
65:9,17,21 66:2,25
67:7 71:21 73:16
74:7 77:18 81:20,21
81:25
**known**
 39:17
**Koppes**
 2:14,14 3:5 4:13,13
  82:1
**Krueger**
 48:13 49:23 51:6,25
  52:13 53:13,23 54:2
  54:21 62:14,25 63:3
**Krueger's**
 52:6 62:20
**Kwik**
 60:12

**L**

**L**
 1:22 2:5 83:4
**labor**
 24:8 41:6 55:16,19
  57:6 63:14,18 64:12
  65:8,9,18 73:10
**Lac**
 11:7
**LARSON**
 2:14
**last**
 5:3 7:20,25 8:15 10:9
  21:13 37:15,15
  65:17 66:3 71:16
**launch**


MAGNA
LEGAL SERVICES

36:8
**laundry**
73:1
**lawful**
2:2
**lawn**
72:24 73:10,20 74:2
**lawsuit**
5:1
**lead**
26:11
**least**
30:16 31:1 39:18
45:6,10,19 64:16
**leave**
68:1
**legal**
1:24 8:5,11,16 12:8
12:23 13:4 14:22
19:16
**Leon**
11:6
**less**
17:18,22 18:20 19:17
28:25 29:19 30:24
39:4 40:5 41:12
49:3 52:11
**let**
6:10 58:6 70:2 81:21
81:25
**let's**
5:20 7:13 8:20 27:20
29:14 35:22 47:21
61:2 69:8 73:21
74:11 78:8 79:19
**level**
14:25 21:20 30:2
51:4,12 54:15
**levels**
50:13
**life**
20:9,10 23:1 33:22
34:5,5,7 60:14
**lifetime**
20:5 23:2,7 61:1
**like**

7:14 10:15 11:21
12:21 13:7 17:6
23:19 24:3,4,8
25:24 42:5 43:9,16
43:23 44:5,18 49:10
51:6 54:21 56:23
57:3 63:20 64:9
67:25 68:18 72:5
74:2 77:7 81:5
**likely**
17:13
**LIMITED**
1:15
**Line**
3:15
**lines**
32:1,18 73:24
**list**
3:17 10:14,16,24
11:18 12:11
**listed**
9:11,21 77:25
**literally**
45:13
**litigation**
8:2 9:24 10:5,12
24:17
**little**
7:13 10:3 28:1 43:4
44:16 47:6 60:21
63:7 65:21 66:24
67:3,12 68:5
**lived**
76:25
**living**
50:20 77:15
**LLC**
1:12,12,13,13,14 4:5
**LLP**
2:19
**local**
2:4
**locations**
2:6 83:9
**logs**
39:25

**long**
8:5 49:9 56:5
**longer**
56:7,9 78:13
**long-term**
65:5,9
**Lonzo**
2:9 3:4 4:9,9 6:25
10:1 13:23 14:9,23
18:4,10,13,15 26:21
31:17 33:7 34:20
44:18 58:20,21
59:15,18,24 60:2
70:23 81:1,8,9,12
81:25 82:3
**Lonzo's**
5:6
**look**
16:7 17:6,9 19:9,22
59:7 61:2 72:22
73:5,9 75:18
**looked**
31:10,11 41:11 65:20
**looking**
6:3,6,8,16 17:1 47:10
47:13 59:1 62:3
72:2 80:16
**looks**
7:14 10:15 54:21
68:18
**Lopez-Mulvaney**
1:3 4:4 31:10,14
72:23
**Lopez-Mulvaney's**
31:24 46:13,20 47:15
47:18 69:10 70:19
**lose**
52:19
**loss**
3:11,12 13:11 14:3
19:19 20:8,16,18
26:5 28:9,20 29:4,5
35:14 46:17 60:5
69:9 70:8 71:13
76:2
**losses**

58:10,17
**lost**
13:21 14:6,16,18,21
15:3,5 20:2 24:13
25:1,4,7 27:15,17
27:20,23 33:5,11
35:21 36:3 50:4
52:17 55:1 59:3,12
67:22 71:2 80:7
**lot**
13:2 26:6 63:19
70:25,25
**love**
32:11
**low**
57:19 58:7
**lower**
45:24 58:2,4
**lowest**
51:18

---

**M**

**made**
83:11
**Magna**
1:24
**main**
11:15 69:5
**maintain**
11:17 47:2,7 66:6
76:19
**maintenance**
72:25 73:16,18 74:23
74:24
**majority**
13:3
**make**
5:21 25:22 28:2 33:9
59:25 65:5
**makes**
36:15 43:7 58:11
**making**
27:13 33:4 42:14,20
43:17
**male**
21:19 24:4 52:5



69:15,19 70:10,17 75:12,14

**males**
24:20 25:17

**man**
48:19 69:25

**management**
9:1,3 74:25 75:1

**many**
12:7 13:10 14:7 54:6 77:6 79:3,4

**March**
6:21 27:2,7 67:15,17 67:17

**Maria**
11:8

**marital**
50:13

**maritime**
34:18

**mark**
5:20 26:25 61:6

**marked**
8:22 61:9 68:19 69:22,23 75:19 80:9

**marker**
33:16

**married**
24:9 48:19 69:15

**Mary's**
10:18

**match**
40:6 42:5,20

**matched**
39:21

**matches**
17:7 43:8

**matter**
4:4 10:21

**matters**
24:17

**maximum**
60:5,7,13,16,19,23 60:25 61:1

**may**
1:20 2:7 4:6 7:5 8:22

19:4 22:5,5 26:13 30:5,23,24,24 33:14 35:14 36:10,21 39:17,17 40:14 43:18 83:9,17

**maybe**
8:19 10:8 13:13 21:1 23:23,24,25 26:7,10 33:25 34:1 36:19 40:10 44:19 64:14

**MBA**
9:3

**McDONALD**
1:22 2:5 83:4

**McMurray**
10:17,21

**me**
5:12 6:10 19:8 24:23 27:21 35:25 38:8 41:3 43:7 47:22 58:20 59:18 70:2 75:19 80:23 82:4 83:8

**mean**
13:25 17:3 30:13,21 35:8 41:3 45:13 49:2 61:24 62:2 78:9

**meaning**
39:21 45:12

**means**
45:8 76:1

**meant**
42:22,23

**measure**
17:23

**meet**
80:24

**Meetings**
6:1

**members**
74:20

**Menomonie**
11:10

**men/women**
22:21

**method**
14:2 15:2

**methodology**
13:20 14:20 15:1,4 16:17 17:1 19:18,25 21:16,23 24:12 25:2 27:21 29:22 30:9 36:2,11 44:22 59:11 66:19 71:2,12

**metric**
65:23

**Michael**
2:18 4:15,24 11:10 11:14

**michael.roman@cl...**
2:20

**Michigan**
11:11

**mid-2025**
6:19

**might**
24:11 26:5,8 32:9,12 35:12 40:7 42:15 58:22 60:12

**Mike**
59:18 81:2

**Milwaukee**
2:11 10:19

**mind**
32:10

**mining**
64:9

**minor**
54:3,6,6 68:21

**minority**
12:16

**minus**
47:24

**minute**
38:17

**minutes**
49:10,10

**mistake**
55:21

**misunderstanding**
62:23

**modification**
68:21

**modified**
7:2

**modify**
33:9 47:19

**modifying**
32:4

**Monday**
1:20

**money**
17:4 43:25 47:5

**Montana**
8:8

**Moore**
24:19

**more**
12:16 16:11 18:23,23 19:5,13 26:6,8 28:1 30:25 33:12 40:10 41:12 52:9 58:11 68:17 70:16 75:14

**most**
6:15 7:1 10:16 13:17 21:9,10

**moved**
67:11,11,12

**moving**
7:22 28:9

**Mr**
4:9,11,13,15,23 5:6 6:25 10:1 13:23 14:9,10,23 18:4,10 18:13,15 26:21 27:14,23 29:7,12,19 31:17 32:14,20 33:5 33:7 34:20 35:4,7,9 35:20 36:25 39:4,8 39:13,25 41:11,16 44:11,25 48:1 49:5 49:9,11,19 50:19,23 51:6,25 52:6,16 53:6,17 54:8,21 55:3 58:20,21 59:3 59:10,11,15,18,22 59:24,25 60:2 61:4



