IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CARRI LOPEZ-MULVANEY, CONNOR MULVANEY, ESTATE OF RANDALL MULVANEY, C&L CONTRACTNG, INC., and AMERICAN INTERSTATE INSURANCE CO.,

Plaintiffs,

v.

FRASER SHIPYARDS, LLC and TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,

Defendants.

OPINION and ORDER

23-cv-789-jdp

---

Randall Mulvaney, a painter employed by plaintiff C&L Contracting, Inc., fell to his death while working onboard the barge *Integrity*, which was docked for maintenance and repairs at Fraser Shipyards in Superior, Wisconsin. Mulvaney's estate, his wife Carri, his son Connor, C&L Contracting, and C&L Contracting's workers compensation insurer American Interstate Insurance Company have sued Fraser and its insurer Travelers Property Casualty Company of America for negligence in connection with Mulvaney's death.

The case is scheduled for trial beginning October 5, 2026. This order addresses the pending motions to strike expert testimony and the motions in limine. It also identifies issues for further discussion at the September 9 final pretrial conference

ANALYSIS

**A. Motions to exclude expert testimony**

Both sides have moved to exclude testimony from the other side's expert witnesses. Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993) and *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999), the court must ensure that

proffered expert testimony meets the requirements of Rule 702. For testimony to be admissible under Rule 702, the individual proffering the testimony must be qualified as an expert, the expert's opinions must be based on reliable methods, and those methods must be reliably applied to the facts of the case.

As for qualifications, the question is not whether the expert is generally qualified in his or her field, but whether the expert has the necessary education and training to draw the conclusions he or she offers in the case at hand. *See Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). Experts may testify on the basis of practical experience as well as on the basis of formal education. *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000); *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000).

The test for reliability is necessarily flexible. *Daubert* identifies factors the court may consider when determining whether an expert's testimony is reliable—whether the expert's technique has been tested, subjected to peer review and publication, analyzed for errors, or is generally accepted—but these factors "neither necessarily nor exclusively appl[y] to all experts or in every case." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779–80 (7th Cir. 2017). The reliability inquiry focuses on the expert's methodology; that is, whether the expert exercised "soundness and care" in reaching his opinions. *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019). The inquiry does not ask whether the expert's ultimate conclusions are correct. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Gopalratnam*, 877 F.3d at 781 (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000))

Finally, expert evidence is relevant if it helps the jury understand a matter beyond the knowledge and experience of a layperson. *Daubert*, 509 U.S. at 591–92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."). Bottom-line conclusions are not helpful and must be excluded if the expert fails to explain how those conclusions are supported by the existing data. *Zamecnik v. Indian Prairie School Dist. No. 204*, 636 F.3d 874, 881 (7th Cir. 2011) ("Mere conclusions, without a hint of an inferential process, are useless to the court." (internal quotation marks and citation omitted)). Expert testimony is also irrelevant if it does not help the jury decide the facts at issue in the case. *Ancho v. Pentek Corp.*, 157 F.3d 512, 515 (7th Cir. 1998) (quoting *Wintz v. Northrop Corp.*, 110 F.3d 508, 512 (7th Cir. 1997)).

Federal Rule of Civil Procedure 26 requires most experts to disclose their opinions and the reasons for them in a timely expert report. *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998). The court's analysis of the admissibility of an expert's testimony is based on the opinions, conclusions, and the basis and reasons for them in the expert's report. *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008). An expert may not cure deficiencies in his report with later deposition testimony. *Id.* The proponent of expert evidence bears the burden of establishing that the expert's testimony is admissible. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

**1. Bruce Niendorf**

Bruce Niendorf is an economist whom plaintiffs retained to determine the value of Randall Mulvaney's lost earning capacity and domestic labor. Dkt. 203-5 (Niendorf report). Niendorf calculated that Mulvaney's lost earning capacity through age 70 was $405,357, and that his lost domestic labor through his life expectancy of 81.9 years was $488,168. *Id.*

Defendants don't challenge Niendorf's opinion about Mulvaney's lost earning capacity. But they contend that Niendorf's opinion about Mulvaney's lost domestic labor should be excluded because Niendorf did not explain the assumptions underlying his calculations.

To calculate Mulvaney's lost domestic labor, Niendorf used Wisconsin labor statistics to determine an average wage for the types of domestic labor that Mulvaney commonly did. Then, he applied that wage to calculate the value of Mulvaney's labor, assuming a life expectancy of 81.9 years and assuming that Mulvaney did an average of 3.4 hours of domestic labor per day (the average for men his age according to the 2023 American Time Use Survey). Finally, he adjusted for interest rate changes and the present value of money.

Defendants argue that Niendorf's opinion is unreliable because he used generic data without explaining how it applies to this case. In particular, defendants take issue with Niendorf's assumption that Mulvaney did 3.4 hours of domestic labor per day, because that assumption is based solely on the average for a man of Mulvaney's age, not on any analysis of Mulvaney's specific domestic labor habits. *See* Dkt. 203-6 (Niendorf Dep. 67:11–13). Defendants argue that the average value is not a useful input in this case, because there is evidence that Mulvaney did less work than average. Mulvaney's wife testified that he travelled often for work and was only home only about 20 percent of the time. Niendorf admitted in his deposition that he was aware that Mulvaney travelled a lot, but he didn't account for that fact in his domestic labor calculation. *Id.* at 67:17–20.