69:24 70:8,15,23
72:24 74:5 75:21
76:19,23 77:14
79:21 80:7,21 81:1
81:2,5,8,9,12,19,20
81:25 82:1,3,3,4
**Mrs**
31:14,24 46:12,20
47:15,18,25 51:1
69:9,10 70:19
**much**
20:24 22:20 23:12,25
24:1 38:19 45:19
50:6
**multiplier**
80:19
**multiply**
20:15 77:11 79:17
**Mulvaney**
1:4,5 27:14 29:19
31:15 32:20 35:4,7
35:20 39:4,8,25
41:16 44:11 48:1
50:19,19 53:17 54:8
59:10 62:8 70:8,15
72:24 74:5 75:21
76:19,23 77:14
79:21
**Mulvaney's**
27:23 29:7,12 31:12
32:14 33:5 35:9
36:25 39:13 41:11
44:25 46:12 47:25
48:4 50:23 51:1
55:3 59:3,11 69:9
69:24 80:7
**must**
58:3
**Mute**
52:18
**my**
4:24 5:18,18 6:8,12
6:18 7:24,25 8:18
9:11 17:23 24:1
25:22 28:16 31:5
33:22 40:21 43:3

46:10 47:13 53:8
55:15,15,21 57:23
58:11,23 63:12,12
67:5 73:25 83:9,10
83:16,17,20

_____
**N**
_____

**N**
2:8 3:1
**name**
4:24 5:2 10:17 73:6
**names**
10:24
**national**
17:19 18:21,21 19:5
19:14,18,21,23
21:18
**nature**
12:18 17:8 34:11
**necessarily**
25:8 26:4 29:23 32:7
32:9 43:20
**need**
16:24,25 81:17,18
**needed**
22:9
**needs**
7:2
**negative**
58:6
**Neither**
38:4
**net**
56:13 59:6
**never**
46:24
**new**
36:9 46:8 66:9,17,20
67:1,6
**news**
58:3
**next**
35:17 36:8
**Niendorf**
1:19 2:1 3:10 4:3,19
5:4 26:20 49:20

52:17 53:7 61:4,8
73:6 80:22 81:5
83:7
**nineties**
7:15
**no**
1:11 4:2 6:15 7:12
11:7 12:15 13:9
16:10,14 18:25 19:7
19:15 20:21 21:7,15
21:22 22:13 23:8
24:15 25:8 29:14,18
30:10 31:18 32:5,23
33:8 34:9 35:7 36:6
37:9 39:6 40:2
41:19 42:11 44:13
44:23 50:25 51:2
54:9 55:6 60:6,22
60:25 64:5 65:20
66:1 69:25 75:24
77:5 78:13 81:1
**normal**
64:16
**normally**
12:19
**North**
1:16,16 2:10
**NORTHSTANDA...**
1:15,15
**Nos**
3:8,15
**not**
6:15 12:10 13:1,1,25
17:11,23,23 18:2,9
18:18 21:2 22:4,5
24:1 25:8 29:23,24
30:7 31:6 32:6,24
33:4,8,23 34:22,25
35:6,7,15,18 36:6
36:19 39:15,20
42:10 43:1,20 46:4
46:17,18 47:14
54:12 55:6,20 56:9
58:2 59:19 60:7
65:17,20,22 66:22
67:23 68:3 69:9

76:12 77:9,15,18
79:25 80:16,19
81:22 83:12
**Notary**
2:5 83:5,19
**notes**
83:11
**notice**
2:5
**now**
4:2 7:1 8:22 19:25
25:23 45:21 46:19
47:3 58:24 65:12
70:19 80:9,19,22
81:11
**number**
11:3 12:15 20:4,6,15
22:3 25:25 26:2,9
26:10 38:23 47:16
48:18 50:14 77:19
**numbers**
10:24 20:11 27:9
45:22 66:12 67:1
77:2 80:8
**nutritionists**
75:2
**N-i-e-n-d-o-r-f**
5:4

_____
**O**
_____

**oath**
4:20
**object**
10:1 13:23 14:23
18:4,10 31:17 33:7
34:20
**objected**
18:15
**objection**
18:13 70:23
**obviously**
76:24
**occupations**
72:21
**off**
16:22,24 23:5 33:24



34:2 37:21 49:13
52:21,22,25 53:2
73:2 74:13,15 81:11
81:14,15
**offer**
42:15 50:4
**offered**
13:10 19:16 39:16,19
39:19
**offering**
67:22
**office**
5:6 83:17
**often**
21:8
**oh**
77:17,21
**okay**
5:16,20 6:12,16 7:10
7:13 8:15 11:23
13:15 19:1,8 20:12
22:10,14 23:9 24:6
24:25 25:9,24 26:24
27:5,24 29:11 33:25
37:3,17 38:5 40:11
40:20 42:23 43:7,13
44:14,24 45:6 47:18
48:3,24 49:5,9,12
49:25 53:7 54:7,10
54:13,25 55:8,18,23
56:4,10,16 59:24
60:2,7 61:15 62:16
62:23 63:5,14 64:22
64:25 66:19 67:4
68:14 69:2,21 70:4
72:22 73:5,25 74:7
74:16 75:9,12,25
76:19 77:13,24 79:2
79:19 80:21,25
81:13,24 82:2,5
**old**
25:18 32:22
**omitted**
57:9
**once**
15:10 62:18

**one**
4:24 5:22 6:3,8,9,15
6:16,23 7:23 9:16
10:14 11:21 12:10
16:9 20:8,16 21:9
21:10,13 24:1,17
27:14 30:11 50:6
51:18,19,21 53:16
53:18,19 65:3 68:8
68:9 70:4 71:6,14
71:17,19,23 72:2
73:17,17 75:19 76:2
76:11,19,21,22
77:18 78:12,18
79:13,20,21,22 80:2
80:15
**ones**
28:15 51:20 74:10
**ongoing**
24:17
**only**
8:13 24:15 31:13
47:14 48:24 53:16
56:13 60:17 61:15
63:13 68:21 71:7
80:5
**onto**
6:2
**onward**
79:11,11
**onwards**
79:15
**opine**
14:18 59:3
**opining**
12:21 14:16 22:1
35:23 36:5
**opinion**
13:10 14:8 15:18
16:4,6,11 17:18,23
18:20 19:16 23:10
23:11 24:25 25:3,7
25:10 26:14,16
27:22 33:5,22 35:2
36:24 48:3 55:2
59:9,10 60:5 70:18