The court will grant the motion to exclude Niendorf's opinion under Rule 702. If Niendorf had explained why the generic data that he used accurately reflected Mulvaney's domestic labor, then defendants' arguments to the contrary would go to the weight of Niendorf's testimony, not its admissibility. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753,

766–67 (7th Cir. 2013) (where expert provided a reason for his assumptions, the soundness of those assumptions was a question of fact for the jury). But here, Niendorf failed to provide a "rational connection" between the generic data he used and Mulvaney's specific case. *Gopalratnam*, 877 F.3d at 781 (quoting *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013)). In fact, Niendorf admitted in his deposition that the generic data might not apply to Mulvaney's case because Mulvaney's wife said that he was not home very often. But Niendorf did not account for that fact in his calculations and he did not explain why.

Plaintiffs point to two out-of-circuit district court cases approving a domestic labor valuation based on the American Time Use Survey. *Bennett v. United States*, No. CV164439, 2018 WL 6265092 (C.D. Cal. Mar. 22, 2018); *Est. of Fouty v. Syrian Arab Republic*, No. CV 18-385, 2024 WL 4006166 (D.D.C. Aug. 30, 2024). Those cases are not persuasive. In *Bennett*, the plaintiff's expert valued Bennett's domestic labor based on the number of hours of domestic labor a "person like Bennett" would typically perform over his lifespan. 2018 WL 6265092, at *6. But the court did not explain how the expert determined the number of hours for a "person like Bennett," so it's not clear how the expert's analysis in *Bennett* compares to Niendorf's. Similarly, in *Fouty*, the court noted that the plaintiff's expert had used the American Time Use Survey, but it did not explain how the expert had applied that data to the facts of the plaintiff's case. 2024 WL 4006166, at *18. The reasoning in *Bennett* and *Fouty* is simply too sparse to allow for any useful comparison with this case.

The court concludes that Niendorf failed to explain how he applied his methodology for calculating the value of lost domestic labor to the facts of this case. His opinion on that issue is inadmissible under Rule 702.

**2. Brad Grunert**

Defendants also move to exclude the testimony of Brad Grunert, a psychologist who opined that Randall Mulvaney would have experienced "panic, terror, and horror" during the brief fall to his death. Dkt. 203-7. Plaintiffs respond that they aren't offering Grunert as a witness, so the court will deny the motion to exclude as moot.

**3. Jay Todd**

Jay Todd is a psychologist retained by defendants to testify about the range of conscious emotions Mulvaney may have experienced during his deadly fall. Dkt. 204 (Todd expert report). Todd was originally retained as a rebuttal witness to Brad Grunert. After plaintiffs decided to withdraw Grunert, they asked defendants to voluntarily withdraw Todd, but defendants declined to do so. Now, plaintiffs seek to exclude Todd's opinions under Rule 702 as irrelevant and unhelpful.

As an initial matter, defendants don't dispute that Todd's rebuttal opinions are irrelevant, because Grunert isn't going to testify. *See* Dkt. 212, at 5 ("Since Dr. Grunert is not testifying at trial, there is no need for Dr. Todd to criticize his opinions"). So the court will consider only Todd's two non-rebuttal opinions. First, Todd opined that Mulvaney would have had limited conscious experience of what was happening, because the fall lasted only 1.6 to 2.0 seconds and it would have taken Mulvaney's brain at least half a second to produce a fear response. Second, Todd opined that the yell that several of Mulvaney's coworkers heard him make as he began to fall may have been an involuntary reaction as opposed to a conscious indicator of fear.

The court will exclude both of Todd's opinions. Todd's first opinion was that Mulvaney did not have enough time before impact to have an "in-depth conscious experience" of the fall.

Dkt. 204, at 4–6. Todd explained that it takes 0.3 to 0.5 seconds for the brain to process a fear-inducing stimulus and produce the feeling of fear, and even longer for the brain to develop "more complex emotional responses" such as panic, terror, and horror. (Todd did not say how much longer these complex responses would take.) Mulvaney's 42-foot fall would have lasted 1.6 to 2.0 seconds, so according to Todd, he had only 1.1 and 1.7 seconds to consciously process fear before impact.

The court concludes that Todd's opinion about Mulvaney's conscious experience of the fall would be unhelpful to the jury's evaluation of the relevant issues. The court of appeals has held that expert testimony does not help the jury if it addresses issues "of which the jury is already generally aware." *United States v. McLain*, 146 F.4th 602 (7th Cir. 2025). Defendants argue that that's not the case here, because, although laypersons know what fear feels like, they "do not know how long the brain takes to register and process conscious fear, or whether a roughly two-second window permits the sequence of panic terror, and horror Plaintiffs describe." That's true, but defendants don't say why the brain's processing time matters here. If Todd had opined that Mulvaney hadn't had time to experience any fear, that would be another matter. But Todd's opinion is that Mulvaney had 1.1 to 1.7 seconds to experience fear, as opposed to 1.6 to 2.0 seconds. That's a trivial difference that adds nothing to what jurors would already know from common knowledge, which is that it took Mulvaney a couple seconds to fall to his death. How much fear Mulvaney experienced during that short time period is up to the jury to decide, and Todd's testimony would not aid in that decision.