75:20 80:6
**opinions**
24:21 27:5,14 33:16
34:8 45:6,8 50:4,24
51:9 53:16 59:2
67:22
**opposed**
54:3
**order**
66:17 81:22
**Orderlies**
74:21
**orders**
81:18,18
**original**
3:23 60:11 67:5 68:9
68:15,20
**originally**
7:3 47:10
**other**
7:10 8:10 21:1 24:8,9
24:11,14 36:9 42:8
42:9 43:10 51:16
66:19 67:13 68:9
80:4,20
**Otherwise**
16:7 17:14
**our**
9:3 47:9 58:21
**out**
19:3 24:2,4,6 37:13
38:5,6 42:4,25 43:5
43:21 60:14,15
64:18 72:12
**outside**
8:2 57:18 70:21
**over**
5:12 6:5 8:15,25 9:25
10:4 11:22,25 12:8
51:19 57:13 65:17
66:3 67:24
**overall**
63:22
**Owens**
11:9

---
**P**
---
**P**
2:8,8
**page**
3:2,15 5:13 6:2 25:23
27:1 32:1 43:12
45:21 63:15 64:17
80:17
**pages**
5:23
**paid**
17:4 37:5
**paragraph**
80:17
**parameter**
50:16
**part**
16:16,19 20:22 33:11
37:12,17 38:16 39:1
39:11,18 40:2,23
45:9,10,12,13 46:14
46:15 55:6 73:17
75:22
**particular**
21:25 30:21 35:3
37:18 57:3 64:4
68:22 69:16 72:5
**particularly**
74:7
**parties**
83:13
**past**
15:14,22 16:15,18
18:1,6,18,24 19:3
19:20 36:25 44:25
**pay**
30:3 65:25
**paying**
66:6
**payment**
39:24
**pays**
44:5
**peer-reviewed**
34:10,15



**pension**
28:19 41:1 43:17
**people**
20:24 22:18 23:14
64:16 73:13,20
**per**
20:9,15,16 22:3,10
26:20 38:25 42:3
48:5 70:4,5 72:3,3
74:5 75:17 76:2,22
78:13,18 79:7 80:2
**percent**
8:18,19 9:23 10:11
10:12 12:5,6 28:11
28:18 39:17,21 40:5
41:1,9,15,17,24
42:4,10,17,19 43:3
43:6,8,9,10 44:12
44:24 45:2,14,18,19
48:10,21 49:21 50:8
50:18 51:3,13 52:3
52:6 53:17,23 55:2
55:16 56:11 58:1,15
62:11,20,21 63:5,8
63:10,21 66:14 67:5
67:6 69:1 70:21
71:8,9,22 78:5,6
79:12
**percentage**
47:12 50:18 52:14
53:14,15
**period**
8:25 9:9 10:7 17:5
25:15 30:4 42:13
43:19 58:7,11 68:2
70:1
**periods**
30:2
**person**
16:23 17:15,16,25
20:12 22:5,6,24
23:12,16,16,17,18
24:3 26:6,7 28:24
33:19 35:16 36:7,8
36:18 41:7 47:1,3
50:15,16

**personal**
1:3 12:19,25 13:5
74:22
**personally**
47:25
**person's**
15:7,19 16:12 17:13
18:1,6,18 19:10,22
23:2 24:16 33:13
35:16 36:13
**phone**
44:5
**phrase**
30:22
**Ph.D**
1:19 2:2 4:3,19 83:7
**pick**
49:7
**picking**
72:12 73:2
**pilot**
36:19
**pinpoints**
56:24
**place**
83:11
**plaintiff**
12:2,5
**plaintiffs**
1:6,10 2:13,17 4:10
4:12,14 5:6
**plan**
39:22 40:1,1 43:23
**planned**
31:15
**planning**
31:20,21 32:8,17
40:8,9
**play**
60:21
**please**
4:7,18 5:2 18:5 42:24
61:9
**plus**
28:25
**point**

30:15 33:18,22 34:4
34:19 67:24 71:18
78:2
**points**
22:14
**portion**
28:22 38:18
**portions**
31:11,11
**position**
8:1
**postsecondary**
9:12,16
**potential**
14:21
**Potentially**
36:17
**preceding**
67:23
**prediction**
57:22
**prefer**
16:9 81:8
**preference**
16:10
**prep**
74:18 75:16
**prepared**
6:17
**presence**
83:10
**present**
2:22 8:21 15:12
56:14,15 58:18 59:6
71:1
**presentations**
5:25 9:14
**presented**
66:23
**President**
57:25
**presumably**
22:8
**pretty**
50:6
**previous**

19:10
**price**
55:19 65:23 66:2
**primary**
27:14
**principle**
61:10 77:16
**prior**
29:13 30:8 31:6
**probably**
6:18 8:18 12:5 14:12
56:19 58:22 67:16
**process**
76:13
**Procurement**
75:3
**produced**
6:6 7:3 27:6
**producer**
63:24,24,25 64:25
**Professional**
6:1
**professor**
7:6,14,17,24,25 8:7,9
8:17,18,19,23 9:24
10:5
**professorship**
7:20
**program**
9:3
**project**
40:2
**PROPERTY**
1:14
**PROTECTING**
1:16
**provide**
6:25 20:6,11,13
21:20 22:2 23:13,21
26:3,10 33:24 36:2
36:16 50:14 70:13
73:18 78:14
**provided**
6:5 10:13,20 12:12
14:7 20:13 23:6
24:21,25 26:21


MAGNA
LEGAL SERVICES

32:20 70:16 75:7,21
79:21
**provides**
17:7 48:16 76:5
79:25 80:1,10
**providing**
23:19
**Public**
2:5 83:5,19
**publication**
34:23 35:2
**publications**
9:18,22,22 34:16,16
**published**
9:19 20:20 21:6,8,14
54:21
**pull**
5:18,21 6:10 22:10
22:14,20
**pulled**
56:24 63:14 74:1,3,8
**pulling**
73:23
**purchasing**
75:3
**pure**
61:20
**purposes**
20:7 22:2 23:14
61:25 62:2
**pursuant**
2:4
**put**
21:22 37:23 50:21
77:1
**puts**
53:21,22
**p.m**
1:21 2:7 4:7 49:15,15
81:14 82:6

**Q**

**question**
8:13 15:15 18:5
19:24 25:5,15 27:8
36:23 42:24 53:8

66:11 80:16
**questions**
81:1
**quick**
6:10
**quite**
21:22

**R**

**R**
2:8 3:14
**Randall**
1:4 31:15
**range**
22:25 23:16,23 43:21
50:12 51:6,9,20
54:11 56:5 62:25
64:8 67:4 69:18,20
72:12
**ranges**
51:16
**rate**
15:9 28:5,11,12
37:22,24 38:1,6,12
38:15 48:9,12,21,24
51:17,25 53:10 54:1
55:2,24 56:11,14,16
56:17,23 57:8 58:7
58:9,16 61:13,14
62:11,14 63:11 65:1
65:2 66:14,24 68:5
68:11,24,25 69:1
71:7,7,8,9,12,22
72:5,8 74:4 77:10
78:21,24,25 79:12
79:12
**rates**
48:17 50:4 57:14,14
57:19,23 58:1 63:6
65:18 67:8,8 73:10
74:1,7 76:8
**rationale**
56:7
**rattled**
34:23
**read**

31:3 58:3 59:9 70:19
74:13,15 81:6
**ready**
81:10
**real**
6:10 62:7
**realistic**
57:16,20
**reason**
17:12,24 30:3,8 36:6
62:24
**reasonable**
33:23
**reasons**
52:9 53:9,12
**recall**
21:15 39:15,18 44:17
56:22 64:8 70:22,24
**receive**
29:11 41:17
**received**
11:22 31:13 32:4
48:22 51:14
**recent**
10:16 21:9,10 67:24
**recess**
49:14
**recognizing**
47:5
**record**
4:2 5:3 32:19 49:13
49:17 52:21,23 53:2
53:3 81:11,14,15,17
81:19 83:6
**reduce**
58:16,17 62:16
**reduced**
28:20,21 46:15 62:19
63:2 83:10
**reducing**
56:13
**Refereed**
9:22
**reference**
23:20 55:10,20
**referenced**