For the same reason, the court will also exclude Todd's opinion that Mulvaney's yell may have been an involuntary reaction as opposed to a conscious indicator of fear. Todd says that peer-reviewed research distinguishes between yelling ("communication using sounds that

are components of language") and screaming ("meaning is communicated by the profile of the non-language sounds"). He says that the lay witnesses that described Mulvaney's sound as a yell may not have understood this distinction, so Mulvaney's sound may actually have been a scream. If so, "peer-reviewed studies show that screaming is not purely an indicator of conscious awareness or foresight; it can be an involuntary or instinctive reaction to non-fear-related stimuli, such as being startled by a sudden loss of balance or being surprised by another person." Dkt. 204, at 8.

Todd's testimony about Mulvaney's yell would be confusing and unhelpful to the jury. His analysis consists of semantic distinctions between yelling and screaming and between being startled, experiencing fear, and experiencing surprise. But these noises and emotions are within the common experience of jurors, and the technical definitions would not help them evaluate what happened to Mulvaney. It will be up to the jury to listen to the lay testimony about Mulvaney's yell and determine what inferences to draw from that testimony.

**B. Plaintiff's motions in limine**

**1. Exclude evidence of C&L Contracting's negligence**

Randall Mulvaney's employer C&L Contracting is a plaintiff in this case for the purpose of enforcing a lien for the workers' compensation benefits that it paid to Mulvaney's family under the Longshore and Harbor Workers' Compensation Act (LHWCA). Because it paid these benefits, the LHWCA bars Mulvaney's family from recovering any damages from C&L Contracting for negligence in connection with Mulvaney's death. 33 U.S.C § 905(a). C&L Contracting is not bringing any claims of its own against defendants, and defendants' counterclaims against C&L Contracting were dismissed on summary judgment. Dkt. 188.

Plaintiffs contend that because the LHWCA protects C&L Contracting from liability, evidence that C&L Contracting's negligence contributed to Mulvaney's death is irrelevant. Plaintiffs point out that federal maritime law employs a comparative negligence approach, under which liability is allocated among the parties proportionate to the comparative degree of their fault. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975). Damages are reduced by the proportion of fault allocated to the plaintiff. *Id.* But all tortfeasors are jointly and severally liable for the remaining damages, even if one tortfeasor is protected from liability under the LHWCA. *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 266 (1979). That means that if a jury finds Fraser even one percent at fault for Mulvaney's fall, Fraser will be jointly and severally liable for the proportion of damages allocated to all parties other than Mulvaney, including C&L Contracting. *Id.*

Defendants don't dispute these general principles. But they argue that evidence of C&L Contracting's negligence is still relevant, because a jury could find that C&L Contracting was the *only* tortfeasor, compelling a liability verdict for Fraser. The court agrees. Whether Fraser is at fault for Mulvaney's fall is the critical liability question in this case, and the jury must weigh the actions of all involved parties, including C&L Contracting, to answer that question.

Plaintiffs cite a series of cases from the Eleventh Circuit for the proposition that non-party tortfeasors' actions are irrelevant. *Wiegand v. Royal Caribbean Cruises Ltd.*, 473 F. Supp. 3d 1348, 1351 (S.D. Fla. 2020) (citing *Ebanks v. Great Lakes Dredge & Dock Co.*, 688 F.2d 716 (11th Cir. 1982)); *Farley v. Magnum Marine Corp., N.V.*, No. 89-0725-CV, 1995 WL 795711 (S.D. Fla. June 9, 1995). These cases are not instructive, for two reasons. First, C&L Contracting *is* a party to this action, so there is no concern that it would be unfair to plaintiffs to have to fight a battle on behalf of a party who is not before the court. *See Ebanks*, 688 F2d

at 718. Second, *Ebanks* and the related district court decisions were about how the jury should apportion liability on the verdict form, not about whether evidence that non-parties were at fault is relevant. In fact, the court in *Ebanks* explicitly stated that that evidence was relevant:

> Appellees . . . contend that the position taken by the appellants amounts to their saying that it was improper for the trial court to hear any evidence about the acts of the [non-party] which would tend to exculpate the dredge from liability. The appellants make no such claim. Of course, they recognize that it was appropriate for the witnesses . . . to tell exactly what happened as the [non-party's boat] bore down on the dredge and its barge, thus clearly showing that it was an act of the [non-party] that created havoc among the crew of the dredge.

*Id.* at 719.

The court will deny plaintiff's first motion in limine. Defendants may introduce evidence about C&L Contracting's actions that may have contributed to Mulvaney's fall.[1]

**2. Exclude evidence that C&L Contracting paid workers compensation benefits to Randall Mulvaney's family**

Citing the collateral source rule, plaintiffs move to exclude evidence that C&L Contracting paid workers compensation benefits to Randall Mulvaney's family after his death. The court will grant that motion in limine as unopposed.