59:20
**referring**
42:18 65:13
**reflect**
46:17
**reflecting**
16:12
**regard**
27:15
**rehab**
15:25 16:5
**related**
55:6 56:19
**relative**
19:23 83:12,14
**relevant**
32:23 34:21
**reliable**
18:2,7,9,18,23
**relied**
34:8
**rely**
15:25 35:1
**relying**
18:23
**remainder**
76:4,22 77:8
**remained**
72:4
**remaining**
57:18 75:22 79:14
**remember**
40:17,18 67:23
**remote**
2:6 83:9
**removal**
72:24 73:13,16 74:3
**remove**
67:21
**removing**
58:7,11
**repairs**
74:24
**replacing**
77:22
**report**



3:10 5:16,18 6:18 6:21 21:11 23:17 26:16,22,25 27:1,3 27:6 29:8 31:5,6,9 32:4 33:3 35:10 40:18 44:20 45:7 46:10 47:10,11,13 52:13 53:23 54:14 54:14 55:15,18 58:25 59:5,19 63:12 63:13 68:9,20,23 69:11,22 71:6 72:22 73:3 80:17

**Reported**
1:22

**reporter**
4:18 52:20,22 81:16 81:24 82:2,5 83:4

**Representative**
1:4

**representing**
4:25 63:8

**Request**
3:15,16,17

**requires**
35:24

**research**
7:6,7 9:6,7,8,13,20 10:12 52:6

**Reserve**
57:13

**responsibility**
30:3

**rest**
8:19 11:5 33:22 38:12

**restate**
18:5 42:24 70:2

**result**
68:24

**results**
53:12

**RESUMED**
49:18 53:5

**retained**
5:5 12:5

**retire**
31:15 32:8,15 35:16 35:24 36:8,15,19 44:6

**retired**
7:5 9:10 32:12 33:25 34:1 36:7 46:5

**retirement**
7:8 10:10 34:12 35:4 35:6,9,11,13,23 39:11,14,20 40:1,22 41:2,10,18 42:2,6 42:17

**retires**
34:19

**return**
16:22,24 29:13

**returns**
9:13

**reverse**
38:1

**review**
17:10,11,14 29:11 31:8 32:19 39:13,24 44:9 50:23 64:3 73:10

**reviewed**
29:7 48:4 69:9

**revised**
3:11,12 26:21 27:5 48:22 51:13 61:3,16 61:21 66:8,13,21 68:15,23 69:22 71:5 71:8 80:8

**revising**
63:15

**revision**
5:23

**revisions**
59:20,23

**re-explain**
19:8

**Rick**
11:12

**right**
5:12 6:5,10,14 7:20

11:25 22:12 25:14 26:20 27:13 36:24 37:14 39:7,23 41:13 45:20,24 46:1 48:10 49:5 54:1,10,25 55:5,23 58:1,6,25 59:7,13 60:21 61:2 62:8 63:3 64:11,20 65:23 66:8,9,16 68:4,6,12 69:3,6,8 69:11,12 70:5 77:2 78:8 79:19 80:5,21 81:2

**Roman**
2:18 3:3,23 4:15,15 4:23,24 14:10 49:5 49:9,19 52:16 53:6 59:22,25 80:21 81:5 81:19,20

**Rose**
2:9,10 4:11,11 49:11 81:2 82:3,4

**rough**
12:13

**roughly**
14:5 25:14

**Rule**
3:17 10:14 11:17

**rules**
2:4 5:13

**run**
39:3 61:8

**running**
30:11 39:2

**Ryan**
11:6

---
**S**
---

**S**
2:8 3:7,14,14

**said**
21:3 23:13 30:11 31:20 32:10,14 37:12 38:7,14 43:2 52:2 54:18 55:18 70:20 73:19 83:11

83:15

**salary**
42:19

**same**
5:13,22 6:9 13:20 14:2,18,20 18:13 21:4,5 24:21 25:3,4 25:6,13,14,15,17,23 25:25 26:1,1,4,15 26:17 38:19,23,24 43:12 45:21 48:21 48:24 51:13 53:24 53:24,24 57:17 61:10 63:5,8 64:17 67:9,13 69:2 71:1,8 77:16 80:20 82:1,3 82:4

**sample**
65:4

**SANDRA**
1:22 2:5 83:4

**saw**
9:14 29:8 44:17,19 44:19 55:18

**say**
7:18 10:4,6 12:12,16 13:3 14:15 27:13 30:20 31:21 33:4,8 33:25 35:1,22 52:25 58:7 65:12 68:4 73:21

**saying**
27:7 41:19 45:21

**says**
34:17 39:7 42:19 72:22

**scenario**
25:6

**scenarios**
39:4

**schedules**
39:24

**school**
73:3

**screen**
6:11,12



MAGNA
LEGAL SERVICES

scroll
 6:14
seal
 83:17
second
 24:19 26:6,9 27:17
   38:17 52:23 61:12
   67:19 80:15,17
section
 6:1
Security
 28:18 39:9
see
 5:23 6:12 19:22
   28:16 29:4,4,5,14
   39:11 43:9,13 46:8
   47:21 52:17 56:10
   57:8 67:1 69:14
   74:11 76:10 77:13
seeing
 34:5 40:19
seems
 44:18
sense
 36:12 43:7
separate
 24:22
service
 3:12 20:8,14,17
   21:17,21,24 22:8,11
   22:19 23:13,18 26:2
   26:12 58:11 69:8
   70:4,8,13 71:13,23
   72:3,6,13 74:22
   76:4,6,11 77:6
   78:12,13,17,18
   79:22 80:11
services
 1:24 14:6,18,21 20:2
   23:21 24:13 25:1,4
   25:7 27:17 69:16,24
   70:16 72:12,16 75:3
   75:13,15,22 77:22
   80:8
set
 35:23 57:24 65:5

 67:19 83:16
Seth
 11:10
sets
 56:21
seven
 49:9
shared
 6:11 72:25
shares
 43:24
she
 31:19,20,20 32:1,7
   32:15,17 47:22,24
   70:20
SHIELD
 1:9
Shipyards
 1:12 4:5,16,25
shopping
 73:1
short
 27:25 65:8
Shorthand
 83:4
should
 8:22 9:21 46:6 47:12
   52:22 62:2 79:18
showed
 40:18
showing
 10:15
shown
 7:23
shows
 12:11 53:13
side
 57:18
sign
 81:6
signature
 81:6
simultaneous
 8:7
since
 7:15 8:6 10:21 27:10

 32:3 37:4 63:12
single
 16:23 24:9 48:19
sit
 21:10
situation
 16:15 17:20 19:21
   24:9
six
 77:1,2,3,3
slight
 68:14
slightly
 66:13
slowly
 10:4
Smith
 24:18
snow
 72:24 73:13,16 74:2
Social
 28:17 39:9
socks
 66:2
Solaris
 11:15
some
 7:14 9:11,13 13:1
   15:20 26:21 27:10
   30:1,2 33:21,22
   36:9,12 41:18,19,20
   42:14 57:12
Somebody
 43:7
somehow
 56:20
someone
 16:4 18:20 19:13,17
   46:24 52:4,9,10
   72:20
someone's
 40:13 53:9
something
 9:19 14:14 43:16
   49:10,25 64:10
sometimes