**3. Sequester non-party witnesses**

Plaintiffs move to sequester non-party witnesses (except for experts) prior to their testimony under Federal Rule of Evidence 615(a). Defendants do not oppose the motion, with the clarification that they may designate a corporate representative to sit in the courtroom throughout the trial. Defendants are correct that business entity parties may designate an

---

[1] Plaintiffs also asked the court to exclude C&L Contracting from the verdict form. But that isn't a proper subject for a motion in limine because it's not an evidentiary issue. The court will address that issue when it turns to the parties' proposed verdict forms.

officer or employee as a representative and that that person may not be excluded from the courtroom. Fed. R. Evidence 615(a)(2). The court will grant the motion in limine as unopposed.

### 4. Exclude untimely expert opinions and limit expert testimony to the opinions in the expert reports

Plaintiffs move to "exclude untimely expert opinions and specifically limit expert testimony to the opinions expressed in their reports." Dkt. 194, at 6. The court will deny this motion as unnecessary. Plaintiffs don't identify any specific testimony that they want excluded, so they are essentially reiterating the requirements of Federal Rules of Civil Procedure 26(a)(2) and 37(c)(1).

### 5. Exclude testimony of Jay Todd

The court granted this motion in limine above. *See* Section A.3.

## C. Defendants' motions in limine

### 1. Bar evidence of mental anguish and grief

In *Sea-Land Services v. Gaudet*, 414 U.S. 573 (1974), the Supreme Court held that the dependents of a deceased longshoreman could recover under federal maritime law for "loss of support, services, and society, as well as funeral expenses." *Id.* at 584. Loss of support means "the financial contributions that the decedent would have made to his dependents had he lived." *Id.* at 584–85. Loss of services means the "monetary value of services the decedent provided and would have continued to provide but for his wrongful death," including "the nurture, training, education, and guidance that a child would have received" and the household services that the decedent performed at home for his spouse. *Id.* at 585. Loss of society "embraces a broad range of mutual benefits each family member receives from the others'

continued existence, including love, affection, care, attention, companionship, comfort, and protection." *Id.* But in a footnote, the court noted that loss of society "must not be confused with mental anguish or grief, which is not compensable under the maritime wrongful-death remedy. The former entails the loss of positive benefits, while the latter represents an emotional response to the wrongful death." *Id.* n.17.[2]

Citing *Sea-Land Services*, defendants seek to prevent Carri Lopez-Mulvaney and Connor Mulvaney from testifying about their grief and mental anguish following Randall Mulvaney's death. Plaintiffs agree that grief and mental anguish aren't compensable, but they argue that there is no reasonable way to bar this testimony, because Carri and Connor's grief is inextricably entwined with the love, affection, care, and companionship that they received from Randall. Plaintiffs argue that the line between compensable loss of society damages and non-compensable grief damages is better addressed by a jury instruction as opposed to an order barring certain testimony.

The court agrees with plaintiffs that there is no reasonable way to draw a line that would allow plaintiffs to testify about the love, affection, care, and companionship that they received from Randall, but that would prevent them from testifying about their grief. The court will deny the motion in limine. However, the court expects plaintiff's counsel to focus their questioning of Carri and Connor on the positive benefits that they received from their relationship with Randall, as opposed to the negative emotions that they experienced after his death. The court will allow some leeway on this issue. But if the questioning strays too far

[2] Portions of *Sea-Land Services* have been superseded by statute, as the Court recognized in *Miles v. Apex Marine Corp.*, 498 U.S. 19, 30–31 (1990). But the parties agree that *Sea-Land Services*'s guidance on damages remains in effect for individuals like Mulvaney who were injured in territorial waters as opposed to on the high seas.

beyond the compensable damages into plaintiffs' non-compensable grief and anguish, the court will be receptive to objections from defendants.

Defendants have also moved to exclude the testimony of Lori Unger, a psychiatric nurse practitioner who treated Carri Lopez-Mulvaney following Randall's death. (This is defendants' ninth motion in limine, but the court will address it here because it involves the same issue about grief and mental anguish). Unger's testimony will concern the psychological conditions that Carri suffered after Randall's death, including anxiety, depression, and bereavement. Defendants argue that Unger's testimony is irrelevant because it concerns Carri's non-compensable grief and mental anguish. Plaintiffs counter that Unger has knowledge of the close relationship between Carri and Randall, and thus her testimony is relevant to Carri's loss of society damages.

The court will grant the motion to exclude Unger's testimony. Unlike Carri and Connor's testimony, Unger's testimony exclusively concerns the negative effects that Randall's death had on Carri; it is not relevant to the jury's determination of the positive benefits that Carri received due to her relationship with Randall. Any testimony that Unger would offer on the "close relationship" between Carri and Randall would just be secondhand testimony about what Carri told her. The jury can hear that testimony from Carri herself.