 15:25 17:9
somewhere
 6:22 44:19
son
 73:2
son's
 31:12
sorry
 18:14 25:21 37:9,11
   41:5 53:7 55:9
   78:23
sort
 12:18
sound
 6:19
sounds
 11:21 25:24 39:23
source
 48:12 57:3,5
South
 2:19
spare
 5:12
speaking
 14:5 52:13 64:15
specific
 68:17
specifically
 12:4 22:4 52:12
   65:20,24 69:23
   73:17
specify
 69:18,19
specious
 43:4
speculate
 35:12
speculation
 32:13 33:13 40:13
spell
 5:2
spelled
 5:4
spend
 20:25 22:18,21 23:12
   23:18 47:4



MAGNA
LEGAL SERVICES

**spending**
50:12,23 51:1
**spends**
23:16 47:2 52:11
**spent**
76:23
**split**
8:16 10:5 12:1
**spring**
8:20
**St**
10:18
**stand**
66:23
**standard**
12:18 36:2
**start**
65:8
**started**
10:6
**starting**
28:8 49:20
**starts**
5:24 56:8
**state**
2:4,6 5:2 83:1,5,19
**stated**
27:3 32:1 46:10
47:11 54:16
**states**
1:1 34:11 46:10
**statistics**
7:18 41:7 55:17,19
63:15,19
**status**
7:22 50:14
**stayed**
48:24
**stenographic**
81:17 83:11
**stick**
79:19
**still**
35:17 36:10,15,20,21
40:6 52:20 62:13
**straight**

65:22 76:12
**Street**
2:10
**strictly**
42:10
**structurally**
56:8
**studies**
53:13
**study**
53:24 54:2,20
**studying**
34:5
**subject**
17:18
**subsequent**
62:21 71:15
**subset**
55:21
**such**
34:23 35:1 64:6,13
83:14
**Suite**
2:10,15,19
**support**
29:2 46:19,21
**sure**
5:22 12:10 13:25
14:2,10 18:6 21:2
25:22 49:11 52:12
52:24 56:19 60:1
80:3
**survey**
20:3,19,20,23 21:6
21:19 22:11,15,17
22:23 23:5 75:8,10
**swear**
4:18
**switched**
67:24
**sworn**
4:20 83:8
**S.C**
2:10,15

———————————
**T**
———————————

**T**
3:7,14
**table**
26:16 49:23 53:22,23
53:24 62:3,20,25
67:6 69:23
**tables**
34:6,7 50:15 51:14
60:15 62:14
**tail**
71:16
**take**
5:9 8:9 15:21 27:21
42:14 45:22,23 46:1
49:6 60:14,15 64:23
64:23 78:9 79:16
**taken**
2:2 49:14,23 83:8
**taking**
60:16 61:19
**talk**
5:1 49:20 69:8
**talked**
44:15 63:9 68:6
69:13 76:17
**talking**
5:22 18:17 25:14
27:9 32:24 34:22
38:18 42:13 43:20
52:18 59:15,19
60:17,25 78:5 79:15
79:17
**tasks**
20:24 22:5,9,17 23:4
23:9
**tax**
16:22,24 29:13
**teaching**
8:24 9:1,2,4 10:11
**tell**
58:21 74:12
**tend**
17:14 22:19
**tended**
10:3
**terms**

12:4 15:1 17:16 22:3
45:14,17 62:18
**testified**
4:21 10:20 11:1 12:1
31:14,19
**testifying**
12:2,4 58:22
**testimony**
3:17 10:20 11:17
12:17 32:3,19 69:10
70:20
**text**
47:11
**than**
7:10 8:10 12:16
17:13,18,22 18:20
18:23 19:5,13,17
24:14 26:6,8 28:1
29:19 30:8 33:12
39:4 40:5 56:7,9
63:11 67:13 70:16
78:6 80:4,20
**thank**
7:9 80:25 82:5
**Thanks**
81:2,3
**that's**
5:4 6:15 11:6,8,11,15
12:13 19:13,15
20:20,20 21:3,6
24:5 25:5,15 30:14
31:19 32:1,12,17
33:8,23 37:4,5,9,21
38:16 40:12 42:8,22
45:25 48:2,7,15
49:3,23 50:6 53:18
53:18,24 55:6,13,13
55:14 56:6,25,25
57:3,5,6 58:15,21
58:23 59:6 60:16,19
62:6 63:1 64:16
66:8 68:24 70:4,11
72:7,10,12 73:3
75:11 77:16,19
78:16 79:23 80:14
80:16,18,22



**their**
 15:8,9,11,13,19,23
  16:6,7,24 17:2,22
  18:2,7,19,23 19:2,4
  19:11,20 20:4,5,9
  20:10 25:1 35:19
  41:9 45:4 46:5,6
  47:22 53:10 54:12
  66:6 72:14,24 73:2
**them**
 12:17 13:2 15:12,12
  20:25 23:20 28:14
  34:24 58:2,4,17,17
  72:14 74:3,4,13,15
  75:9 82:1
**themselves**
 4:8 62:5 66:22
**then**
 6:9 10:9,13 14:1,6
  15:8,10,25 16:25
  17:14 19:8 20:14
  22:20,23,23 23:23
  24:6 25:13 27:10,17
  28:3,5,7,9,14 35:10
  37:20,21 39:7 44:14
  45:2,16,22 46:12
  48:3,9 50:14 54:25
  59:10,17 61:6 62:1
  62:9,10 63:5 68:8
  69:2,5 71:14 72:14
  73:13 75:18 77:8,11
  77:13 78:3,20 79:3
  79:11 80:5 81:16
**there**
 6:12 17:24 24:2,3
  28:5 30:1,3,6,8 34:7
  34:10,15 39:11
  40:19 42:9 43:17,21
  48:20 49:3,3,7 52:9
  52:12 57:17 62:21
  64:2,18,18 68:1,8,8
  68:14 71:17 79:16
  80:18
**there's**
 15:17 16:6 33:1 36:6
  40:12 43:3,9,19,21

 60:24 63:19,24,25
  73:15
**these**
 11:5
**they**
 12:19 17:4 19:4
  20:14,24 22:9 23:24
  23:24,25 25:13,18
  25:21,24,25 26:1,3
  26:4,7,8,8 35:17,19
  36:8,10,19,20,20,21
  37:5 39:19,19 43:18
  45:22 47:4,7 50:14
  53:13 54:2,4 56:20
  56:20 57:17 64:7,8
  64:13,15 65:8 66:10
  66:22 72:11 73:18
**they'd**
 26:10 57:21
**they're**
 18:9 25:14,17,17,18
  35:18,19 50:11,11
  56:18,19 66:23 75:7
  76:12
**thing**
 48:24 57:17 63:8
**things**
 12:21 17:6 25:11
  30:12 42:5,9 43:5
  43:10 74:2 76:20
**think**
 5:15 6:18,21 7:11 8:6
  9:14 12:9,9 13:9
  14:7,14 29:8,15,18
  30:10 31:20 37:12
  38:7 39:15,15 43:13
  43:22 44:1,3,3,14
  45:20,25 46:22 49:2
  52:2 53:7,12 55:1
  56:7 57:16,16,20
  58:6 60:3 62:17,23
  64:7,13 66:1 67:16
  68:3,4 70:15 73:15
  80:22
**third**
 61:13 68:8,10