**2. Exclude evidence of OSHA citations and penalties**

After Randall Mulvaney's fall, OSHA cited both C&L Contracting and Fraser for violations of federal workplace safety regulations. Dkt. 203-1 and Dkt. 203-2. The OSHA Area Director also sent a letter to Carri Lopez-Mulvaney informing her about the citations and expressing sympathy for Carri's loss. Dkt. 203-1, at 2. Defendants move to exclude the citations and letter, contending that they are irrelevant, Fed. R. Evidence 401 and 402; that they are

hearsay, Fed. R. Evidence 801(c); and that the risk of unfair prejudice substantially outweighs the probative value, Fed. R. Evidence 403.

As an initial matter, plaintiffs say that they do not intend to introduce the sympathy letter from the OSHA Area Director to Carri Lopez-Mulvaney. The court will grant that part of the motion as unopposed.

The court will also grant the motion to exclude the OSHA citations under Rule 403. (The court need not consider defendants' other arguments for exclusion.) The citations show that OSHA charged both C&L Contracting and Fraser with "serious" violations of 29 C.F.R. § 1915.73(d), a regulation that requires ships to have guardrails in most places with drop-offs of more than five feet. Dkt. 203-1, at 12; Dkt. 203-2, at 7. Plaintiffs point out that OSHA regulations are evidence of whether a particular workplace condition creates an unreasonable risk of harm. *Elberg v. Mobil Oil Corp.*, 967 F.2d 1146, 1151 (7th Cir. 1992); *Jones v. Spentonbush-Red Star Co.*, 155 F.3d 587, 595–96 (2d Cir. 1998); *see also Henderson v. Chemtool Inc.*, No. 21 CV 50285, 2022 WL 2818718, at *2 (N.D. Ill. July 19, 2022). But the probative value of the OSHA citations for that purpose is limited, because neither side disputes that the gap in the guardrail that Mulvaney fell through created an unreasonable risk of harm. Both sides' experts readily agreed to that fact, *See* Dkt. 141, at 15; Dkt. 139, at 4, and it's a matter of common sense.

In addition to the limited probative value, the OSHA citations carry a substantial risk of unfair prejudice and confusion of the issues. The crux of this case is whether Fraser breached a duty of ordinary care under the circumstances by failing to barricade the gap in the guardrail or otherwise prevent Mulvaney's fall. *See In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010). Fraser's theory is that it had no obligation to do so because C&L

Contracting was responsible for safety on the *Integrity* worksite, not Fraser. The OSHA citations aren't relevant to whether Fraser breached its duty of ordinary care, because the standard that OSHA used in deciding to cite Fraser is different from the negligence standard: all OSHA had to find was that the regulation was violated and that Fraser was an "employer" under the occupational safety laws. *See* 29 U.S.C. § 654(a)(2). Any inference that Fraser must have been negligent because it was cited by OSHA would be improper. But there's a substantial risk that a jury would make that improper inference if the citations were admitted. The court will grant defendants' second motion in limine and exclude the OSHA citations and related testimony.

**3. Exclude evidence of OSHA standards**

Defendants also move to exclude any reference to OSHA standards that may have been violated at the *Integrity* worksite, contending that they are irrelevant because Fraser was not Mulvaney's "employer" and thus was not responsible for complying with OSHA standards. Plaintiffs dispute that point, but it is ultimately irrelevant. As the court already discussed, OSHA standards are relevant to whether a particular condition creates an unreasonable risk of harm, *Elberg*, 967 F.2d at 1151, so plaintiffs can introduce the OSHA standards to establish that the gap in the guardrail was dangerous. Unlike the OSHA citations, this will not pose a substantial risk of undue prejudice or jury confusion. The mere fact that an OSHA standard was violated does not imply that Fraser was responsible for the violation.

**4. Exclude evidence about OSHA Multi-Employer Citation Policy**

Defendants' fourth motion in limine also concerns OSHA. Citing Rule 403, defendants ask the court to exclude any reference or testimony about OSHA's "Multi-Employer Citation Policy" (MEP), which governs enforcement actions on worksites involving multiple employers. The MEP states that "[o]n multi-employer worksites (in all industry sectors), more than one

employer may be citable for a hazardous condition that violates an OSHA standard." Occupational Safety and Health Administration, U.S. Department of Labor, *Multi–Employer Citation Policy,* CPL 2–0.124 (1999). The MEP also provides a two-step process for OSHA inspectors to determine whether multiple employers should be cited. First, the inspector classifies employers as "creating," "exposing," "correcting," or "controlling" employers based on their role at the worksite and their relationship to the hazardous condition. Second, the inspector reviews whether the employer met its OSHA obligations based on its specific classification. *Id.*

Both parties' experts used the MEP classification system as a guideline to explain C&L Contracting and Fraser's respective roles on the *Integrity* worksite. Dkt. 139 (Kenneth Smith); Dkt. 140 (Claudio Crivici); Dkt. 141 (Marshall Krotenberg). Defendants want to prevent these experts, and any other witnesses, from referring to the classification system in their testimony, arguing that the "creating," "exposing," "correcting," and "controlling" labels are irrelevant and would be confusing to the jury.