**this**
 4:1 5:13 6:5,6,16 7:3
  8:3 21:18,20 26:22
  27:3,14 31:4 32:11
  32:20 33:16 34:8
  35:2 40:8 42:25
  44:9,15 50:24 51:10
  55:21,22 59:5 60:23
  61:6 65:21 67:25
  68:9 69:25 70:1,1
  74:19 76:24 79:20
  81:21,22 83:17
**Thomas**
 2:9 4:9
**those**
 7:10 9:18,21 10:25
  13:9,17 20:11 22:18
  22:21 23:4 24:11,15
  25:1,3,6,10 26:14
  26:17 28:3,14,15
  29:3 30:1,17 31:12
  32:18 38:7 40:25
  47:6 56:2 57:12
  59:2 63:2 66:16
  67:3,21 68:6 69:16
  72:14 73:24 75:5,9
  75:20 76:10,16,16
  76:17 77:3,22 79:23
**though**
 28:8
**thought**
 32:7,15,17
**thousand**
 51:11,18,18,22,22,22
  51:23,23,23,24
  62:24
**three**
 28:1 29:20 42:21
  61:11
**through**
 5:6 6:14 7:13 8:21
  9:9 20:10 23:1
  24:10 26:24 27:6,21
  30:11 31:10,11
  32:21 34:18,24 36:3
  36:16 37:13 38:3

 41:3 46:1 54:24
  61:8 67:15,17,18
  69:17 71:21 76:9
  78:9
**tied**
 21:24 22:4 51:3
  69:23 75:9
**ties**
 33:3
**time**
 4:7 6:18,22 8:18,21
  8:25 9:9,10,17,23
  9:25 10:4,7 11:25
  12:24 15:8,19 20:3
  20:19,24 21:3,4,10
  21:18 22:16,18,21
  22:25 23:5,12 24:18
  25:15 30:2,4 31:24
  32:21 42:13 57:9
  58:23 69:10 70:1,21
  75:8 81:22 83:11
**times**
 13:10 20:15 70:10
  76:7 77:3 79:7
**Timothy**
 11:9
**tjl@rosegrouplaw....**
 2:11
**today**
 5:2,14 6:24 8:3 11:23
  21:10 48:22
**Today's**
 4:6
**together**
 74:4 76:10
**Tom**
 18:14
**took**
 28:3 44:25
**topic**
 9:20
**topics**
 9:8
**top-line**
 59:2
**total**



20:17 26:11 29:4 37:19,25 38:2 53:14 60:4 76:3 77:4,7 80:6,7

**totals**
59:1

**track**
54:4 64:7,8

**tracked**
20:23

**tracking**
50:11

**tracks**
64:6,11,18

**training**
44:2

**Tranportation**
1:13

**transcript**
3:23

**transcripts**
31:4

**Transfer**
11:12

**transportation**
1:13 64:9

**traveled**
70:24

**Travelers**
1:14 5:1

**Traveler's**
4:16

**Treasury**
57:14 67:8

**trial**
58:21

**trick**
80:16

**Trip**
60:12

**Truckers**
11:2

**true**
77:24 78:1 83:6

**Trump**
57:25

**trying**
38:5 40:2 42:8,25 43:5,12 79:5 81:20

**twice**
23:24,25

**two**
7:10 9:14 24:15,17 24:21,22,22 25:10 26:14,17 27:13 28:3 30:17 31:13 32:18 66:16,16

**Twohig**
11:6

**two-page**
27:1

**type**
24:8 41:18 72:19 73:22

**types**
16:18 20:23 25:10 43:5 50:12

**typical**
33:17

**typically**
13:20,25 15:4,13 16:11 20:1 24:12 50:3 67:21

**T-bills**
58:14 67:10

---

**U**

**U**
3:14

**ultimate**
70:7

**ultimately**
38:15

**umbrella**
63:23

**under**
2:3 25:6 29:22 36:2 36:11 63:22,22,23 74:19

**undergraduate**
9:2

**understand**

8:21 21:16 26:20 27:9 36:11 41:15 42:23 44:25 60:16 66:10 69:13 70:7

**understanding**
33:2 55:24 57:23 58:24 73:19,25

**understated**
47:16

**understood**
45:20

**UNITED**
1:1

**universities**
8:10

**University**
7:21 8:8

**unless**
17:24 36:17 60:25

**unpaid**
22:19

**until**
31:23 32:11 60:10,10 60:17

**up**
5:18,21 6:10 12:17 27:22 32:21 34:18 36:3,16 37:19,25 38:15,19 40:16,18 43:8 49:7 52:1,14 56:23 60:17 62:3 63:11 65:7,8,12,13 65:19,20 72:9 73:2 74:4,8 75:5 76:10 77:20 80:14,18

**updated**
7:1,2 11:17,20 61:12 61:13 63:16 66:14 67:14 68:24,25 69:6

**upon**
15:17 36:12

**upping**
40:9

**up-to-date**
6:7,8

**us**

2:19 46:1 61:8 78:9

**use**
8:20 13:14 14:2,20 15:5 16:3,6,9,15,18 19:2,21 20:1,3,19 21:17,18 22:16 23:5 33:15,17 34:12 35:3 35:6,18 37:24 38:1 39:24 40:22 44:21 48:21 50:3 51:13 53:19 54:10 55:12 56:1,4,14 58:19,20 59:9 60:4 61:23 64:25 71:1,11 74:10 75:8,20 79:3,4

**used**
21:23 27:21 28:12 35:13 38:6,21 43:1 44:24 47:9,19 48:9 50:18 51:21 54:8 56:10,17,22 57:4 58:8,13 59:11 61:21 61:23 62:7,9,13,24 63:3,15,20 65:4 66:20 67:9,14 71:8 78:21 79:1 80:8

**useful**
35:15

**uses**
44:7 50:6 51:7 54:14

**using**
17:22 18:21 19:18 20:3,22 22:23 25:2 38:15 40:15 43:11 52:4 55:16,18 56:7 56:25 66:13 71:25 72:5,10,14

**Usually**
16:20

**utilize**
35:9 51:9

**utilized**
29:20 53:16,25 54:22 54:23

**UW-Oshkosh**
7:5 8:14



**U.S**
17:17 20:13,20,21
22:3 28:11,17,24
39:10 40:22 41:1,8
41:9,22 45:3 55:13
57:1 65:14 67:8
75:10

---
**V**

**valuation**
13:1
**value**
9:12,15 15:12 20:8
20:16,17 22:2 23:14
28:21 29:2 35:19
41:20,23,25 42:9,10
43:3,6,20 44:7
46:16 49:23 56:14
56:15 58:10 59:6
60:24 69:15,25 71:1
71:14,17,19,23 72:2
76:2,3,11,21 77:4
78:11,12,16,17 79:8
79:22 80:7
**values**
15:11 26:11 28:3,14
28:15 29:3,4 58:11
66:22 67:3 76:16,16
76:17 78:3
**variations**
68:14
**varied**
10:3
**various**
2:6 74:1 83:9
**vast**
63:19
**version**
6:5 7:1,23 9:21 11:20
26:24 47:15
**versus**
4:4 10:5,18 11:1,6,8
11:10,12,15 12:2
17:11 24:18,19 33:1
48:19,19,20 60:20
68:25 69:1 78:6

**very**
57:15,19,19
**vesting**
43:19
**video**
6:11
**videoconference**
1:19 2:1,12,17,21
83:7
**Videographer**
2:22 4:1,17 49:12,16
52:24 53:3 81:10,13
**video-recorded**
81:15
**view**
43:4
**Vitae**
3:9,16
**voc**
15:25 16:5
**vocational**
15:18,18 16:6 19:9
**vs**
1:11