Defendants rely primarily on *Aguirre v. Turner Construction Company*, 582 F.3d 808, 815 (7th Cir. 2009). In that case, a construction worker who had fallen from some scaffolding sued the construction project's general contractor for negligence under Illinois law. After a jury found for the general contractor, the construction worker appealed, challenging several evidentiary decisions and jury instructions. As relevant here, the construction worker asserted that the judge had impermissibly narrowed the scope of allowable testimony about whether the general contractor was a "controlling" employer under the MEP. The Seventh Circuit decided that the issue wasn't properly before the court, because the plaintiff had voluntarily decided not to ask his expert about that issue. *Id.* But the court also wrote that "[t]he only effect of the OSHA

policy statement before the jury would have been to confuse it about the significance of 'control' by pasting the label 'controlling employer' on the defendant." *Id*. Defendants rely on that statement to argue that the MEP classification labels would distract the jury from the relevant negligence standard and introduce unfair prejudice.

The court concludes that *Aguirre* does not compel exclusion of the MEP labels in this case. As an initial matter, the court in *Aguirre* found that the word "controlling" would be confusing because the plaintiff in that case was relying on the doctrine of *res ipsa loquitor*, so the jury had to find that the instrument that caused the plaintiff's injury was under the defendant's "control." *Id.* at 811. Here, the labels don't map onto the elements that plaintiffs need to prove in the same way, which lowers the risk of jury confusion.

More importantly, both the *Aguirre* court and other courts have recognized that OSHA guidance is relevant to determine "what due care should require." *Id.* at 815; *see also Reed v. Malone's Mech., Inc.*, 765 F.3d 900, 910 (8th Cir. 2014); *Pedraza v. Shell Oil Co.*, 942 F.2d 48, 52 (1st Cir. 1991). That's how both parties' experts have used the MEP in their expert reports: they rely on it to explain what C&L Contracting and Fraser's duties were at the worksite based on their respective employer classifications. That testimony is highly probative, because the key issue in this case is whether Fraser's duty of ordinary care required it to barricade the gap in the guardrail or otherwise prevent workers from falling through that gap.

The court concludes that the probative value of the MEP testimony is not outweighed by the risk of jury confusion or the unfair prejudice. The motion in limine will be denied.

Defendants' multiple motions about the role of OSHA-related evidence in this case raise the question whether a jury instruction is needed to clarify how the jury should consider the

OSHA evidence. The parties should be prepared to discuss that issue at the final pretrial conference.

**5. Exclude Fraser's contract with vessel owner**

Defendants move to exclude a contract between Fraser and the owner of *Integrity*, in which Fraser agreed that it was "solely responsible for the safety of its workers, subcontractors, Owner's Representative, and outside contractors." Dkt. 152-1, at 3. Defendants say that the contract is irrelevant and would confuse the jury, because the parties to the contract are Fraser and the non-party owner of *Integrity*, not Fraser and C&L Contracting.

The court sees no reason to exclude the contract. It is relevant, because even though *Integrity*'s owner is not a party, the contract establishes Fraser's role on the project, which is relevant to its duty of ordinary care under the circumstances. *See Bubla v. Bradshaw*, 795 F.2d 349, 353 (4th Cir. 1986) (maritime negligence standard is duty of ordinary care, which requires guarding against reasonably foreseeable risks); *Hoida, Inc. v. M & I Midstate Bank*, 717 N.W.2d 17 (Wis. 2006) (contracts "assist[] us in determining what would be reasonable . . . to foresee under the circumstances"). Nor does the court see how the contract would be confusing or overly prejudicial to Fraser. Fraser can establish on cross-examination that C&L Contracting was not a party to the contract, and it can introduce its own evidence to show whether it delegated any of its responsibility for safety to C&L Contracting.

Defendants also ask the court to exclude two opinions from plaintiffs' expert Kenneth Smith about the contracts between the parties in this case, arguing that they are legal conclusions, not proper expert opinions. See *RLJCS Enterprises, Inc. v. Professional Benefit Trust Multiple Employer Welfare Benefit Plan & Trust*, 487 F.3d 494, 498 (7th Cir. 2007) ("Argument

about the meaning of . . . contracts . . . belongs in briefs, not in 'experts' reports"). Specifically, defendants take issue with the following opinions:

- Normally a contract exists between a shipyard and contractors hired by the shipyard which makes clear the responsibilities of the parties with respect to indemnification, communication, mitigation, and correction of safety hazards and deficiencies. No such contract was produced in response to requests for appropriate documents.
- According to the contract between the owners (Holcim and Andrie) and Fraser, Fraser assumed responsibility for correction of safety deficiencies, specifically including protecting gaps in guardrails. Fraser failed to properly perform that responsibility. Had Fraser properly identified and corrected the hazard caused by the gap in the guardrail on Integrity, the accident would have been prevented.

Dkt. 139, at 25.

The court will not exclude the first opinion. That opinion concerns the ordinary practice when shipyards employ contractors such as C&L Contracting. Smith can testify about that. Fraser does not contend that he is not qualified to testify on that issue, and it's plainly relevant. Fraser did not have a written contract with C&L Contracting, and the jury is entitled to consider whether that deviation from ordinary shipyard practice was negligent.