---
**W**

**W**
2:9
**Wacker**
2:19
**wage**
13:11 14:3 29:16
37:24 55:23 63:6
64:3,19 65:5,6,18
74:1
**wages**
14:16 19:18 39:7
41:10 63:11 65:25
72:20
**waive**
81:6,7
**walk**
41:3
**want**
5:21 25:22 26:24
27:6 38:16 59:25

62:13 77:7
**wanted**
22:9 60:13
**wants**
58:2,4
**washing**
75:15
**wasn't**
78:3
**Watertown**
2:16
**way**
21:22 24:2,4 28:6
41:20 50:20 79:20
**we**
4:2 6:8,24 13:14
21:10 25:2 31:14
32:12,14 35:12 40:3
40:6 41:11 43:11
44:15 45:6,8,16
48:22 49:6,20 51:14
52:22 58:3,25 59:9
61:16 63:6,9 64:16
69:14,22,23 75:19
75:25 76:5,8,10,17
77:13 78:10 79:11
79:13
**website**
57:6 63:19
**week**
35:17 36:8
**weekend**
77:1
**weekends**
76:25
**weeks**
28:1
**weight**
75:5,13
**weighted**
23:3 72:15 75:7,9
76:12,13 77:20
**weights**
75:7
**well**
7:5 8:20 9:7,11,17

15:6 17:4 19:16
21:23 22:14,24 25:5
25:12,13 27:1 28:7
28:20 29:21 30:15
30:20,23 32:14
33:20 37:7,19 42:23
43:9 47:21 50:9
51:18 54:4,20 56:1
57:25 60:8,14 61:20
63:12 66:10 67:23
68:18 70:2 71:11
72:20 74:12 77:18
77:19 79:5 80:6
**went**
63:7 67:5 76:8 77:20
**were**
8:9,11,20,24 9:8,8,18
13:18 14:14 16:8
17:2,4,13 19:10
25:2,18 27:25 30:11
30:16,17 36:4,13
37:20 41:21,21
44:11 45:1,20 49:20
57:12,14 59:20 69:5
69:24 72:5 79:17
**Western**
1:1 11:13
**we'll**
5:20 26:25 27:10
49:2,7 60:3 61:2,6
81:25
**we're**
5:1,13,22 6:6,16
11:23 18:17 22:25
25:14,22 27:9 34:21
38:18 43:20 45:15
45:21 49:12,16
52:25 59:1,15,18
60:17 64:17 78:5
81:13,22
**we've**
10:13 49:5 61:9 68:5
68:19 69:13 75:19
80:9
**whatever**
22:4,8 25:19 35:17



38:11,11 42:15,16
45:7 50:16 60:11,12
63:2 81:7
**what's**
12:7,18 46:22 65:12
72:19 75:12 79:5
80:6
**when**
6:17,24 8:20 10:6
11:22 21:13 23:4
30:11,20 35:12 63:1
67:21
**whenever**
35:11,12
**where**
12:12 13:18 16:15
19:18 30:6 40:4,15
40:17,21 43:23
44:14 48:12 56:23
57:19 60:19 63:20
66:8,10 68:1 70:20
72:11
**whereof**
83:16
**wherever**
45:7
**whether**
10:19 17:6 21:19
29:12,16 38:16
44:10 54:2 65:17
**which**
5:20 8:21 9:1 11:21
16:9,11 31:8 34:19
35:20 38:19 39:4
43:3,19 44:24 45:1
45:3 46:12 51:16
54:7,23 61:24 68:5
69:21 70:9,10 74:10
78:1,24,24
**whichever**
74:14
**while**
8:11 50:20 70:15
**White**
24:20 25:17 69:15,19
**who**

18:20 19:13,17 24:20
26:15 52:9 73:13,20
83:7
**whoever**
26:5
**who's**
46:24 52:4
**why**
32:6 35:10 49:3,6
53:9,12 54:10 56:4
57:11 63:10 64:22
64:25 68:22,22
**wide**
43:21,21 72:11
**wider**
64:8
**wife**
31:10 32:14 48:20
72:23
**will**
4:7,17 5:14 27:5
43:23 60:15 61:7
**wind**
12:17
**window**
57:19 67:12,14
**Winnebago**
11:15
**Wisconsin**
1:1,9 2:6,11,16 9:16
11:13 13:17 71:25
72:10,16,18 73:7,20
83:1,5,19
**Wisconsin-Oshkosh**
7:21 8:8,11,24
**with**
3:23 5:24,25 6:25
7:21 20:11 22:6
24:23 27:1,15,22
35:25 36:1 38:7
40:16 43:1 47:8
48:1 52:1 56:17,23
60:22 61:11 65:12
65:13,19 72:9 74:4
74:8 75:5 76:10
79:19 80:23 82:1,3

83:10
**within**
22:7 23:22 63:25
64:4,19
**witness**
2:2 4:18 5:5 49:8
52:19 80:25 81:4,7
83:16
**woman**
48:19
**wondering**
68:22
**word**
43:4
**work**
7:17 8:2,5,7,12,16
8:17 9:4,11,13,24
10:6,12 12:3,19,20
13:4,4 14:22 30:24
30:25 31:23 32:21
33:19,21 34:5,5,7
36:9,14 42:18 60:10
60:10,14 70:24,25
72:24 73:13,20 74:2
77:2
**worked**
8:13 9:23 12:7,14,15
12:23 32:11 38:23
76:19 79:23
**worker**
34:18
**workers**
13:8 74:18,22
**workforce**
66:7 71:25 72:10,18
73:8
**working**
8:9 9:9 38:7,22 41:21
60:11
**workplace**
72:16 73:7
**works**
34:18 35:23 49:7
57:24 70:11
**worth**
37:22 75:21

**wouldn't**
21:22 26:4 32:23
34:21 64:15
**writing**
83:10
**written**
26:14
**wrong**
47:8
**wrongful**
12:25 13:11 14:9,10
14:12,17 34:13
**www.MagnaLS.com**
1:25
**W-2**
17:5 29:13
**W-2s**
16:20 29:7 37:21

---

**X**

**X**
3:1,7 24:18

---

**Y**

**Y**
24:19
**yard**
73:15,16,18 74:23
**yeah**
5:18 13:25 14:11,25
18:10,12,15 23:22
25:17 30:6 36:22
37:11 38:14 39:23
42:8,25 43:13,14
45:20,25 46:3 48:16
52:25 55:21 59:22
62:6,6 64:13 66:4
67:14 68:18 70:22
73:15 74:15 81:20
**year**
10:3,16 28:2 33:24
37:6 38:3,13,18,19
39:1 47:24 48:5
54:20 59:7 60:24
63:3 69:17 70:5
71:16 72:3 77:14,17



77:18,19,21,23,24
78:15,18,20 79:7,21
**years**
8:15 10:9 15:20
25:18 29:4,13,17,20
30:8,17,23 32:22
34:6,12 36:13 44:6
56:5 57:12,12,18
62:12,22 65:17 66:3
67:21,25 71:15,20
**year's**
28:9 37:22
**year-old**
21:19 24:20
**yep**
42:23 73:8 81:4 82:1
82:4,4
**yet**
36:15 46:5 78:4
**you'd**
58:6 77:5,8
**you're**
8:3 14:16,17 16:15
22:1 23:19 25:12
27:13 30:5 32:24
33:4 34:17 36:4
40:15 42:13,20
43:11 47:10,13
60:25 65:13 66:1
67:2,22 73:22 76:3
76:20 79:15
**you've**
5:5,9 10:19 11:25
12:7,14,23 14:7
48:3 70:19