The court will not exclude the second opinion either. Smith may testify that the accident would have been prevented if Fraser had identified and corrected the gap in the guardrail, because that is a proper expert opinion. And Smith may refer to the contract between Fraser and *Integrity*'s owner in doing so, because the contract is part of the factual circumstances that Smith considered. Smith is not providing a legal interpretation of the contract; he's explaining how the contract's plain meaning figured into his ultimate conclusions.

### 6. Bar evidence of subsequent remedial measures

After Mulvaney's fall, Fraser welded a guardrail over the gap where he fell, which remained in place until the end of the maintenance work on *Integrity*. Workers also wore personal fall arrest systems on the deck of *Integrity* after the accident. Defendants move to exclude evidence of these safety measures under Federal Rule of Evidence 407, which bars evidence of subsequent remedial measures "to prove negligence [or] culpable conduct." Rule 407 allows the introduction of subsequent remedial measures for other purposes, including "providing ownership, control, or feasibility of precautionary measures, if controverted, or impeachment." *Id.*

In their response, plaintiffs focus on Fraser's post-accident installation of a guardrail. They don't address the personal fall arrest systems, so that issue is forfeited, and the court will grant the motion to exclude that evidence.

As for the guardrail, plaintiffs argue that it is admissible for multiple reasons, but the court need discuss only one. Rule 407 allows subsequent remedial measures to be admitted to prove "control" if that issue is disputed. *See also Wallner v. Kitchens of Sara Lee, Inc.*, 419 F.2d 1028, 1032 (7th Cir. 1969) (evidence that defendant bakery fixed a malfunctioning conveyer after it injured the plaintiff was admissible to rebut the bakery's contention that a contractor was responsible for maintenance and repairs to the conveyor). In this case, control is one of the key issues: Fraser Shipyards asserts that C&L Contracting controlled the *Integrity* worksite at the time of the accident, and plaintiffs assert that Fraser controlled the worksite at least for the purpose of maintaining safety. Plaintiffs are entitled to introduce evidence that Fraser welded a guardrail over the opening after the accident to rebut Fraser's contention that it lacked control over the worksite. The court will deny the motion in limine.

In their response to this motion in limine, plaintiffs appear open to a limiting instruction to inform the jury that it may not consider the subsequent remedial measures as evidence of negligence. The parties should be prepared to discuss whether a limiting instruction is warranted on this issue at the final pretrial conference, and if so, what the scope of the instruction should be.

**7. Exclude evidence of death benefits paid to plaintiffs**

Defendants move to exclude evidence that C&L Contracting and its insurer paid death benefits to plaintiffs, and to prevent plaintiffs from telling the jury that their damages award would be offset or reduced based on the death benefits already paid. The court will grant this motion in limine as unopposed.

**8. Exclude references to insurance companies, including defendant Travelers**

Defendants seek to exclude any reference to the fact that Faser is insured, citing Federal Rule of Evidence 411, which provides that evidence of insurance coverage is not admissible to prove whether a party acted negligently or wrongfully. Defendants also request that Fraser's insurer Travelers Property Casualty Company of America not be listed in the case caption on any materials given to the jury.

Plaintiffs agree that evidence of Fraser's insurance is irrelevant, but they argue that Travelers is a named party, so "there should not be an order to ignore Travelers exists." Dkt. 211, at 21. But plaintiffs cite no authority requiring that the jury be told the name of every party to the case, and this court's usual practice is to remove the names of parties that are in the case solely for the purpose of indemnification. *E.g.*, *Blaha v. Sauk Cnty.*, No. 24-cv-834-jdp, 2026 WL 357566 (W.D. Wis. Feb. 9, 2026). The court will grant the

motion in limine. Neither party should refer to Travelers as a party in front of the jury, and documents shown to the jury should not include references to insurance companies.

**9. Exclude testimony of Lori Unger**

The court granted this motion in limine above. *See* Section C.1.

**10. Exclude testimony of Bruce Niendorf about lost domestic services**

The court granted this motion in limine above. *See* Section A.1.

**11. Bar arguments about punitive damages in opening statements**

Defendants ask the court to "preclude any reference to punitive damages prior to Plaintiffs establishing a *prima facie* case for punitive damages." Dkt. 203, at 18. The wording of this motion is confusing. At first, it seems that defendants are asking for a limited prohibition preventing plaintiffs from mentioning punitive damages in their opening statement. Defendants say that they anticipate moving for a directed verdict on this issue at the close of plaintiff's case, so it would be prejudicial and confusing for the jury to hear about the possibility of punitive damages before then. But later, it seems that defendants are asking for a broader prohibition on all testimony or evidence relevant to the punitive damages issue, although they don't provide any specific reasons to exclude that evidence.

If defendants are requesting a broader prohibition on punitive damages evidence, that argument is undeveloped and the court will reject it on that basis. The request to preclude references to punitive damages in opening statements will be granted as unopposed.

**12. Exclude testimony of Brad Grunert**

The court denied this motion in limine as moot above. *See* Section A.2.