---

**Z**

**zero**
57:15,20,25 58:5,12

---

**$**

**$100,000**
42:21
**$11**
74:12
**$11.99**

74:16
**$119,000**
47:25 48:5
**$119,318**
47:23,23 54:15
**$13.37**
74:17
**$14.03**
74:18
**$14.09**
74:21
**$14.42**
74:17
**$16.02**
74:22
**$16.79**
74:21
**$16.80**
74:11
**$17.53**
74:23
**$18.15**
72:8,9,15 73:25 74:5
75:6 77:21 78:25
**$19.66**
77:20
**$2.30**
42:2
**$20.25**
74:24
**$21.24**
75:4
**$22.80**
79:2,7,23
**$23.73**
74:25
**$28.16**
75:1
**$30.48**
75:2
**$31.87**
42:3
**$454**
72:3,7 75:21 76:7,18
76:21 77:3
**$493,993**

80:13
**$52,000**
38:9
**$52,950**
37:20,25 38:10,16
**$57,180**
37:11,12,23 38:13
**$58,624**
28:7 29:19 36:25
37:7
**$60,000**
41:12,17 47:24
**$60,068**
47:24
**$7,792**
79:24
**$7,972**
78:14 79:10
**$8,321**
79:8

---

**0**

**03**
9:25
**03/26/25**
3:10

---

**1**

**1**
3:9,16 4:2 5:21 6:11
27:2 28:16 46:8,8
47:9,9 48:14 51:14
53:22,23 58:25 61:3
61:10 62:20 66:9,21
66:23 67:1,5 68:15
69:22
**1st**
25:19 67:15,17,17
**1,200**
68:21
**1.037**
28:11
**1.0377**
79:18
**1.2**
43:10

**10**
44:6 49:10
**10/18/26**
83:20
**100**
2:15 51:22 60:15
**11**
1:20 3:17 4:6
**11th**
2:7 83:8
**11.9**
52:6
**11.95**
52:3
**1134**
2:10
**114.9**
51:22
**115**
51:23 52:1 54:11
**119**
62:6
**119,000**
66:15
**119,318**
61:24 62:9,11,13,16
62:19 63:1
**128,429**
66:12
**138**
2:15
**14th**
83:17
**143,579**
80:19
**145,292**
70:9 80:20
**149**
52:1
**149.9**
51:23
**15**
73:21
**150**
51:23 54:11
**16.14**



48:10,21 49:21 50:8
50:18 51:3,13 53:17
53:23 62:20,21
**18**
32:1
**19**
32:1
**199.9**
51:24
**1991**
67:15,17
**1994**
7:15

— **2** —

**2**
3:10,17 26:25 27:2
61:7 69:14,21 71:6
72:2 75:18 77:25
78:6 80:17
**2.9**
67:6 68:12 71:9
**2.90**
69:1
**2:01**
1:21 2:7 4:7
**20**
3:17 10:12 12:6,11
51:18 66:3
**200,000**
51:19,21
**2002**
8:6 10:7
**2003**
8:6 10:7
**2008**
8:21 9:9
**2010**
67:23
**2011**
54:14,24 57:9 67:18
**2012**
54:18 62:17
**2013**
54:14,24
**2015**

54:21 57:9 67:18
**2021**
10:14 12:11 27:25
29:8,13,15,17,20
37:9 41:12 47:22
48:8 61:23 62:7,16
62:19
**2022**
27:25,25 28:2,8 29:8
29:15 37:2,8,9,11
37:19 54:15,16,17
61:21,23 70:2 71:16
71:18 72:4,8 75:20
75:22 76:3,4,5,22
76:24 77:1,8,9,16
78:1 79:1
**2023**
21:9,13 28:10 71:19
77:14,17,18 78:1,7
**2023-CV-0187**
11:3
**2024**
10:15,17,22 11:5,6
12:11 71:21 78:3,4
78:6
**2024-CV-000474**
11:16
**2025**
6:21,23 7:5,7 8:22
11:1,4,7,9,12,14
27:2,7
**2026**
1:20 2:7 4:6 28:15
58:18,19 59:6 67:15
67:17 78:12,15,16
78:20 79:9,24 83:9
83:17
**2027**
78:8,19,22,23 79:2,8
79:11,19
**2040**
69:17 71:21
**206,305**
59:13
**21**
30:9 37:10 39:5 45:1

48:7
**22**
30:9 32:1 37:10 39:5
45:2 48:7
**220**
2:10
**23**
8:15
**23-cv-00789**
1:11
**23-CV-66**
11:7
**24**
3:16
**24-CV-720**
11:9
**24-17677-NI**
11:11
**25**
9:25 37:15 71:17
72:4 77:9
**26**
3:10,17 6:21 10:14
11:17 27:2,7 37:16
37:22 38:7,21 58:18
58:19 59:6 78:11,16
78:22
**26th**
28:15 79:9
**2600**
2:19
**27**
79:11
**29.9**
51:18

— **3** —

**3**
3:11 28:16 42:19,21
58:15 61:3,6,9,10
61:22 67:2,6 68:12
68:19 69:1 79:16
**3.0**
56:11,16 67:5
**3.4**
70:10 76:6,7

**3.7**
55:2,5,10,16,23
56:17,23 63:5,21
65:21,22
**3.70**
68:25
**3.77**
62:11 63:8,10 66:14
68:25 71:8,22 78:5
78:6 79:12
**3:24-CV-00217-JDP**
11:14
**3:25**
49:13,15
**3:36**
49:15,17
**3:42**
53:1
**3:44**
53:4
**30**
2:19 10:11 56:5,7,7,9
65:17
**30-year**
55:14 56:4 58:13,15
67:9,11
**344**
38:11
**365**
79:7
**380,276**
68:20
**381,419**
68:20

— **4** —

**4**
3:12 61:6 69:23
75:19 78:5 80:9
**4.3**
39:17,21 40:5,10,15
44:15,21 45:7,7,18
45:23
**4:41**
81:14
**4:42**



82:6
**401(k)**
17:7 39:22 42:5,12
42:20
**405,357**
60:4,18
**454**
76:1,2 77:12
**488,168**
70:9 80:14,18

---
**5**

**5**
3:3,9 70:2 76:23 77:1
**5th**
37:25
**50**
13:13,14,17 14:13
**5256**
75:17
**53098**
2:16
**53233**
2:11

---
**6**

**6**
3:16 29:5 43:8,9
**6th**
40:7
**6.2**
28:18
**60-some**
66:15
**60606**
2:20
**61**
3:11,12
**64**
21:19 25:18,20
**64.2**
70:3
**65**
24:20 35:24 36:15
**67**
31:15,23 32:8,16

59:10
**68**
31:16,23 32:8,10,12
32:15
**69,611**
66:13

---
**7**

**7**
29:6
**7,972**
78:9 79:6,16
**7.2**
41:15,17 42:9,25
43:3,6 44:12,24
45:2,12,22
**7.22**
41:1,9,24 42:4,17
45:14,19
**70**
8:18 9:23 10:11
32:22 33:16,17,20
33:25 34:2,3,12,19
35:4,6,9 36:3,16
60:9,18
**75**
13:13,14,17 14:13
60:10

---
**8**

**8,039**
79:18
**80**
8:19 9:23 10:11 12:5
32:11 33:20 51:11
60:10 62:24 70:21
**81.9**
70:3
**866-624-6221**
1:24
**89**
62:24
**89,000**
51:20
**89.9**
51:11

---
**9**

**9th**
2:10
**90**
51:22
**90-day**
58:14 67:8,9
**90/10**
10:8
**91**
67:15
**99.9**
51:22



MAGNA
LEGAL SERVICES