**13. Exclude body cam footage of Mulvaney's body after the fall**

Defendants ask the court to exclude body cam footage of responding police officers and paramedics performing CPR and other first aid on Mulvaney after the fall, which show Mulvaney with bloody wounds on his head, mouth, and face. The court will grant this motion in limine as unopposed.

**14. Exclude witness testimony about Mulvaney's body after the fall**

In a similar vein, defendants move to exclude witness testimony about the condition of Mulvaney's body after the fall. Defendants identify the following testimony from Fraser Safety Manger Amanda Sayle as the type of testimony that should be excluded:

> Q: Okay. You indicated in the statement, He had blood spurting out of his head and mouth as chest compressions were being performed. That part's still—is in your memory?
>
> A: Yes.

Dkt. 129 (Sayles Dep. 30:22–31:1).

Defendants argue that it is undisputed that Mulvaney died on impact, so the condition of his body is irrelevant to his pain and suffering or any other issue in the case. In response, plaintiffs simply assert generally that "[t]his testimony is relevant and helpful to understanding what happened on the day Mr. Mulvaney tragically died." Dkt. 211, at 31. But plaintiffs don't identify any specific fact of consequence that would be made more or less probable by this evidence. *See* Fed. R. Evidence 401. The court agrees that the condition of Mulvaney's body or the medical care that he received after the fall is irrelevant, so the court will grant the motion to exclude that testimony.

### 15. Exclude video of the incident

Defendants seek to exclude surveillance video of the fall under Rule 403, arguing that the video is "grainy," that its probative value is "slight in light of the witness testimony as to how the incident occurred," and that it is unfairly prejudicial. The court will deny the motion. The surveillance video is grainy (the camera was located far away), but defendants don't explain why that merits exclusion, nor do they provide any reason why they believe that there is a risk of unfair prejudice here.

## D. Other issues for final pretrial conference

There is one other issue that the parties should be prepared to discuss at the final pretrial conference. Plaintiffs contend that Wisconsin's safe-place statute, Wis. Stat. 101.11, applies to this case, and they have requested that the jury be instructed accordingly. Dkt. 190, at 12. Defendants object to this proposed instruction, stating that the "heightened duty of care under the Wisconsin Safe Place statute conflicts with the ordinary care standard under maritime law." Dkt. 215, at 4. From the court's own research, it appears that defendants are correct that any conflict between substantive maritime law and Wisconsin negligence law would require the application of maritime law. *See Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 628 (1959); *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 210 (1996). But the Supreme Court has recognized some situations in which state law can supplement federal maritime law. *Yamaha*, 516 U.S. 199 (wrongful death remedies). The parties should be prepared to discuss whether federal maritime law precludes any application of the safe-place statute here.

## ORDER

IT IS ORDERED that:

1. The court rules on plaintiff Carri Lopez-Mulvaney, Connor Mulvaney, and Estate of Randall Mulvaney's motions in limine, Dkt. 194, as follows:

    a. Plaintiff's first motion in limine to exclude evidence of C&L Contracting's negligence is DENIED.

    b. Plaintiff's second motion in limine to exclude evidence of workers' compensation benefits is GRANTED as unopposed.

    c. Plaintiff's third motion in limine to sequester non-party witnesses is GRANTED as unopposed.

    d. Plaintiff's fourth motion in limine to exclude untimely expert opinions and limit expert testimony to opinions in reports is DENIED as unnecessary.

2. The court rules on defendant Fraser Shipyards' motions in limine, Dkt. 203, as follows:

    a. Defendant's first motion in limine to bar evidence of mental anguish and grief is DENIED.

    b. Defendant's second motion in limine to exclude OSHA citations and penalties is GRANTED.

    c. Defendant's third motion in limine to exclude OSHA standards is DENIED.

    d. Defendant's fourth motion in limine to exclude OSHA's Multi-Employer Citation Policy is DENIED.

    e. Defendant's fifth motion in limine to exclude Fraser's contract with the vessel owner is DENIED.

    f. Defendant's sixth motion in limine to exclude subsequent remedial measures is GRANTED for evidence that workers wore personal fall arrest systems. It is DENIED for evidence that Fraser welded a guardrail over the gap where Mulvaney fell.

    g. Defendant's seventh motion in limine to exclude death benefits is GRANTED as unopposed.

h. Defendant's eighth motion in limine to exclude references to insurance companies is GRANTED.

i. Defendant's ninth motion in limine to exclude the testimony of Lori Unger is GRANTED.

j. Defendant's tenth motion in limine to exclude the testimony of Bruce Niendorf about lost domestic services is GRANTED.

k. Defendant's eleventh motion in limine to exclude arguments about punitive damages in opening statements is GRANTED as unopposed. The motion is otherwise DENIED.

l. Defendant's twelfth motion in limine to exclude the testimony of Brad Grunert, is DENIED as moot.

m. Defendant's thirteenth motion in limine to exclude body cam footage of Mulvaney's body is GRANTED as unopposed.

n. Defendant's fourteenth motion in limine to exclude testimony about Mulvaney's body is GRANTED.

o. Defendant's fifteenth motion in limine to exclude surveillance video footage is DENIED.

Entered August 19, 2026.

BY THE COURT:

/s/

JAMES D. PETERSON
District Judge